## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Commonwealth of Pennsylvania, By Attorney General Josh Shapiro<br><br>      Plaintiff,<br><br>      v.<br><br>Navient Corporation and Navient Solutions, LLC,<br><br>      Defendants. | Case No. _____<br><br><br>(Electronically Filed) |

## COMPLAINT FOR PERMANENT INJUNCTION AND OTHER RELIEF

*Table of Contents*

Introduction, Jurisdiction, Venue, Parties, and Background ....................................2

Factual Allegations

I.    Origination of Loans...........................................................13
II.   Servicing of Loans............................................................24

Claim for Relief - Origination of Loans

Count I: State Law - Unfair and Deceptive Origination of Loans..........................46

Claims for Relief - Servicing of Loans

Count II: State Law - Steering Borrowers into Forbearance ...................................49
Count III: Federal Law - Steering Borrowers into Forbearance.............................50
Count IV: State Law - Servicing Failures Related to Recertification ....................52
Count V: Federal Law - Servicing Failures Related to Recertification...................54
Count VI: State Law - Misrepresentations Related to Cosigner Release................56
Count VII: Federal Law - Misrepresentations Related to Cosigner Release...........58
Count VIII: State Law - Repeated Payment Processing Errors..............................59
Count IX: Federal Law - Repeated Payment Processing Errors ............................60

Prayer for Relief…...................................................................62

The Commonwealth of Pennsylvania, by Attorney General Josh Shapiro, through the Bureau of Consumer Protection (Commonwealth) brings this action against Navient Corporation and Navient Solutions, LLC (collectively, Defendants or Navient) and alleges the following:

## **INTRODUCTION**

1.      The Commonwealth brings this action pursuant to the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1, *et seq.* (Consumer Protection Law), to restrain unfair methods of competition or unfair or deceptive acts or practices in the conduct of any trade or commerce declared unlawful by Section 201-3 of the Consumer Protection Law, and to prevent unfair, deceptive, or abusive acts or practices under the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. § 5552(a).

2.      At all times relevant hereto, Defendants engaged in trade and commerce by offering, selling, marketing and promoting student loans to borrowers and by servicing and collecting on borrowers' student loans.

3.      Defendants maintain a large student loan servicing center located at 220 Lasley Ave, Wilkes-Barre, PA 18706, with approximately 1,000 employees.

4.      Defendants have engaged in practices that have harmed countless student loan borrowers by: (a) peddling risky and expensive subprime loans that they knew or should have known were likely to default, and (b) while servicing

student loans, failing to perform core servicing duties, thereby causing harm to borrowers and cosigners.

5.     Defendants are using, have used, or are about to use methods, acts, or practices declared unlawful by Section 201-3 of the Consumer Protection Law and/or by Section 1036 of the CFPA.

6.     The CFPA, which prohibits "unfair, deceptive or abusive acts or practices," explicitly delegates to state attorneys general the authority to bring federal civil enforcement actions in order to enforce the Act and to secure remedies provided therein. 12 U.S.C. § 5552(a)(1). This provision is subject to a requirement that an attorney general provide prior notice to the Consumer Financial Protection Bureau (CFPB). The Commonwealth has provided such notice.

7.     Sections 1031 and 1036 of the CFPA prohibit a "covered person" from committing or engaging in any "unfair, deceptive or abusive act or practice" in connection with any transaction with a borrower for a consumer financial product or service, or the offering of a consumer financial product or service. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B). Defendants are "covered person[s]" within the meaning of the CFPA. 12 U.S.C. § 5481(6).

8.     An act or practice is unfair if it causes or is likely to cause substantial injury to consumers, which is not reasonably avoidable by consumers, and such substantial injury is not outweighed by countervailing benefits to consumers or to

3

competition. 12 U.S.C. § 5531(c). A representation is deceptive if: (1) it misleads or is likely to mislead the borrower; (2) the borrower's interpretation of the representation is reasonable under the circumstances; and (3) the misleading representation is material. An act or practice is abusive if it, among other things, takes unreasonable advantage of the reasonable reliance by the consumer on a covered person to act in the interests of the consumer. 12 U.S.C. § 5531(d).

9.     The Commonwealth alleges that all of the practices described in the Complaint below herein were performed willfully. Accordingly, and pursuant to Section 201-8 of the Consumer Protection Law, 73 P.S. § 201-8, the Commonwealth seeks the imposition of civil penalties of One Thousand Dollars ($1,000) for each violation of the Consumer Protection Law, including enhanced civil penalties of Three Thousand Dollars ($3,000) for each violation involving victims age sixty (60) or older, in addition to other relief sought, as appropriate.

10.     The CFPA empowers this Court to grant any appropriate legal or equitable relief with respect to violations of Federal consumer financial law, including, without limitation, a permanent or temporary injunction, rescission or reformation of contracts, the refund of moneys paid, restitution, disgorgement or compensation for unjust enrichment, and civil money penalties. 12 U.S.C. § 5565. The Commonwealth believes that, after a reasonable opportunity for discovery, the evidence will likely show that Defendants knowingly violated a Federal consumer

financial law when they engaged in the acts and practices described herein. Accordingly, the Commonwealth seeks the imposition of third tier civil penalties of up to One Million Dollars ($1,000,000) for each day during which such violation continues. *See* 12 U.S.C. §§ 5565(a)(2)(H), 5565(c)(1) & 5565(c)(2)(C).

11.     The public interest is served by seeking before this Honorable Court a permanent injunction to restrain the methods, acts and practices alleged, including restitution and disgorgement of all income and monies Defendants have derived from these methods, acts and practices, as well as civil penalties, and investigative and litigation costs.

12.     The Commonwealth believes that citizens of the Commonwealth are suffering and will continue to suffer harm unless the acts and practices complained of herein are permanently enjoined.

## JURISDICTION AND VENUE

13.     This Court has subject-matter jurisdiction over this action because it is "brought under Federal consumer financial law," 12 U.S.C. § 5565(a)(1), presents a federal question, 28 U.S.C. § 1331, and is brought by the Attorney General of Pennsylvania in a "district court of the United States in that State . . . to enforce provisions of the" CFPA, 12 U.S.C. § 5552(a)(1).

14.     This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367.

15.     Venue is proper in this district because Defendants are located, reside, and/or do business in this district, and/or a substantial part of the events or omissions giving rise to the claims occurred in this district. 28 U.S.C. § 1391(b), (c); 12 U.S.C. § 5564(f).

## PARTIES

16.     Plaintiff is the Commonwealth of Pennsylvania, acting by Attorney General Josh Shapiro, through the Bureau of Consumer Protection, with offices located at 15th Floor, Strawberry Square, Harrisburg, PA 17120.

17.     Defendant Navient Corporation is a Delaware corporation with its principal executive offices located at 123 Justison Street, Wilmington, DE 19801.

18.     Defendant Navient Solutions, LLC, formerly known as Navient Solutions, Inc., is a Delaware limited liability company with its principal executive offices located at 123 Justison Street, Wilmington, DE 19801.

## BACKGROUND

## I. DEFENDANTS' CORPORATE BACKGROUND

19.     Defendants Navient Corporation and Navient Solutions, LLC have two corporate predecessors: a parent company (SLM Corporation) and a subsidiary (Sallie Mae, Inc.).

20.     From 2004 until April 2014, SLM Corporation and its subsidiaries (including Sallie Mae Bank) conducted the full spectrum of student lending

6

business activities, including originating federal and private loans, marketing

student loans and loan packages to schools and students, and servicing and

collecting loans, under one corporate structure.

21.     In April 2014, Defendants Navient Corporation and Navient

Solutions, LLC assumed the liabilities of their predecessors, SLM Corporation and

Sallie Mae, Inc. Navient took over the predecessors' servicing and debt collection

business. Pursuant to the terms of the split, Navient Corporation assumed

responsibility for liabilities resulting from pre-split conduct of SLM Corporation

and its subsidiaries, Sallie Mae, Inc. and Sallie Mae Bank. Included in the

liabilities assumed by Defendant Navient Corporation is the loan origination and

servicing conduct described in this Complaint.

22.     There is significant overlap between the corporate governance and

management of Navient Corporation and Navient Solutions, LLC. Specifically,

many of the directors and officers of Navient Solutions, LLC have also been

directors or officers of Navient Corporation. For example, as of 2014, John

Remondi served as President and CEO for both Navient Corporation and Navient

Solutions, LLC; John Kane served as Chief Operating Officer for both Navient

Corporation and Navient Solutions, LLC; Somsak Chivavibul served as Chief

Financial Officer for both Navient Corporation and Navient Solutions, LLC;

Timothy Hynes served as Chief Risk Officer for both Navient Corporation and

Navient Solutions, LLC; and Stephen O'Connell served as Senior Vice President and Treasurer for both Navient Corporation and Navient Solutions, LLC.

23.     Navient Corporation controls and directs the hiring of employees for its subsidiaries, including Navient Solutions, LLC.

24.     In addition to Navient Corporation's direction and control of Navient Solutions, LLC, Navient Corporation often makes no meaningful distinction between Navient Corporation and its subsidiaries. Instead, it conflates the entities, naming only "Navient."

25.     Navient Corporation consented to, has knowledge of, has materially participated in, and/or has controlled the activities of Navient Solutions, LLC with respect to the conduct alleged in this Complaint.

26.     Unless otherwise specified herein, whenever reference is made in this complaint to any act of a Defendant, such allegations shall be deemed to mean the act of a Defendant acting individually, jointly, severally, or in concert with other Defendants.

## II. FEDERAL STUDENT LOANS

27.     As used in this Complaint, "federal student loans" are those loans funded or guaranteed by the federal government.

28.     Federal student loans carry certain characteristics unique from most other loan products, including, but not limited to, (1) primarily need-based and

made to borrowers regardless of credit history - approval is automatic if the student meets program requirements; (2) the interest rate is capped by the federal government; and (3) have a variety of repayment options available to borrowers, including options that are keyed to the borrower's income.

29. Because federal student loans have lower interest rates and better repayment options, borrowers typically access federal loans before private loans.

30. Until approximately 1994, federal student loans were originated and funded by private lenders such as Defendants, and guaranty agencies insured those funds, which were reinsured by the government pursuant to the Federal Family Education Loan Program (FFELP).

31. In 1994, through the enactment of the Direct Loan Program, the federal government began originating loans directly to borrowers, eliminating private middlemen.

32. The ramp-up of the Direct Loan Program (and wind down of the FFELP program) lasted until 2010, when origination of FFELP loans ended.

33. No matter what kind of federal student loan a borrower has, and no matter the channel by which the government provided the loan to the borrower, the management or "*servicing*" of federal student loans is administered by private entities, such as Defendants.

34.    After borrowers leave school, sometimes they cannot meet their monthly payment obligation under the original terms of their loan. In these instances, federal student loans come with an array of repayment options to fit a borrower's short-term and long-term goals, including some repayment plans that cap the monthly payments based on the borrower's income.

35.    Federal student loan servicers handle a multitude of issues for borrowers, including: collecting payments, providing repayment options to borrowers, facilitating the loan's payoff, and collecting on delinquent loans.

36.    Although federal student loans offer borrowers significant advantages, there are consequences to borrowers who default. For instance, their wages may be garnished without a court order and their social security may be subject to offset.

## III. PRIVATE STUDENT LOANS

37.    As with federal loans, the management of payments on private student loans is handled by a servicer, such as Defendants.

38.    Private student loans are very different from federal loans, however. Private student loans are not tied to, or guaranteed by, the federal government. Rather, they are made by private institutions, usually to cover the gap between the cost of college and the total federal aid.

39.    Private student loans are extended to borrowers by private institutions based on the lender's assessment of the borrower's creditworthiness / likelihood of

repaying the loan.  Private student loan lenders have to more fully evaluate a potential borrower's likelihood of repaying the loan because the loans are not guaranteed by the federal government.

40.     Private student loans are almost always more expensive and carry higher interest rates when compared to federal loans. In contrast to the federal student loan interest rates set by Congress, private student loan interest rates fluctuate based on financial indexes such as the Prime rate or LIBOR, and many private loans come with variable rather than fixed interest rates.

41.     Today, many private student loan borrowers are required to obtain a cosigner who is equally responsible for the payments on the loan.

42.     In some cases, private student loan borrowers struggle to meet their monthly payment amounts. Unlike federal loans, however, there are no standard repayment plan options for private student loan borrowers. Instead, if a borrower is offered a repayment plan, the private loan repayment plan is provided at the discretion of the servicer, sometimes with parameters set by the lender or current owner of the debt.

43.     Because private student loans are more expensive and lack many protections of federal student loans – such as income-driven repayment (IDR) programs – a federal student loan and private student loan to the same individual may have very different consequences for that person's budget, credit score, and

11

financial life. Particularly for borrowers struggling to make ends meet, federal student loans can often be made manageable through IDR plans, while private student loans lacking these protective features default, with devastating consequences.

44.     Even though private student loans are more like credit cards and other unsecured credit products in the marketplace, these loans generally cannot be discharged in bankruptcy.

## FACTUAL ALLEGATIONS

## I. ORIGINATION OF LOANS

45.     As far back as the year 2004, as described above, SLM Corporation, acting through its subsidiaries Sallie Mae, Inc. and Sallie Mae Bank, originated both FFELP and private student loans nationwide, including in Pennsylvania.

46.     Liability for practices relating to the origination of these loans was transferred to Navient Corporation and/or its subsidiaries as part of the 2014 corporate split. While most of the Origination conduct occurred when Defendants were known as SLM Corporation and Sallie Mae, Inc., for clarity, this Complaint attributes such conduct to Defendants because they assumed these liabilities.

47.     Defendants held themselves out as trusted resources for students who needed some help to advance their economic position in life but, in reality, borrowers had no idea the private loans Defendants originated were likely to fail.

12

48.     While Defendants have had the benefit of utilizing accounting practices to write-off these loans as a business expense, countless borrowers, including many in Pennsylvania, are struggling to repay these debts.

**A. The Preferred Lending Era**

49.     Until approximately 2007, many school financial aid offices maintained a list of "preferred lenders" to provide guidance to students who had to choose between the different lenders offering federal and private student loans.

50.     After 2007, new regulations were imposed on preferred lending due to the many known and unmanaged conflicts of interest of the financial aid offices.

51.     Students typically borrowed from lenders on the preferred lender lists, reasonably assuming that such a list represented the wisdom of the financial aid office.

52.     The lenders listed on a school's preferred lender lists typically received in aggregate up to 90% of the loans taken out by the institution's students and their parents, giving the preferred lender exclusive or near-exclusive access to a school's population of borrowers. Therefore, Defendants sought to establish themselves at the top of the preferred lending lists in order to obtain nearly exclusive access to a school's borrowers.

53.     In order to become a preferred lender, Defendants created custom packages of loans that they marketed to schools.

54.     These packages consisted of a variety of loan products including: FFELP loans; private loans for borrowers who qualified for Defendants' standard private student loan products (prime loans); and private loans for borrowers who were ineligible for Defendants' standard private student loan products (subprime loans). These "packages" allowed schools to enroll more students – i.e., the students who would not have ordinarily qualified for standard loan products to cover the "gap" between the available federal student loans and the total cost of attendance, and who therefore would not have been able to enroll but for Defendants' agreement with their schools to fund subprime private student loans that they expected to default as a "loss leader," as described below.

55.     Thus, marketing private loans as part of a package deal was appealing to both schools and lenders. For schools, it meant a streamlined way to ensure that the most students could get funding to attend school, boosting enrollment (and associated revenue). For Defendants, it meant securing a greater volume of federally guaranteed FFELP loans.

56.     FFELP volume was valuable to Defendants for two main reasons: first, FFELP loans made up a much larger part of the market than private loans; and, second, the government insured almost 100% of the loan's value, allowing Defendants to profit from the interest income generated from the loan without risking financial exposure if the loan defaulted.

57.     ***Prime*** private student loan volume was also valuable to Defendants because private student loans typically had significantly higher interest rates than FFELP loans, and those interest rates were not capped.

58.     In contrast, ***subprime*** private loans were merely part of a package of student financing presented to colleges to sell to their students. Even though many students defaulted on the subprime loans, the overall loan package was profitable for Defendants and the colleges. The loans were a critical tool for Defendants to convince schools to include them on the schools' preferred lender lists.

## B. Defendants' Subprime Private Student Loan Strategy

59.     Defendants offered a variety of subprime loan products designed to extend credit to borrowers whom Defendants would not have otherwise considered for traditional private loan financing, in order to market lucrative complete loan packages to their school-clients.

60.     Defendants did not disclose to borrowers receiving Defendants' private student loans that the loan came from a subprime lending program that had a high likelihood of default.

61.     Defendants' subprime products featured high variable interest rates and origination fees. In some cases, these interest rates were as high as Prime +9% or +10%. In June 2007, an interest rate of Prime +10% equated to a ***15.75% interest rate***.

62.     In addition to high interest rates, some of the loans came with **origination fees as high as 9%**. The origination fee was often added to the principal balance of the loan, earning interest on them as well.

63.     As explained further below, Defendants unfairly and deceptively engaged in a series of acts and practices to facilitate originating these subprime loans to many borrowers who had a high likelihood of defaulting.

64.     In February 2007, Defendants internally described their subprime lending strategy and implications as follows: "Current Strategy is Working: - Use subprime to win school deals and secure FFELP and standard private volume – View economics on an all-in basis."

65.     The strategy to use subprime loans to bring in the profitable and guaranteed FFELP volume worked, in part, because of the method Defendants used to value the deals they made with schools.

66.     As long as a school's overall "package" of loan products, consisting mostly of federally guaranteed FFELP loans, was profitable, Defendants did not require each loan in the package to be profitable. The unlikelihood of repayment by most of the school's subprime borrowers was only a secondary concern.

67.     One of Defendants' January 17, 2007 emails entitled "Subprime Lending workgroup meeting attachments," describes one of Defendants' subprime loan programs as "the baited hook to gain [FFELP] volume."

16

68.     According to one of Defendants' documents, one of the stated "[p]ros" of that particular subprime loan program included, "Helps close deals..." Defendants therefore "built this program into [its] core offering strategy."

69.     A 2007 investigation by the U.S. Senate Committee on Health, Education, Labor & Pensions into preferred lending relationships, including Defendants' subprime loan programs, cited in its "Second Report on Marketing in the Federal Family Education Loan Program":

> [Defendants'] calculations…show for Opportunity Loans offered to a particular college an expected default rate of 70%, an expected yield of negative 9%, and an estimated return on equity of negative 3%. Clearly, these funds are considered a marketing expense rather than a profit center….Internal [Defendant] documents show that the company used Opportunity Loan funds as a bargaining chip to trade for expanded [FFELP] market share.

70.     The report also revealed that Defendants' subprime loans were provided to at least one university "in exchange for expanded [FFELP] market share…" for several years.

71.     Even while Defendants considered altering their subprime lending practices, the associated prime volume that subprime loans generated remained a key consideration.

72.     One of Defendants' January 24, 2007 internal documents entitled "Subprime Lending Overview" explains that Defendants' high rate of subprime lending to students at for-profit schools generated such "significant additional

17

traditional Private and FFELP volume" that any decision to alter Defendants' subprime lending practices could not "be taken in isolation, given the associated volume that would be put at risk."  In other words, Defendants were aware that an alteration to their subprime lending strategy would represent a threat to their prime private and federal loan volume.

73.     The Commonwealth believes that, after a reasonable opportunity for discovery, the evidence will likely show that Defendants arranged to be presented as the "preferred lender" to subprime private student loan borrowers by using those very borrowers as "bait" and a "loss leader." Thus, this would have been an important or material fact when those borrowers were considering whether to enter into a loan with Defendants.

## C. Defendants Loosened Credit Standards to Give Expensive Loans to Students Who Could Not Afford Them

74.     In order to offer attractive "packages" to obtain increased FFELP and prime private loan volume, Defendants loosened their credit standards by expanding the required credit criteria downward so that they could provide loan packages to schools which covered subprime student borrowers.

75.     For example, in academic year 2001/2002, Defendant's "Creative Education" Loan product had three qualifying credit tiers. The following year from

academic year 2002/2003, Defendants added a lower credit tier. In 2003/2004, Defendants added two even lower credit tiers.

76.     Defendants also lent to borrowers attending schools with low graduation rates, including schools with less than 50% graduation rates.

77.     Although graduation is a key predictor of a student loan borrower's ability to repay the loan, Defendants did not limit lending to those borrowers who had little chance of graduating – and thus repaying their loans – until after 2008, when the new regulations limiting preferred lender programs took effect. Instead, Defendants continued to push through subprime loans to borrowers who had little chance of graduating.

78.     In a January 23, 2008 investor earnings call, Defendants explained the importance of graduation rate to loan performance.  "…Graduation is critical. [Defendants have] lent too much money to students who have gone to schools without very good graduation records. Such students at such schools are virtually singly responsible for 60% of the '07 credit losses…"

79.     In the years after 2007, Defendants were sued in various capacities for certain practices, including a lack of appropriate underwriting. One such lawsuit filed in 2009 in the Southern District of New York, *In Re SLM Litigation*, alleged that the then CEO, Thomas Fitzpatrick, in a 2007 internal executive meeting summarized Defendants' private education loan underwriting standards by stating,

**"If the borrower can create condensation on a mirror, they need to get a loan this year"** (emphasis added).

80.    Defendants experienced rapid growth in loan originations from 2000 to 2006. These increases were not driven by significant increases in lending to students who qualified for traditional "prime" loans but instead by a much higher jump in Defendants' originations to vulnerable subprime borrowers whom Defendants exploited in order to secure lucrative exclusive deals with schools.

81.    In particular, Defendants saw extremely rapid growth in the riskiest category of subprime lending - loans to borrowers who: (1) attended for-profit or non-profit schools with graduation rates less than 50%, (2) had FICO scores of 640 or less, and (3) were charged high interest rates, high fees, or both (High Risk Loans). For example, Defendants originated only 706 High Risk Loans in 2000 from their Signature Student loan and Career Training loan programs, but this number grew to 54,008 by 2006 – an increase of 7,550%.

82.    For the aforementioned loan programs, in every year from 2000 to 2007, between *68% and 87%* of High Risk Loans defaulted.

83.    For example, in 2006, the overall percentage of borrowers who defaulted on a particular type of loan was approximately 34%. Yet, among the borrowers in that loan program who received High Risk Loans, the default rate was approximately 72%.

84.     Although borrowers given High Risk Loans over the relevant time period were not told, and had no idea, that they were far more likely to default than pay back their loans, this fact was no secret to Defendants.

85.     The riskiest credit tier of subprime loans that Defendants offered were called Opportunity Loans, referred to in paragraphs 69 and 75 above herein. Many but not all Opportunity Loans fit into the High Risk Loans category described in paragraph 81 above herein. In an internal communication, a Defendant manager wrote, "Most Opportunity volume performs very poorly."

86.     Communications between Defendants and a for-profit school showed that default rates in the Opportunity Loan Program were so high that Defendants were seeing "very minor impact on cash flows from those students that actually pay interest let alone principal," and therefore, Defendants discussed reducing the interest rate.

87.     The Commonwealth believes that, after a reasonable opportunity for discovery, the evidence will likely show that: (1) there has been a profound impact on the financial lives of borrowers who were sold risky subprime loans by the Defendants; (2) many borrowers have had to delay starting a family, (3) many borrowers have been unable to save for the down payment on a home, and (4) others have not been able to start their own business and actually apply the education for which they borrowed.

21

**D. Defendants Protected Themselves Financially from High Default Rates While Leaving Borrowers on the Hook**

88.     Although borrowers were fully liable for the repayment of their high cost loans, Defendants took steps to further insulate themselves from any risk these defaults presented to the companies, even going beyond their profits from prime, FFELP, and traditional private loans that purportedly made up for the losses incurred by their subprime defaults.

89.     Defendants achieved this by shifting the risk of default losses on particular loans using a variety of tools, including **"credit enhancement"** or **"recourse"** arrangements.

90.     In a "credit enhancement" scenario, the school took on some of the risk by accepting only a portion of the loan money upfront. An internal Defendant memo describes this:

> These school-provided credit enhancements are beyond any borrower origination fee required in the contracts, and are necessary for [Defendant] to achieve the required economic returns from the loans originated from these agreements. . . . The typical origination scenario is [Defendant] originating a $100 loan (face) but only disbursing $60 at origination. The $40 difference is the credit enhancement that the school is providing SLM as $40 of the $100 loan is not considered collectible at origination.

91.     Therefore, in the credit enhancement scenario, unbeknownst to the borrower, Defendants made a deal with the borrower's school to cover a portion of

the borrower's loan because the Defendants were betting the borrower would not repay it, all the while attempting to collect the full amount from the borrower.

92.    Defendants also entered into "recourse agreements" in which some schools agreed to cover a certain percentage of a defaulted loan. For example, Defendants had a recourse agreement with a for-profit school that agreed to pay for 20% of the defaults on private student loans Defendants provided to its students.

93.    In summary, Defendants originated subprime private student loans in order to gain access to schools' preferred lender lists, which drove Defendants' highly profitable FFELP loan and prime private loan origination business. Defendants loosened their credit standards to give expensive subprime loans to students who could not afford them, leading to extraordinarily high default rates. Defendants knew these loans had a high risk of default, and it lost money on many of them, but the overall strategy was highly profitable for Defendants because the subprime loans were a "loss leader" that allowed Defendants to obtain preferred lender status with schools. Countless students were harmed by these defaults.

## II. SERVICING OF LOANS

### A. Defendants Steered Borrowers Who Were Experiencing Long-Term Financial Hardship into Costly Forbearances

94.     For undergraduate education, federal student loans come in two main forms: subsidized loans and unsubsidized loans, both of which are limited in amount. Generally, for **subsidized loans**, the government pays the interest while the student borrower attends school. For **unsubsidized loans**, the loan accrues interest even while the student attends school.

95.     In general, students have six months after leaving school before they must begin repaying their loans. At that time, a federal student loan borrower is assigned to or selects a specific repayment plan. However, borrowers have the right to change their repayment plan selections at any time, including when they are experiencing financial hardship or distress.

96.     In 2009, the federal government began offering income-driven repayment (IDR) plans designed to help borrowers manage their student loan debt and make monthly payments more affordable. Most federal loans are eligible for at least one IDR plan.

97.     IDR plans cap borrowers' required monthly payments on federal student loans at an amount intended to be affordable based on income and family size. Monthly payments may be as low as $0 per month in an IDR plan.

98.    In addition to providing a more affordable monthly payment, most IDR plans offer several other benefits for federal student loan borrowers, especially borrowers experiencing long-term financial hardship.

99.    For example, for borrowers with **subsidized loans** whose monthly payment amount does not fully cover accrued interest, the federal government will pay any remaining unpaid interest that accrues on those loans during the first three consecutive years of enrollment in the IDR plan. This interest subsidy can be a significant benefit to such borrowers because they generally will never have to pay the interest that the government pays in those three years.

100.    Furthermore, because that unpaid interest is paid in full by the federal government, it is not added to the principal balance of the loan.

101.    Another benefit available to borrowers who are enrolled in an IDR plan is **forgiveness** of the remaining balance of their federal loan, either after making 20-25 years of qualifying payments for most IDR plans or 10 years of qualifying payments while working full time for certain employers, under the Public Service Loan Forgiveness (PSLF) program.

102.    Congress created the PSLF to help public servants – such as teachers, first responders, servicemembers, nurses, and other government employees – manage their student loan debt by providing them with loan forgiveness after 10 years of qualifying payments. To qualify, borrowers must make payments under a

qualifying repayment plan, while employed full time in a qualifying public service job. Months during which loans are in forbearance do not qualify towards loan forgiveness under PSLF or any other federal loan forgiveness program.

103.   Federal student loans are generally also eligible for **forbearance**, which is a short-term, temporary postponement of payment. With forbearance, a borrower experiencing financial hardship or illness may be able to stop making payments or reduce his or her monthly payment for a defined period of time, which can be multiple consecutive months. Borrowers may be entitled to multiple forbearances over the course of a loan, up to 36 months in total.

104.   Defendants' website states that forbearance is appropriate for borrowers who "have a problem making on-time payments due to a ***temporary*** financial difficulty."

105.   Forbearance is suitable only for borrowers experiencing temporary or short term financial hardship and distress. Borrowers who enroll in forbearance face significant costs, such as the accumulation of unpaid interest and the addition of that unpaid interest to the principal balance.

106.   As a result of the costs associated with long-term enrollment in forbearance, a borrower's monthly payment can dramatically increase after the forbearance period ends and over the entire repayment term.

107.   IDR plans enable borrowers to avoid or reduce the costs of forbearance. Therefore, for borrowers whose financial hardship is not short-term, enrolling in an IDR plan is usually a better option than forbearance.

108.   Defendants have repeatedly encouraged borrowers experiencing financial hardship to contact them for assistance in evaluating the repayment options. For example, Defendants' website has included the following statements:

- "If you're experiencing problems making your loans payments, please contact us. Our representatives can help you by identifying options and solutions, so you can make the right decision for your situation."
- "We can help you find an option that fits your budget, simplifies payment, and minimizes your total interest cost."

109.   Nevertheless, since at least July 2011, despite publicly assuring borrowers that it will help them identify and enroll in an appropriate, affordable repayment plan, Defendants have routinely disregarded that commitment and instead steered borrowers experiencing long-term financial hardship into forbearance.

110.   Defendants' compensation policies for their customer service representatives have incentivized them to push numerous borrowers to forbearance without adequately exploring IDR plans with those borrowers and, in some cases, without even mentioning IDR plans at all.

111.   Because of the number and complexity of repayment options, a conversation about alternative repayment plans and the borrower's financial situation is often time-consuming.

112.   Defendants, however, have compensated their customer service personnel, in part, based on average call time. As a result, engaging in lengthy conversations about borrowers' particular financial situations and trying to determine the IDR plan that is most appropriate for each borrower would have been financially detrimental for those employees.

113.   Moreover, since a borrower is required to submit a paper or online application to enroll in an IDR plan, and to include tax documentation with that application, the process of enrolling a borrower in such plans sometimes requires Defendants to have multiple, lengthy conversations with the borrower. Indeed, Defendants found that "more than half of borrowers enrolling in IDR for the first time could not navigate the options on their own."

114.   In addition to the initial paperwork required to enroll borrowers in IDR plans, borrowers in IDR plans must complete recertification forms each year to document their income and family size, which are used to adjust the borrowers' payment amounts. Processing these forms further increases the employee time Defendants must devote to borrowers in IDR plans.

115.    In sum, counseling borrowers about and enrolling them in IDR plans is costly and time consuming for Defendants and their employees. In contrast, enrolling a borrower in forbearance can often be completed over the phone, in minutes, without any paperwork.

116.    Defendants' employees have routinely failed to invest the time and effort necessary to help financially distressed borrowers identify and enroll in affordable repayment plans most appropriate for their financial situations.

117.    Between January 2010 and March 2015, the number of borrowers that Defendants enrolled in forbearance has generally exceeded the number of borrowers enrolled in IDR repayment plans. For example, in December 2010, around 9% of borrowers with FFELP loans held and serviced by Defendants were enrolled in voluntary forbearance, while less than 1% of borrowers with the same loan type were enrolled in IDR plans. Similarly, in December 2012, approximately 7% of Defendants' borrowers with this type of FFELP loans were enrolled in voluntary forbearance, while just 2% were enrolled in IDR plans.

118.    Defendants' representatives sometimes initially responded to borrowers' inability to make a payment by placing them in voluntary forbearance without adequately advising them about available IDR plans. This occurred even though many of those borrowers would have likely qualified for a $0 payment in

an IDR plan. Indeed, more than 50% of Defendants' borrowers who need relief and are eligible for IDR plans qualify for a $0 monthly payment.

119.   For example, between January 1, 2010 and March 31, 2015, nearly 25% of borrowers who ultimately enrolled in Income-Based Repayment, an IDR plan, with a $0 payment were enrolled in voluntary forbearance within the twelve-month period before they enrolled in Income-Based Repayment. Similarly, during that same time period, nearly 16% of borrowers who ultimately enrolled in Pay As You Earn (PAYE), another IDR plan, with a $0 payment were enrolled in voluntary forbearance within the twelve-month period before they enrolled in PAYE. Defendants enrolled the majority of IDR borrowers in voluntary forbearances more than three months prior to enrolling them in IDR plans, which suggests that Defendants did not merely offer forbearances to these borrowers while their applications for IDR plans were pending.

120.   Because Defendants placed IDR borrowers into forbearance before ultimately enrolling them in IDR plans with a $0 payment, the borrowers had delayed access to the benefits of IDR and were negatively impacted by consequences of forbearance, including the addition of interest to the principal and lost months that would have otherwise counted toward forgiveness. This may have been avoided had Defendants enrolled borrowers in IDR initially.

121.   Defendants also enrolled many borrowers in multiple consecutive forbearances, even though they had clearly demonstrated a long-term inability to repay their loans, rather than the short-term financial hardship appropriate for forbearances.

122.   For example, between January 1, 2010 and March 31, 2015, Defendants enrolled over 1.5 million borrowers in two or more consecutive forbearances totaling *twelve months or longer*. Nearly 1 million borrowers were enrolled in three or more consecutive forbearances, where each forbearance period lasted, on average, six months.

123.   More than 520,000 of these borrowers were enrolled in four or more consecutive forbearances. Therefore, hundreds of thousands of borrowers were continuously enrolled in forbearance for a period of two or three years, or more. Regardless of why these borrowers did not enroll in an IDR plan from the start, their long-term inability to repay was increasingly clear as each forbearance period expired. Yet Defendants' representatives continued to enroll them in forbearance again and again, rather than an IDR plan that would have been more appropriate for most of them.

124.   Enrollment in multiple consecutive forbearances imposed a staggering financial cost on these 1.5 million borrowers. At the conclusion of those forbearances, Defendants had added nearly four billion dollars of unpaid interest to

the principal balance of their loans. For many of these borrowers, had they been enrolled in IDR plans, they would have avoided much or all of their additional charges because the government would have paid the unpaid interest on their subsidized loans during the first three years of enrollment. Even for the unsubsidized loans, for many borrowers, had the borrowers been enrolled in IDR plans, they would have saved on interest charges because interest would not have been capitalized while the borrower maintained continuous enrolment in IDR. In addition, enrolling these borrowers in forbearances instead of IDR plans delayed them from staying on track with monthly payments that would count towards loan forgiveness under PSLF or other forgiveness programs.

### i. Consumer Example 1

125.   One Pennsylvania consumer attended college between 2001 and 2006. During that time, she secured multiple loans through Defendants. She states that her massive student loan debt has paralyzed her ability to move ahead in life.

126.   When she called Defendants to ask for assistance with her loan payments, Defendants told her that her only option for loan assistance was a forbearance, despite the fact that she qualified for an IDR plan. The forbearance was in 6 month increments and there was a fee each 6 month extension. Defendants failed to adequately inform her about any fees or interest accrual when the initial forbearance was completed.

32

127.   The consumer has worked in the public sector since 2006, qualifying her for loan forgiveness under PSLF. However, when she asked Defendants about PSLF in 2007, Defendants' employees gave her information that deterred her from enrolling. She alleges they told her falsely that she would have to make 120 consecutive payments while employed at a qualifying organization for ten consecutive years to qualify for forgiveness. She learned in 2014, seven years after first enquiring about PSLF, that the information given to her by the Defendants in 2007 was false. Unfortunately, since she did not enroll in 2007, none of the payments she made since 2007 could be applied to the PSLF. This resulted in seven additional years of loan payments that need to be made before her loans are forgiven under the PSFL. If Defendants had been truthful in 2007, she may have qualified to have her loans forgiven as soon as 2017.

### ii. Consumer Example 2

128.   Another Pennsylvania consumer was enrolled in a master's degree program from 1996 to 2004. Unfortunately, like many students, he did not complete the degree. Since he left the school, he has struggled to pay his loans.

129.   The consumer's student loans were in and out of forbearance for the next 11 years. Despite the fact that the consumer had demonstrated long-term financial hardship to Navient for five years by the time IDR plans became available in 2009, Navient did not enroll him in one until 2015, when he entered

Income-Based Repayment with a monthly payment of $0. According to the

consumer, nearly $27,000 in interest has been added to his loans since 2004.

### iii. Consumer Example 3

130.   Another Pennsylvania consumer took out 25 student loans, federal and

private, while attending school. After he left school in 2011, he enrolled in

Income-Based Repayment. When he started having trouble making payments and

contacted the Defendants to review his options, they told him that forbearance was

his only option. In fact, according to the consumer, continuing his IDR plan would

have been a better option for him in the long term.

### B. Defendants' Servicing Failures Relating to Recertification

131.   A federal student loan borrower who is enrolled in an IDR plan must

certify his/her income and family size to qualify. The IDR payment amount applies

for twelve months, after which the IDR plan and payment amount will expire

unless the borrower renews his/her enrollment. As discussed above, to renew the

plan, the borrower must **"recertify"** his/her income and family size by submitting

updated information, including documentation of income.

132.   If the twelve-month period expires because the borrower has not

timely recertified income and family size, several negative consequences will

occur: (1) the borrower's monthly payment amount may immediately increase; (2)

any unpaid, accrued interest will be added to the loan principal; (3) for subsidized

34

loans in the first three years of enrollment in an IDR plan, the borrower will lose an

interest subsidy from the federal government for each month until the borrower

renews his/her enrollment; and (4) for some borrowers who enroll in forbearance

when the twelve-month period expires, progress towards loan forgiveness is

delayed because the borrower is no longer making qualifying payments that count

towards loan forgiveness. These consequences are all irreversible.

133.   At the time of enrollment in the IDR plan, Defendants sent borrowers

an "initial disclosure notice" which identified the beginning and end dates of the

initial enrollment in the repayment plan. The notice also advised borrowers:

"You'll be notified in advance when your loan(s) is up for renewal for the [IDR]

plan. At that time, you'll be provided with a date to submit a new application." The

notice failed to indicate any specific renewal deadline.

134.   The notice did not identify any consequences that might result if the

borrower attempts to renew by submitting a renewal application, but the

application is incorrect or incomplete in some respect or is not submitted in a

timely manner.

135.   Since at least January 1, 2010, federal student loan servicers,

including Defendants, have been required to send at least one written notice

concerning the annual renewal requirements to borrowers in advance of their

renewal deadline. From at least January 1, 2010 until December 2012, Defendants'

annual renewal notices for IDR plans sent through U.S. mail did not inform borrowers of the actual date by which they had to submit the renewal application to avoid expiration of the twelve-month period during which payment was set at an affordable amount based on the borrower's income and family size.

136.   Instead, Defendants' pre-December 2012 notices stated vaguely that the borrower's IDR period would "expire in approximately 90 days" and that the "renewal process may take at least 30 days."

137.   It is impossible to determine from these two statements the deadline by which a borrower must submit the required documentation in order to timely renew enrollment in the plan. The notice also failed to advise borrowers of the consequences if they failed to timely submit their renewal application.

138.   The pre-December 2012 notices also failed to advise borrowers of the likely consequences of submitting incorrect or incomplete information. The notices encouraged borrowers to fill out the forms completely and warned borrowers that, "by providing incorrect or incomplete information the [renewal] process will be delayed." This implied that the only consequence of providing incorrect or incomplete information was a "delay" in the renewal "process" – that while the renewal *process* would be delayed by the submission of an incomplete and incorrect application for renewal, as long as the deficiencies were rectified, no other consequences would result.

139.   Borrowers who have submitted a renewal application have clearly chosen to renew their enrollment; their choice to renew was evidenced by their submission of the application, even if that application was incomplete or inaccurate in some respect. But Defendants' pre-December 2012 notice said nothing to warn these borrowers that failing to submit complete and accurate information before the end of the twelve-month period would have essentially the same consequences as if the borrower chose not to renew their enrollment in the IDR plan at all. Those consequences are set forth in paragraph 132 above herein. Borrowers could not reasonably have been expected to interpret Defendants' reference to a mere processing delay to actually mean irreversible financial harm.

140.   For the 75% of Defendants' federal loan borrowers who consented to receiving electronic communications, Defendants sent electronic renewal notices that could only be accessed by logging into Defendants' online portal. Between at least mid-2010 and March 2015, these borrowers had to log into Defendants' portal with their user ID and password to view an electronic version of the renewal notice sent via U.S. mail to other borrowers.

141.   The only step that Defendants took to advise these borrowers of the availability of the electronic notice was to send them an email with a hyperlink to its website. Neither the subject line of this email nor its contents provided any indication of the purpose of the notice.

142.   From at least January 1, 2010 through November 15, 2012, the subject line of the email simply read: "Your Sallie Mae Account Information." Likewise, from at least November 16, 2012 through March 18, 2015, the subject line of the email was: "New Document Ready to View." Until mid-2015, the body of the email stated only that, "a new education loan document is available. Please log in to your account to view it."

143.   In stark contrast, during the same time period, other emails sent by Defendants described the content or purpose of the referenced document. For example, the subject line of one such email was: "Your Sallie Mae – Department of Education Statement is Available," and the body of the email stated, "Your monthly statement is now available. Please log in to your account at SallieMae.com to view and pay your bill."

144.   Defendants have tracked the number of borrowers who click on the hyperlink in the emails that Defendants send to them. Thus, Defendants knew or should have known that many borrowers did not view the electronic renewal notices.

145.   Between at least July 2011 and March 2015, the percentage of borrowers who did not timely renew their enrollment in IDR plans regularly exceeded 60%. Defendants have been aware that the majority of borrowers were failing to renew their enrollment in IDR plans.

146.    Beginning in or around March 2015, Defendants made several enhancements to their email that provides access to the electronic renewal notice. They changed the subject line of the email to read "Your Payment Will Increase Soon!" and the text of the email now states: "[I]n order to keep your lower payment amount, it's important that you apply soon to renew your repayment plan." Since Defendants made these enhancements to its electronic notices, the renewal rate has more than doubled.

### i. Consumer Example 4

147.    The same Pennsylvania consumer mentioned in Consumer Example 3 above claims that Defendants made multiple misrepresentations regarding the renewal of his Income-Based Repayment plan. Due to these misrepresentations, his payments increased and nearly $5,000 of accrued interest was added to the loan balance.

148.    This consumer said in his complaint that the Defendants have never sent him the email with the annual renewal reminder that Defendants have repeatedly told him they sent. Defendants are successfully sending him other information via email.

### C. Defendants' Misrepresentations Relating to Cosigner Release

149.    A cosigner is generally necessary for a borrower to obtain a private student loan, or to obtain that loan with more favorable terms. Once a borrower

enters repayment on his/her private student loan with Defendants, he/she generally can apply to release the cosigner from the loan after meeting certain eligibility criteria.

150.   Since at least January 2010, one of the eligibility criteria that Defendants have required private student loan borrowers to meet before they can apply to release a cosigner is that the borrower must make a minimum number of **consecutive, on-time payments** consisting of both principal and interest.

151.   Since January 21, 2014, Defendants have required the borrower to make 12 consecutive, on-time principal and interest payments before applying for cosigner release. Prior to January 21, 2014, Defendants required borrowers to make between 12 and 48 consecutive, on-time principal and interest payments before applying for cosigner release. Defendants, however, failed to specifically define for borrowers "consecutive" or "on-time" payments.

152.   A borrower in repayment will sometimes make a payment that is a multiple of the monthly payment amount due. For example, a borrower whose monthly payment amount due is $100 may choose to pay $200 or $300 instead of $100.

153.   When a borrower makes such a "multiplier overpayment," Defendants generally applies the payment to satisfy the borrower's current monthly payment

due, and then places the borrower in a "paid ahead" status for the subsequent

months that have been satisfied by the excess payment.

154.   For each month that the borrower is in a "paid ahead" status on his/her

private student loan, Defendants send the borrower a bill indicating that the

payment due for that month is $0 because the borrower is not required to make any

payment that month in order to remain current on his/her loan. Thus, there is no

"on-time principal and interest payment" that is even due that month.

155.   Until at least mid-2015, in determining whether a borrower made the

minimum number of "consecutive, on-time principal and interest payments" for

purposes of cosigner release, Defendants treated the lack of payment by a borrower

in response to a $0 bill as a failure to make a "consecutive, on-time principal and

interest payment" that month.

156.   As a result, Defendants **reset** the borrower's progress towards the

"consecutive, on-time principal and interest payments" requirement to zero

months.

157.   Based on the plain meaning of "on-time" and "consecutive,"

Defendants' policy was contrary to its statement to borrowers that they can apply

for cosigner release if they make a certain number of "consecutive, on-time

principal and interest payments."

158.   Nothing on Defendants' billing statement, their website, nor any other borrower-facing document advised borrowers that making no payment in response to a $0 bill could impact their eligibility for cosigner release.

159.   By resetting borrowers' progress toward the "consecutive, on-time principal and interest payments" requirement to zero months when they submitted no payment in response to a $0 bill as a result of a previous multiplier overpayment, Defendants delayed cosigner release for borrowers who had already made progress towards Defendants' disclosed requirements. The Commonwealth believes that, after a reasonable opportunity for discovery, the evidence will likely show that this had a negative financial impact on cosigners.

### i. Consumer Example 5

160.   A Pennsylvania consumer inquired with the Defendants on how to get his co-signer released from his student loans. He alleges that he was told that in order for the co-signer to be removed he would have to make one year of payments and his co-signer would be released. The consumer paid 12 months of payments in a lump sum. He is now being told that the payments do not count because they were not consecutive payments.

### ii. Consumer Example 6

161.   A Pennsylvania consumer was a co-signer for his stepson's student loans. The consumer called the Defendants and was told that it order to be removed

as a co-signer, he would need to make two years of on-time payments. However, the consumer had made three years of on-time payments and still had not been removed as co-signer. At the time of his complaint, he was in poor health and was getting harassed by multiple collection agencies. He has since settled the debt with a collection agency.

### D. Defendants' Repeated Payment Processing Errors

162.   One of Defendants' primary responsibilities as a student loan servicer is to process payments made by borrowers on their student loan accounts. Defendants, however, do not have adequate processes and procedures in place to sufficiently address certain errors they make in the processing of payments they receive or to prevent errors from recurring.

163.   Allocation of payments means how a payment is distributed across multiple loans. Application of payments means how a payment is applied to a specific loan or loans based on the terms of each loan's promissory note.

164.   A significant number of borrowers do not submit payments through Defendants' online portal, but instead submit their payments by mailing a check or through an external bill payment system. The Commonwealth believes that, after a reasonable opportunity for discovery, the evidence will likely show that many of these borrowers also send written instructions on how they want Defendants to apply or allocate their payments.

165.   Since at least July 2011, many borrowers and cosigners, primarily those who pay by mailing a check or through an external bill payment system, have complained that Defendants misallocated or misapplied submitted payments.

166.   One source for payment processing errors appears to be Defendants' default payment allocation methodology which Defendants did not disclose on any billing statement, promissory note, or printed or online resource available to borrowers. The default allocation methodology varied based on whether the loan was federal or private, as well as whether the borrower submitted an underpayment, overpayment, or an overpayment that was a multiple of the borrower's monthly payment amount due.

167.   Because Defendants did not make their default allocation methodologies clear or public until at least late 2013, prior to that time, borrowers generally had no way of knowing in advance how Defendants might allocate payments.

168.   While a borrower or cosigner could submit written instructions with a paper check as to how a payment should be processed, Defendants' mail reading equipment did not always properly detect the presence of such instructions. Even where the instructions were detected and acted upon by a representative of Defendants, the representative did not always implement the instructions properly. Thus, borrowers who did not use Defendants' online portal to submit payments had

to call if they discovered, as was sometimes the case, that their payment processing instructions had not been implemented properly.

169.   Errors made by Defendants in the processing of payments have resulted in: (1) borrowers and cosigners incurring improper late fees and increased interest charges, and (2) the furnishing of inaccurate negative information to consumer reporting agencies.

170.   Many borrowers and cosigners have complained that a payment processing error was not an isolated event, but rather that the same payment processing error recurred time and again, even after they contacted Defendants to correct the error. While Defendants might correct a specific error if a borrower contacts Defendants to report it, if the error is not escalated beyond a first-level customer service representative, Defendants do not necessarily identify and fix the underlying issue causing the error to prevent it from recurring. As a result, some borrowers have suffered the same payment processing error in multiple months.

171.   Moreover, Defendants do not categorize most non-escalated borrower inquiries about payment processing errors. Defendants, thus, are unable to systematically search and/or aggregate these non-escalated inquiries. As a result, Defendants have been unable to effectively understand many of the problems that borrowers are experiencing and take action to prevent these problems from recurring.

### i. Consumer Example 7

172.    The Pennsylvania consumer mentioned in Consumer Examples 3 and

4 complained that he had to continuously call the Defendants to correct allocation

problems with his loan payments. He would typically send two paper checks each

month and write instruction on the checks as to how to allocate the payment.

Defendants ignored these instructions month after month. He would call to have it

corrected only to have the same error happen again. Defendants' employees told

him that nobody reads the check memo.


## CLAIM FOR RELIEF – ORIGINATION OF LOANS

### COUNT I
## VIOLATIONS OF PENNSYLVANIA CONSUMER PROTECTION LAW
## CONDUCT RELATING TO ORIGINATION OF LOANS

173.    The averments and allegations of the preceding paragraphs are

incorporated as though the same were fully set forth herein.

174.    As described above, while engaging in trade or commerce within the

Commonwealth through origination of loans, Defendants:

a.       Unfairly and deceptively offered and originated risky,

expensive subprime loans to borrowers in spite of the high likelihood those

loans would default, and leaving borrowers in debt, for the purpose of

gaining access to federal loan volume, while shifting a portion of the default risk to schools through contractual arrangements;

b.      Failed to adequately inform borrowers experiencing financial distress of the existence of contractual arrangements Defendants had with schools to protect themselves from some of the losses they knew were likely to occur due to defaults on risky subprime loans they made to borrowers;

c.      Unfairly and deceptively originated risky loans to: (1) borrowers with low credit scores; (2) who were attending schools with low graduation rates; (3) which carried high interest rates and origination fees; (4) had a high likelihood of default; (5) for which there were no set repayment options for borrowers unable to repay; and (6) for which there is little to no chance for borrowers to discharge in bankruptcy;

d.      Failed to disclose to borrowers that it was highly likely the loan that they were taking out to attend schools with low graduation and gainful employment rates would default; and

e.      Unfairly and deceptively concealed material facts from prospective student loan borrowers, including that: (1) Defendants were being promoted as the "preferred lender" for the subprime borrowers' school due to arrangements that included using subprime borrowers (and their loans) as "bait" and loss leaders; (2) Defendants had entered into credit

enhancement arrangements whereby the school funded a portion of the student's loan; (3) Defendants had entered into recourse agreements with schools pursuant to which the school would cover a portion of Defendants' loss when borrowers defaulted, as expected; (4) Defendants' lending business model was built around establishing and enhancing relationships with schools by making loans that it believed were more likely than not to default; (5) a majority of students who received certain high risk loans defaulted; and (6) such defaults would harm borrowers' credit scores, making it more difficult for them to get credit and obtain employment.

175.   The aforesaid methods, acts and practices constitute unfair methods of competition and unfair acts or practices in the conduct of trade or commerce prohibited by Section 201-3 of the Consumer Protection Law, as defined by Section 201-2 of said Law, including, but not limited to, the following:

a.    Section 201-2(4)(vii), representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another; and

b.    Section 201-2(4)(xxi), engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

73 P.S. §§ 201-3, and 201-2(4)(vii) and (xxi).

48

## CLAIMS FOR RELIEF – SERVICING OF LOANS

## COUNT II
## VIOLATIONS OF THE PENNSYLVANIA CONSUMER PROTECTION
## STEERING BORROWERS WHO WERE EXPERIENCING LONG-TERM
## FINANCIAL HARDSHIP INTO COSTLY FORBEARANCES

176.   The averments and allegations of the preceding paragraphs are incorporated as though the same were fully set forth herein.

177.   As described above, while engaging in trade or commerce within the Commonwealth through steering borrowers suffering long-term financial hardship into forbearance, Defendants:

a.   Misrepresented, either expressly or by implication, the suitability of certain federal loan repayment options for borrowers struggling with their payments;

b.   In phone calls, failed to meaningfully disclose to borrowers struggling to make their payments that the federal government offers IDR plans to help borrowers avoid default;

c.   Misrepresented that Defendants would "work with" borrowers struggling to pay their loans, "help [borrowers] make the right decision for [their] situation"; and "help [borrowers] by identifying options and solutions, so [borrowers] can make the right decision for [their] situation" when, in fact, Defendants in many instances did not do so; and

49

d.      Continuously offered forbearances to borrowers who
demonstrated a long-term inability to repay, when in fact forbearance is
intended for a temporary hardship.

178.   The aforesaid methods, acts and practices constitute unfair methods of
competition and unfair acts or practices in the conduct of trade or commerce
prohibited by Section 201-3 of the Consumer Protection Law, as defined
by Section 201-2 of said Law, including, but not limited to, the following:

a.      Section 201-2(4)(vii), representing that goods or services are of
a particular standard, quality or grade, or that goods are of a particular style
or model, if they are of another; and

b.      Section 201-2(4)(xxi), engaging in any other fraudulent or
deceptive conduct which creates a likelihood of confusion or of
misunderstanding.

73 P.S. §§ 201-3, and 201-2(4)(vii) and (xxi).

### COUNT III
### VIOLATIONS OF THE FEDERAL CFPA
### STEERING BORROWERS WHO WERE EXPERIENCING LONG-TERM
### FINANCIAL HARDSHIP INTO COSTLY FORBEARANCES

179.   The averments and allegations of the preceding paragraphs are
incorporated as though the same were fully set forth herein.

180.   As described above, while engaging in trade or commerce within the Commonwealth through steering borrowers suffering long-term financial hardship into forbearance, Defendants:

a.      Misrepresented, either expressly or by implication, the suitability of certain federal loan repayment options for borrowers struggling with their payments;

b.      In phone calls, failed to meaningfully disclose to borrowers struggling to make their payments that the federal government offers IDR plans to help borrowers avoid default;

c.      Misrepresented that Defendants would "work with" borrowers struggling to pay their loans, "help [borrowers] make the right decision for [their] situation"; and "help [borrowers] by identifying options and solutions, so [borrowers] can make the right decision for [their] situation" when, in fact, Defendants in many instances did not do so; and

d.      Continuously offered forbearances to borrowers who demonstrated a long-term inability to repay, when in fact forbearance is intended for a temporary hardship.

181.   Federal student loan borrowers reasonably relied on Defendants to act in the borrowers' interests in advising about options to address their financial situation. As described above, in numerous instances, Defendants took

51

unreasonable advantage of consumers' reasonable reliance on Defendants to act in the consumers' interests. Therefore, Defendants' acts and practices as set forth herein constitute abusive acts or practices in violations of sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531, 5536(a)(1).

182.   Defendants' acts and practices relating to steering of borrowers into forbearance caused, or was likely to cause, substantial consumer injury. This consumer injury was not reasonably avoidable because Defendants steered borrowers into forbearance while providing no or inadequate information about alternative repayment plans. The substantial consumer injury caused or likely caused by Defendants' steering of borrowers into forbearance was not outweighed by countervailing benefits to consumers or to competition. Therefore, Defendants' acts and practices as set forth herein constitute unfair acts or practices in violations of sections 1031 and 1036 of the CFPA. 12 U.S.C. §§ 5531, 5536(a)(1).

## COUNT IV
## VIOLATIONS OF PENNSYLVANIA CONSUMER PROTECTION LAW
## SERVICING FAILURES RELATING TO RECERTIFICATION

183.   The averments and allegations of the preceding paragraphs are incorporated as though the same were fully set forth herein.

184.   As described above, while engaging in trade or commerce within the Commonwealth through servicing student loans requiring recertification in IDR plans, Defendants:

a.      Failed to disclose a date certain by which a borrower must submit materials to recertify an income driven repayment plan;

b.      Represented by implication that the only consequence a borrower will face in failing to submit a timely income driven repayment plan recertification is a delay in processing, when in fact, the borrower will face the following consequences: (i) The borrower's monthly payment amount will immediately increase from the IDR payment to one that is higher; (ii) A capitalization event of any unpaid interest that has accrued; (iii) The loss of an applicable interest subsidy provided by the federal government for the first three years of enrollment in an IDR plan for each month until the borrower renews her enrollment; and (iv) Delayed progress towards loan forgiveness because the borrower is no longer making qualifying payments that count towards loan forgiveness; and

c.      Failed to adequately notify borrowers who consented to receive electronic communications of the existence of the renewal notice because the email it sent to them that purportedly provided such notice included no information about the purpose or contents of the notice in the subject line or body of the email.

185.   The aforesaid methods, acts and practices constitute unfair methods of competition and unfair acts or practices in the conduct of trade or commerce

prohibited by Section 201-3 of the Consumer Protection Law, as defined

by Section 201-2 of said Law, including, but not limited to, the following:

      a.    Section 201-2(4)(vii), representing that goods or services are of

a particular standard, quality or grade, or that goods are of a particular style

or model, if they are of another; and

      b.    Section 201-2(4)(xxi), engaging in any other fraudulent or

deceptive conduct which creates a likelihood of confusion or of

misunderstanding.

73 P.S. §§ 201-3, and 201-2(4)(vii) and (xxi).

## COUNT V
## VIOLATIONS OF THE FEDERAL CFPA
## SERVICING FAILURES RELATING TO RECERTIFICATION

186.   The averments and allegations of the preceding paragraphs are

incorporated as though the same were fully set forth herein.

187.   As described above, while engaging in trade or commerce within the

Commonwealth through servicing student loans requiring recertification in IDR

plans, Defendants:

      a.    Failed to disclose a date certain by which a borrower must

submit materials to recertify an income driven repayment plan;

      b.    Represented by implication that the only consequence a

borrower will face in failing to submit a timely income driven repayment

54

plan recertification is a delay in processing, when in fact, the borrower will face the following consequences: (i) The borrower's monthly payment amount will immediately increase from the IDR payment to one that is higher; (ii) A capitalization event of any unpaid interest that has accrued; (iii) The loss of an applicable interest subsidy provided by the federal government for the first three years of enrollment in an IDR plan for each month until the borrower renews her enrollment; and (iv) Delayed progress towards loan forgiveness because the borrower is no longer making qualifying payments that count towards loan forgiveness; and

c.      Failed to adequately notify borrowers who consented to receive electronic communications of the existence of the renewal notice because the email it sent to them that purportedly provided such notice included no information about the purpose or contents of the notice in the subject line or body of the email.

188.   These acts and practices caused or were likely to cause substantial injury to consumers because numerous federal student loan borrowers' affordable income-based payment in the IDR plan expired as a result of those acts or practices, causing them to suffer significant negative financial consequences that were not reasonably avoidable. The substantial consumer injury caused or likely to be caused by Defendants' acts and practices relating to renewal of IDR plans was

not outweighed by countervailing benefits to consumers or to competition.

Therefore, Defendants acts and practices as set forth herein constitute unfair acts or

practices in violations of sections 1031 and 1036 of the CFPA, 12 U.S.C. §§

5531, 5536(a)(1).

189.   These acts and practices were also deceptive because Defendants

made an implied representation, and created the false impression, that the only

consequence of submitting a renewal application with incomplete or inaccurate

information would be a processing delay and nothing more. It was reasonable

under the circumstances for borrowers to interpret Defendants' statement to mean

that a processing delay was the only consequence of submitting incomplete or

incorrect information. Defendants' representation was material and likely to

mislead a reasonable federal student loan borrower. Therefore, Defendants'

misrepresentations as set forth herein constitute deceptive acts or practices in

violation of sections 1031 and 1036(a)(1) of the CFPA, 12 U.S.C. §§

5531, 5536(a)(1).

## COUNT VI
## VIOLATIONS OF PENNSYLVANIA CONSUMER PROTECTION LAW
## MISREPRESENTATIONS RELATING TO COSIGNER RELEASE

190.   The averments and allegations of the preceding paragraphs are incorporated as though the same were fully set forth herein.

191.   As described above, while engaging in trade or commerce within the Commonwealth through servicing student loans secured by co-signors, Defendants:

      a.   Misled borrowers by misrepresenting the consecutive, on-time principal and interest payments requirement for cosigner release, including without limitation the effect of paid ahead status on satisfying this requirement; and

      b.   Created a likelihood of confusion or misunderstanding for borrowers as to the necessary requirements for obtaining a cosigner release.

192.   The aforesaid methods, acts and practices constitute unfair methods of competition and unfair acts or practices in the conduct of trade or commerce prohibited by Section 201-3 of the Consumer Protection Law, as defined by Section 201-2 of said Law, including, but not limited to, the following:

      a.   Section 201-2(4)(vii), representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another; and

57

b.     Section 201-2(4)(xxi), engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

73 P.S. §§ 201-3, and 201-2(4)(vii) and (xxi).

### COUNT VII
### VIOLATIONS OF THE FEDERAL CFPA
### MISREPRESENTATIONS RELATING TO COSIGNER RELEASE

193.   The averments and allegations of the preceding paragraphs are incorporated as though the same were fully set forth herein.

194.   As described above, while engaging in trade or commerce within the Commonwealth through servicing student loans secured by co-signors, Defendants:

a.     Misled borrowers by misrepresenting the consecutive, on-time principal and interest payments requirement for cosigner release, including without limitation the effect of paid ahead status on satisfying this requirement; and

b.     Created a likelihood of confusion or misunderstanding for borrowers as to the necessary requirements for obtaining a cosigner release.

195.   It was reasonable for borrowers to interpret Defendants' express representation about the "consecutive, on-time principal and interest payments" requirement to mean that a borrower was only required to submit consecutive "on-

time principal and interest payments," and not that such payments must be made in consecutive months and even in months when no such payment was due. Defendants' misrepresentations were material and likely to mislead a reasonable federal student loan borrower. Therefore, Defendants' misrepresentations as set forth herein constitute deceptive acts or practices in violation of sections 1031 and 1036(a)(1) of the CFPA, 12 U.S.C. §§ 5531, 5536(a)(1).

### COUNT VIII
### VIOLATIONS OF PENNSYLVANIA CONSUMER PROTECTION LAW
### REPEATED PAYMENT PROCESSING ERRORS

196.   The averments and allegations of the preceding paragraphs are incorporated as though the same were fully set forth herein.

197.   As described above, while engaging in trade or commerce within the Commonwealth through processing payments by borrowers and/or co-signors toward their student loans, Defendants:

     a.    Unfairly made errors, sometimes month after month, in misallocating and misapplying payments made by borrowers;

     b.    failed to implement adequate processes and procedures to prevent the same errors from recurring; and

     c.    misapplied and misallocated borrower payments.

198.   The aforesaid methods, acts and practices constitute unfair methods of competition and unfair acts or practices in the conduct of trade or commerce

prohibited by Section 201-3 of the Consumer Protection Law, as defined

by Section 201-2 of said Law, including, but not limited to, the following:

      a.     Section 201-2(4)(vii), representing that goods or services are of

a particular standard, quality or grade, or that goods are of a particular style

or model, if they are of another; and

      b.     Section 201-2(4)(xxi), engaging in any other fraudulent or

deceptive conduct which creates a likelihood of confusion or of

misunderstanding.

73 P.S. §§ 201-3, and 201-2(4) (vii) and (xxi).

## COUNT IX
## VIOLATIONS OF THE FEDERAL CFPA
## REPEATED PAYMENT PROCESSING ERRORS

199.   The averments and allegations of the preceding paragraphs are

incorporated as though the same were fully set forth herein.

200.   As described above, while engaging in trade or commerce within the

Commonwealth through processing payments by borrowers and/or co-signors

toward their student loans, Defendants:

      a.     Unfairly made errors, sometimes month after month, in

misallocating and misapplying payments made by borrowers;

      b.     failed to implement adequate processes and procedures to

prevent the same errors from recurring; and

        c.     misapplied and misallocated borrower payments.

201.   These acts and practices caused or were likely to cause substantial injury to consumers in the form of late fees, interest accrual, and negative credit reporting. These injuries were not reasonably avoidable because consumers had no control over errors, including repeat errors, that Defendants made in the processing of their payment(s). The substantial consumer injury caused or likely to be caused was not outweighed by countervailing benefits to consumers or to competition. Therefore, Defendants' acts and practices as set forth herein constitute unfair acts or practices in violations of sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531, 5536(a)(1).

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Commonwealth respectfully requests that this

Honorable Court issue an Order:

A.      Declaring Defendants' conduct as described herein above to be in

violation of the Consumer Protection Law and the CFPA;

B.      Permanently enjoining Defendants and all other persons acting on

their behalf, directly or indirectly, from violating the Consumer Protection Law,

the CFPA, or any other provision of federal consumer financial law, as defined

by 12 U.S.C. § 5481(14), and any amendments thereto;

C.      Directing Defendants to make full restitution to all borrowers who

have suffered losses as a result of the acts and practices alleged in this complaint

and any other acts or practices proved by the Commonwealth;

D.      Permanently enjoining Defendants from selling, assigning,

transferring, conveying, collecting or causing to be collected (including but not

limited to through litigation or judgments) any subprime private student loans that

are the subject of this litigation;

E.      Directing Defendants to withdraw any judgments, liens, garnishments,

claims in bankruptcy, or other legal proceedings that Defendants have been

initiated or entered against consumers relating to subprime private student loans

that are the subject of this litigation;

F.      Directing Defendants to cease and desist furnishing any negative credit information to a consumer reporting agency with respect to the subprime private student loans that are the subject of this litigation;

G.      If Defendants have furnished such negative credit information to a consumer reporting agency, directing Defendants to instruct the consumer reporting agency to delete all such negative credit information;

H.      Directing Defendants to disgorge and forfeit all profits they have derived as a result of the conduct alleged herein;

I.      Requiring Defendants to finance the cost of a notice program to borrowers;

J.      Directing Defendants to pay to the Commonwealth appropriate civil penalties pursuant to the Consumer Protection Law and/or the CFPA;

K.      Directing the rescission or reformation of contracts where necessary to redress injury to borrowers;

L.      Directing Defendants to pay the Commonwealth's investigative and litigation costs in this matter; and

M.      Granting such other general, equitable, and/or further relief as the Court deems just and proper.

Dated:  October 5, 2017          Respectfully submitted,

Josh Shapiro
*Attorney General*

Michelle Henry
*First Deputy Attorney General*

Sara Manzano-Diaz
*Executive Deputy Attorney General*
*Public Protection Division*

Sarah A. E. Frasch
*Chief Deputy Attorney General*
*Director, Bureau of Consumer Protection*

Nicholas Smyth
*Senior Deputy Attorney General*
*Assistant Director, Bureau of Consumer Protection*

___/s/ John Abel_____
John Abel, PA 47313
(Email: jabel@attorneygeneral.gov)
(Phone: 717-783-1439)
(Fax: 717-705-3795)
Jesse Harvey, PA 63435
(Email: jharvey@attorneygeneral.gov)
(Phone: 412-565-2883)
(Fax: 412-880-0196)
*Senior Deputy Attorneys General*

Attorneys for Plaintiff
Commonwealth of Pennsylvania
Office of Attorney General
Bureau of Consumer Protection
417 Lackawanna Ave
Scranton, PA 18503