

COMMONWEALTH OF PENNSYLVANIA
OFFICE OF ATTORNEY GENERAL

JOSH SHAPIRO
ATTORNEY GENERAL

October 10, 2018

The Honorable Robert D. Mariani
U.S. District Court, Middle District of Pennsylvania
William J. Nealon Federal Bldg. & U.S. Courthouse
235 N. Washington Avenue
Scranton, PA 18503

Re:   ***Commonwealth of Pennsylvania v. Navient Corporation et al***, No.
        **3:17-cv-01814-RDM**

Dear Judge Mariani:

Thank you for your time today on our telephonic conference call regarding the Privacy Act discovery dispute referenced in the Commonwealth's August 17, 2018 letter (Document 35).  As you requested, the Commonwealth writes to submit the order and transcript from a recent hearing on the State of Washington's motion to compel similar student loan borrower data from Navient in the case of *State of Washington v. Navient Corporation, et al.*, Case No. 17-2-01115-1 (King County Sup. Ct.). At this hearing, the Court ordered Navient to produce the requested data to the State of Washington, rejecting many of the same arguments that Navient made on today's conference call. Enclosed please find a copy of the court's order and transcript, with a discussion of the Privacy Act dispute on pages 5-18.

On today's call you also inquired as to whether either party was aware of a precedent regarding Navient's argument that it should not be ordered to produce the data because it does not have legal ownership of the data. On page 7 of the enclosed transcript, the attorney for the State of Washington references such a case: *In re Bankers Trust Co.*, where the Sixth Circuit held that *actual* possession, custody or control (not legal ownership) was determinative under FRCP 34(a).  *See In re Bankers Trust Co.*, 61 F.3d 465, 469-471 (6th Cir. 1995) (holding that records legally owned by the Federal Reserve but in the actual possession of a bank were subject to discovery from the bank rather than the Federal Reserve).

Respectfully,
/s/ Nicholas Smyth

1

**Enclosures:**                                                                          **Page**

**Exhibit A:** *State of Washington v. Navient Corp. et al.*, Case No. 17-2-01115-1
(King County Superior Court), Verbatim Transcript from Recorded
Proceedings Before the Honorable Veronica Alicea-Galvan,
September 21, 2018...……………………………………………………3

**Exhibit B:** *State of Washington v. Navient Corp. et al.*, Case No. 17-2-01115-1
(King County Superior Court), Order Granting State of Washington's
Motion for an Order Compelling Production of Documents,
September 21, 2018…………………………………………………….65

**Exhibit C:** *In re Bankers Trust Co.*, 61 F.3d 465 (6th Cir. 1995)……………….68

# Exhibit A

September 21, 2018

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

IN AND FOR THE COUNTY OF KING

————————————————————————————

|  |  |
|---|---|
| STATE OF WASHINGTON, | ) |
|  | ) |
| Plaintiff/petitioner, | ) |
|  | ) King County Superior Court |
| v. | ) No. 17-2-01115-1 SEA |
|  | ) |
| NAVIENT CORPORATION, et al., | ) |
|  | ) |
| Defendant/Respondents | ) |

————————————————————————————

Verbatim Transcript from Recorded Proceedings

Before The Honorable Veronica Alicea-Galvan

————————————————————————————

September 21, 2018

King County Courthouse

Seattle, Washington

TRANSCRIBED BY:  Grace Hitchman, AAERT, CET-663

Page 2

```
 1

 2                    A P P E A R A N C E S

 3

 4    For the plaintiff:

 5    Benjamin J. Roesch
      Shannon Smith
 6    Attorney General of Washington
      TB-14
 7    800 Fifth Ave., Suite 2000
      Seattle, WA 98104-3188
 8    206.389.2105
      BenjaminR@atg.wa.gov
 9

10    For the defendant:

11    Kristin Silverman
      Calfo Eakes & Ostrovsky, PLLC
12    1301 2nd Avenue, Suite 2800
      Seattle, WA 98101-3808
13    206.407.2210
      Contact:  George Barrington
14    GeorgeB@calfoeakes.com

15
      Michael Shumsky
16    Lauren Beebe
      Jennifer Levy
17    Kirkland & Ellis LLP
      655 15th Street NW
18    Washington, D.C. 20005-5793
      202.879.5000
19    michael.shumsky@kirkland.com

20

21

22

23

24

25
```

Page 3

1            (The Honorable Veronica Alicea-Galvan presiding)

2                    (Friday, September 21, 2018)

3                            --o0o--

4            (Recording begins 9:59 a.m.)

5            THE COURT:  Good morning, everyone.  You may be

6    seated.  This is Washington v. Navient, 17-2-01115-1 SEA.

7            A couple of things before we begin.  I'm going to

8    listen to argument in this case.  With regard to any issues

9    that I have not fully decided at the conclusion of the

10   argument, those issues will be rendered in a written

11   opinion.  So I just kind of want to let -- there's a lot of

12   balls in the air on these matters, and I want to make sure

13   that I have those spelled out accordingly.

14           So with that in mind, let's note the appearances for

15   the record.  On behalf of the state of Washington, please?

16           MR. ROESCH:  Good morning, Your Honor.  Benjamin

17   Roesch, assistant attorney general.

18           MS. SMITH:  Good morning, Your Honor.  Shannon

19   Smith, assistant attorney general.

20           THE COURT:  Good morning.

21           MS. LEVY:  Good morning, Your Honor.  Jennifer Levy

22   from Kirkland and Ellis, Navient.

23           MS. SILVERMAN:  Good morning, Your Honor.  Kristin

24   Silverman from Calfo Eakes for defendant.

25           MR. SHUMSKY:  Good morning.  Mike Shumsky from

Page 4

1    Kirkland and Ellis for Navient defendant.

2         MS. BEEBE:   Good morning.   Lauren Beebe from

3    Kirkland and Ellis.

4         THE COURT:   Okay.   So in terms of making this as

5    easy as it can be, I received two different sets of motions

6    to take judicial notice of adjudicative facts.   As those

7    issues pertain to the 12(c) motion, I can let you know that

8    there's going to be some facts that the Court takes notice

9    of and others that the Court does not take notice of because

10   it doesn't help the Court.

11        In terms of argument, I'm going to allow the State

12   to present their 12(c) motion on certain defenses first, and

13   then we'll hear from respondent on those issues.   And then

14   I'll hear your rebuttal arguments.

15        With respect to -- then we'll go to respondent's

16   12(c) motion.   We'll hear from your response and then we'll

17   hear their rebuttal.

18        So I'm going to try to keep these as contained as I

19   can, even though I know that they spill into each other

20   significantly.

21        So -- and with regards to the motion to compel, now,

22   was I correct in that the parties requested oral argument on

23   the motion to compel?

24        MR. ROESCH:   Your Honor, Navient requested oral

25   argument.

Page 5

1          THE COURT:  Okay.  All right.  So let's start with

2     that motion.  And then we'll get to the 12(c) motions.

3          MR. ROESCH:  Good morning, Your Honor.  As I

4     indicated before, my name is Ben Roesch, here on behalf of

5     the State.

6          The State's motion to compel seeks production of

7     specific borrower files.  These data include personally

8     identifying information for those borrowers.  These

9     borrowers have, by the way, all submitted complaints either

10    to the Consumer Financial Protection Bureau, to the

11    Washington attorney general's office, or to the Better

12    Business Bureau.  And I can say with about 99.9 percent

13    confidence -- only because I didn't review my records this

14    morning -- that we have, in fact, interviewed all of these

15    borrowers.

16          Although the motion to compel presents some sort of

17    novel arguments in terms of federal law, these issues are

18    actually very straightforward.  The objections to production

19    fall under three general categories.  First, we have the

20    federal Privacy Act.  Second, we have Navient's contract

21    with the Department of Education, and third, we have a

22    suggestion that it would be more convenient all around if

23    the State instead sought these documents through the Touhy

24    regulations that the Department of Education has

25    promulgated.

September 21, 2018

Page 6

1          Your Honor, let's address these in turn.  First, in

2     terms of the Privacy Act, the act itself in 5 USC

3     552a(b)(11) allows production pursuant to an order of a

4     court with competent jurisdiction.  There isn't an argument

5     in this case that the Court doesn't have competent

6     jurisdiction.  There is personal jurisdiction over the party

7     from whom production is sought, and certainly the Court has

8     subject matter jurisdiction.  And as such, the In Re Tucker

9     court was very explicit that this Court is the best suited

10    entity to determine whether the Privacy Act applies and

11    whether production should be made.

12         The regulations implementing those -- that section

13    are not to the contrary.  Both the national archives and

14    their Department of Education's regulations both have an

15    exemption from the general prohibition on disclosure that

16    quotes that provision verbatim.

17         And, in addition, the Department of Education's

18    regulation at 34 CFRb(2)(d)(5) specifically provides that

19    the Privacy Act regulations aren't about whether documents

20    or data are made available to parties in litigation.  It

21    says, quote, the availability of such records to the general

22    public or to any subject individual or party in such

23    litigation or proceedings shall be governed by applicable

24    constitutional principles, rules of discovery, and

25    applicable regulations of the Department.

Page 7

1          The case law is quite clear that there is no

2     privilege that arises out of the Privacy Act or its

3     regulations.  And, in fact, discovery can be had through the

4     ordinary court processes.

5          Second, Your Honor, Navient suggests that its

6     contract with the Department of Education prohibits

7     production in this case.  Generally, as you know, parties

8     aren't allowed to escape the operation of the Rules of Civil

9     Procedure simply by contracting around them, and that's

10    certainly not the case here.  First of all, Navient explains

11    that the contractual provisions requesting prior consent

12    from the Department are there to implement the protections

13    of the Discovery Act.  Well, because the Discovery Act

14    contains this exemption, which clearly applies in this case,

15    the contract neither explicitly nor implicitly authorizes

16    the withholding of these documents.

17         In addition, the Bankers Trust case explained the

18    legal ownerships of the documents it not determinative.  And

19    there's no dispute here, I don't believe, that Navient has

20    possession of the data that's been requested.

21         Finally, Your Honor, there's an argument that the

22    Department's Tuohy regulations suggest it to be more

23    convenient for the Court to require us to go to the

24    Department of Education.  The Tuohy regulations, first of

25    all, by their own terms, don't purport to apply here.  They

Page 8

1    apply where documents are, in fact, sought from the

2    Department of Education, its employees, or its special

3    employees, and that's not the case here.  The documents are

4    being sought by Navient.

5         More to the point, the procedure proposed by Navient

6    would only add steps as, in fact, the Bankers Trust case

7    explains, rather than the relatively straightforward

8    discovery procedures.  We have a situation where a separate

9    request is made to the Department.  The Department, if it

10   decides to grant the request, has to go get those documents

11   from Navient if it wants to produce them, or it can order

12   Navient to produce them, which is exactly what we're here

13   for.

14        The proposed -- the Tuohy regulations aren't more

15   convenient in this case.  They only add potential steps and

16   potential side litigation in federal court over the

17   Administrative Procedures Act.

18        THE COURT:  Thank you.

19        MR. SHUMSKY:  Good morning, Your Honor.  Thanks for

20   the opportunity to argue the motion to compel.  I understand

21   that it is somewhat unusual to be hearing an argument on

22   this.  We bring it to your attention because we think that

23   there are some very significant issues and concerns that the

24   Court ought to consider before it orders production.

25        Let me be clear at the outset here, we are not

Page 9

1  taking the position that this Court has no authority to

2  enter the order that the State is requesting.  The question

3  is whether or not the Court should exercise that authority

4  and what limitations the Court should order on the

5  production of this information.

6         So let me step back and talk just for a second about

7  the type of information that we're talking about.  We're

8  talking about individually identifiable information that

9  discloses borrowers' names, home addresses, telephone

10 numbers, maybe more dangerously Social Security Numbers,

11 bank account information, credit histories, really serious

12 stuff that a lot of bad actors would like to get their hands

13 on.

14        THE COURT:  Let me stop you right there.  Aren't

15 there things in effect, protective orders, orders to seal,

16 filing certain documents that do redact that personal

17 information and any complete documents under an order for

18 seal?  Aren't there protections that allow for that?  I

19 mean, we have cases here that involve banks, that involve

20 multibillion dollar corporations that oftentimes contain

21 very sensitive and personal information, and yet we manage

22 to handle all of those cases.

23        MR. SHUMSKY:  Sure, Your Honor.  That's exactly

24 right.  No question.  There's a protective order in place,

25 and I have no reason to think -- Navient certainly isn't

Page 10

1   taking the position that Ben can't safeguard this

2   information, that he's going to improperly use it or that

3   somebody in his office is going to improperly use it, that

4   they're going to leak it to a newspaper.  But what the

5   Department of Education has required and what federal law

6   has required is a series of very highly reticulated data

7   security and information security procedures that are

8   designed to prevent somebody from hacking into a computer

9   system that contains this information and unlawfully

10  accessing it.

11         And, you know, Ben talked about some of the

12  authorities, but there's Privacy Act regulations that govern

13  data security.  There are NARA regulations that govern data

14  security practices and procedures.  There are Department of

15  Education regulations that govern all of that.  Navient's

16  contract governs all of that.

17         We explained in our brief at some length some of

18  the, I'll call them cybersecurity, features that we need to

19  build into our systems.  And I would add, there's one other

20  statute that's relevant here. it's the FISMA, the Federal

21  Information Security Management Act, that requires the

22  federal government when it maintains -- and I should say

23  expressly applies to contractors who maintain sensitive data

24  on behalf of the government, that those companies need to

25  put in place to prevent hackers or unauthorized individuals

1    from accessing this information.

2            So, again, I respect we've got a protective order in

3    place.  We don't mean to suggest in any way that the Bureau

4    is going to be releasing or unlawfully using this

5    information.  The question is whether or not the State has

6    in place data architecture and cybersecurity features that

7    are sufficient to safeguard this information, that are

8    compliant with federal law, and that meet the standards that

9    the United States Department of Education has imposed.

10           And so we have sort of two sets of concerns that

11   arise here, right?  On the one hand, we have half a dozen or

12   more provisions of the contract, which we laid out at Pages

13   4 to 5 of our opposition that are designed to locate this

14   information exclusively within the federal government's

15   power to control and dispose of as it sees fit.  And then

16   secondarily, consistent with the contract pursuant to the

17   contract, a series of technical specifications and

18   information security requirements that are designed to

19   safeguard this highly sensitive, very desirable information.

20           THE COURT:  Without going down, for lack of a better

21   term, the rabbit hole of cybersecurity that you have raised,

22   doesn't the State already keep sensitive information on many

23   of its constituents or citizens or residents?  And doesn't

24   it do that in the context of DSHS, in the context of a

25   myriad of other criminal cases, all of that?  I mean, isn't

Page 12

1    that -- is that truly what the concern is?

2         MR. SHUMSKY:  Your Honor, I have no reason to doubt

3    that the State maintains this information.  What I can't

4    represent, what I'm not sure that the State can represent to

5    you today, is that the system architectures and the

6    technical specifications that they had in other places are

7    consistent with the requirements of federal law, with the

8    requirements the Department of Education has imposed, that

9    FISMA imposes and that federal law requests, the federal

10   government, federal agencies that maintain this data, to

11   impose.

12        And the position that we're taking in this case is

13   that in contemplating whether or not to issue a discovery

14   order, the question isn't just whether or not the

15   information is discoverable within the terms of CR 34.  But

16   rather under CR 26(b)(1) requires you to consider what the

17   limitations are on the parties, what the burdens are on the

18   parties, what the interests at stake are in ordering the

19   production.  And, in particular, whether or not there is a

20   mechanism for the party to get this information without

21   imposing an undue burden on the party from whom it's sought.

22        And we're in a really tough position, Your Honor,

23   right?  We're being put in between a rock and a hard place.

24   On the one hand, the threat of violating a court order to

25   produce this data, and on the other hand, the threat of

Page 13

1  violating our contract with the United States government,

2  with the Department of Education, that bars us from

3  producing this data outside of the limitations that the

4  government, I think quite reasonably, has imposed on this

5  data.

6       And what we're asking you to consider is the fact

7  that the Department of Education has asked the State to come

8  before it and request the data.  That at that point the

9  Department of Education can sit down with the state of

10 Washington and discuss the appropriate limitations that will

11 be placed on that access to ensure that only pre-cleared

12 individuals are able to access it, to ensure that the state

13 of Washington and the Bureau's computer systems have

14 sufficient safeguards in place to prevent hackers or other

15 unauthorized actors from accessing the information.

16      And given the limitations that are imposed on

17 Navient here, I think it's not crazy to say this is

18 something that ought to be worked out between the Department

19 of Education, which has taken every imaginable step to say

20 we have exclusive control and custody of these records, even

21 though we have used a contractor to build this server and

22 even though the contractor is performing functions on the

23 government's behalf.  But come to the government and talk to

24 us about this so that we can defend the government's

25 interest and the Department of Education's interest in

Page 14

1   protecting this highly sensitive data.

2           And, you know, I understand Mr. Roesch's argument,

3   which is to say, well, you know, it would really be

4   duplicative at this point for us to go and ask the

5   Department of Education, because we have come into court and

6   asked the Court to order the production of this.  But that

7   sort of defect or argument really is the State's own fault.

8   If they had gone to the Department of Education in the first

9   instance and made this request, it would have taken the

10  State far less effort than it took the State to file the

11  motion to compel, file a reply brief, and come into court

12  and argue their position today.  The fact that they chose

13  not to do it doesn't sort of make that unduly burdensome.

14  It certainly doesn't make it unreasonable.

15          What we're asking, what the Department of Education

16  has ordered us to say to the Court and to the state of

17  Washington, is come to us.  Have a discussion about this,

18  and show us that you've got the systems in place and the

19  protections in place to safeguard this information.

20          And so, again, I want to be clear.  Our position is

21  not that you somehow lack the power to enter this order but

22  whether, in light of the things you need to consider under

23  CR 26 it's appropriate to do so without any consideration

24  for the Department of Education's interests, for the

25  interests of the United States government.  And, you know,

1   we respectfully submit that the appropriate way to handle

2   this is to have the state of Washington go to the Department

3   of Education, determine whether or not Ed and the state of

4   Washington can come to an agreement on the procedures and

5   restrictions that are going to apply to this data.  If they

6   can, that's great.  The State's going to get all of the

7   information that they're looking for.  If not, they can come

8   back into court, and you at that point can make a

9   determination of whether or not to compel Navient to

10  disregard the contractual limitations that are in its

11  contract with the federal government.

12          And one very last thing, if I can just briefly point

13  out.  Mr. Roesch has said they re looking for a limited set

14  of information in this case on particularly identified

15  Washington borrowers.  They have already sat down with those

16  borrowers, met with those borrowers.  I would add sort of

17  one addendum to all of this.  I think there are 46

18  Washington borrowers that are at issue here whose data the

19  State is seeking.  We understand from the State that they

20  have gotten releases from 39 of those 46 borrowers that

21  essentially waive any objection that that borrower would

22  have to the production of its information.  Our

23  understanding from informal communications with the

24  Department of Education is that with those releases in hand,

25  the Department likely would release that information to the

1    State.

2         We said to Mr. Roesch when we had a discovery

3    dispute that prompted the motion to compel, go back to the

4    other set of borrowers.  Get the same releases for those

5    individuals.  We'll take that to the Department of Education

6    and see if the Department of Education will give us the

7    requisite written authorization to release this information

8    to you.  And the State refused to do that.  They said no, we

9    want to take this to Court.  We want to set a precedent.  I

10   suspect we're hearing it's 46 borrowers today.  Tomorrow

11   it's going to be every call record, every record that

12   Navient has, every single borrower in the system.  But there

13   was a solution to this problem that the State chose to

14   forego.

15        And I think in choosing whether or not to sort of

16   force Navient into this no-good-option scenario between

17   violating a court order and violating our contract with the

18   United States government, that it's worth having the state

19   of Washington go through the procedures that the Department

20   has requested and see if there's a way to work these issues

21   out.  We're willing to be a, you know, useful and helpful

22   participant in that process, but in our view, it's premature

23   and inappropriate to order us to violate our contract and

24   disregard the legitimate and significant issues that the

25   federal government has sought to assert and protect itself

Page 17

1   with the regulations and the contractual provisions we're

2   dealing with.

3           THE COURT:  All right.  Thank you, counsel.  You may

4   be seated.

5           In looking at this issue, the Court finds and is

6   going to grant the motion to compel.  The Court does not

7   find that the federal Privacy Act is a bar under these

8   circumstances, that this Court has and is a Court of

9   competent jurisdiction to grant this motion.  The Court

10  finds that with regards to the contract, that a provider of

11  government services can't simply say this contract doesn't

12  allow us to; therefore, we're somehow not obligated to

13  provide this type of discovery.  These are the risks that

14  governments run when they provide outside individuals to

15  contract services.  There's a presumption that at some

16  point, there may be litigation, and they are no more immune

17  from the requirements of discovery than the government

18  itself would be.

19          This isn't a provision to violate a contract.  This

20  is a court order.  And this is not an intentional violation.

21  This is not a willful violation.  This is an obligation

22  under an order of a Court of competent jurisdiction.

23          With regards to the convenience, the place that is

24  the most likely and easiest place to obtain this information

25  is from the person who holds this information.  Again, you

Page 18

1   can delegate authority; you can't delegate responsibility.

2   And while the Department of Education may be ultimately

3   responsible for these loans, they have delegated certain

4   authority to Navient.  And within that context of the

5   authority is the keeping of these records.  And Navient is

6   the source of those.  And the Court is going to grant the

7   motion to compel.

8        So I'm going to ask that you prepare an order on

9   that.  We'll take all of the orders at the end that I'm

10  going to take care of today.  Okay?

11       That brings us then to the plaintiff's 12(c) motion.

12  And I'm going to give each side 15 minutes -- do you want

13  certain time reserved for rebuttal?

14       MR. ROESCH:  Yes, Your Honor.  I would like to

15  reserve five minutes for rebuttal, please.

16       THE COURT:  Okay.  Five minutes for rebuttal.  And

17  you may proceed.

18       MR. ROESCH:  Good morning, Your Honor.  The State's

19  motion should be granted for the reasons set forth in the

20  briefing and to the extent specifically provided in the

21  State's proposed order.

22       THE COURT:  Let me ask a question.  Why a 12(c)

23  motion?

24       MR. ROESCH:  Yes, Your Honor.  I think that's a fair

25  question.  In this case, Navient's answer provided a lot of

Page 19

1    grist for the State to look through.  For example, Navient

2    denied knowledge that would allow it to either admit or deny

3    things like whether it serviced federal and private loans,

4    whether its obligations in servicing those loans included

5    collecting payment.  So there was a lot for the State to get

6    its head around.  That didn't happen within 20 days.

7         We planned to present these issues in a motion for

8    summary judgment.  When the defendants decided that they

9    were going to be moving for a 12(c) partial dismissal of the

10   State's claims, it seemed like an appropriate time for the

11   Court to consider the purely legal issues presented by

12   conflict preemption and, to a certain extent, the express

13   preemption provision of 20 USC 1098g.

14        THE COURT:  Didn't this Court address those issues

15   somewhat in the 12(b)(6) motion that it heard?

16        MR. ROESCH:  Your Honor, it did.  However, the

17   procedural posture required denial of that motion based on

18   the any conceivable fact standard that applies here to both

19   of the cross motions.  And so as defendants rightly pointed

20   out, it's not necessarily conclusive on the entire case.

21   We're happy for that ruling to stand and be dispositive

22   regarding the affirmative defenses, including conflict

23   preemption, but as a belt and suspenders way of closing the

24   book on those specific defenses, we want to present these

25   very clearly for the Court's consideration.

1          THE COURT:  Okay.  So let's start with the issue of

2     conflict preemption.  And are you also going into an issue

3     of field preemption?  Is that --

4          MR. ROESCH:  Well, Your Honor, it's a little bit

5     unclear whether there's a field preemption defense that's

6     being asserted here.  For example, we didn't think there was

7     a statute of limitations defense that was being asserted.

8     It turns out today, there is.  So, again, belt and

9     suspenders.

10          As far as conflict preemption goes, there are two

11     different types.  The first is impossibility preemption.

12     That's where a party cannot comply with both state and

13     federal law.  There's no suggestion that that's the case

14     here.

15          So what we're left with is obstacle preemption.

16     This is where the state law stands as an obstacle to the

17     accomplishment and execution of the full purposes and

18     objectives of Congress.  That is a legal matter to be

19     decided by examining the federal statute as a whole and

20     identifying its purposes and intended effects.

21          And we believe, Your Honor, that prohibitions on

22     unfair or deceptive acts or practices by state law doesn't

23     get in the way of anything Congress intended to do with the

24     higher education act.  The higher education act was intended

25     to help students, to help them finance their educations, to

Page 21

1   help them repay their loan obligations, including through

2   income-driven repayment plans.  Nothing in that broad

3   purpose conflicts with the notion of borrowers not being

4   lied to or being treated unfairly.

5           So what we have is the Department of Education

6   notice of interpretation which, I think it's worth pointing

7   out under the Wyeth Levine case, is afforded some weight at

8   the most.  And the amount of weight is essentially, Your

9   Honor, like an amicus brief.  The Court look at how thorough

10  it is, whether it's consistent with prior positions -- it's

11  not, for the reasons we've explained in the briefing -- and

12  how persuasive it is.

13          And the Department of Education has two purposes

14  that it says state UDAP, Unfair and Deceptive Acts or

15  Practices, may conflict with.  The first is uniformity.

16  Your Honor, the weight, and indeed most recent federal

17  authority on this, which was put out after the Department's

18  notice of interpretation, finds that uniformity is not a

19  purpose of the Higher Education Act and certainly doesn't

20  displace traditional state consumer protection laws in light

21  of the presumption against preemption.

22          And that's not surprising.  It would be a really

23  unusual purpose of Congress to prevent the state of

24  Washington from protecting its consumer by saying you can't

25  make misrepresentations to them for the reason the company

1  needs to be free to make those same representations to

2  borrowers all across the country.  That is contrary to

3  everything we know about the Higher Education Act's purpose

4  as well as the other federal laws that apply in these areas

5  like, for example, the Federal Trade Commission action.

6       THE COURT:  Let me ask a question.  You have asked

7  this Court to take notice of certain adjudicative facts.

8  Some of those facts I know that you offered for the purpose

9  of their existence as opposed to for the purposes of their

10 content.  How is the mere existence of those relevant

11 without the content?

12      MR. ROESCH:  Because, Your Honor, it goes to -- it

13 goes to the consistency with which the Department of

14 Education has approached the issue of compliance with state

15 law and whether its servicers need to do that.

16      THE COURT:  Well, let me ask a follow-up question.

17 How does this Court give any, I don't know what the word is,

18 credence, leeway to the policy decisions on how to proceed

19 from the Department of Education?  We have had, certainly

20 since the inception of this case, a change in policy, a

21 significant change in policy as to how these things are

22 handled or viewed.  So what weight is the Court to give to

23 agency policy with regards to, as they argue, that somehow

24 the Department of Education itself, their new policy somehow

25 preempts the consideration of this by the Court?

1          MR. ROESCH:  Certainly, Your Honor.  We don't view

2     this as what the Obama administration said versus what the

3     Trump administration says.  We go much further back than

4     that, in fact, to the 1992 notice of interpretation

5     regarding the preemptive effect of 34 CFR 628.411, which

6     governs the minimum requirements that a servicer must do to

7     take -- to try to collect on Folk (phonetic) loans.  And

8     there -- and again, I think that was probably developed

9     during the end of the George H.W. Bush administration, put

10    out at the beginning, perhaps, now.  It would have been in

11    the George H.W. Bush administration.  The Department of

12    Education said the preemptive effect of these regulations --

13    and this is written into subsection O of that regulation

14    itself -- only extends so far as is necessary to allow

15    services, to allow collectors, to undertake these minimum

16    efforts.

17          So what we have -- and this, by the way, is

18    completely consistent with Congress's mandate in the Higher

19    Education Act 20 USC 1082 A-1 it instructed the Department

20    to provide minimum standards for servicers.  And the

21    Department did just that.  If you look at the regulation I

22    cited earlier, the words "at a minimum," "at least," appear

23    over and over and over again.  And as a result, courts have

24    held all across the country that prohibitions on making

25    misrepresentations don't get in the way of --

Page 24

1        THE COURT:  Meeting those minimal obligations.

2        MR. ROESCH:  -- meeting those minimum requirements.

3   So there isn't a conflict between the intent to provide a

4   minimum floor for what activity needs to take place and

5   preventing people from making misrepresentations.

6        I think, Your Honor, there's also -- if I could just

7   have one moment -- there's a big difference between

8   establishing a minimum, establishing a floor, and an

9   intention to establish an exclusive set of contracts.

10  Neither the Higher Education Act nor the Department of

11  Education's own regulations purport to be exclusive.  That

12  comes up for the first time, Your Honor, in this 2018 notice

13  of interpretation.

14       THE COURT:  All right.

15       MR. ROESCH:  Thank you.

16       THE COURT:  Thank you.  So I'll ask you the same

17  question, and I'm going to start off with the same question.

18  Does -- what effect does a policy of a federal agency have

19  on preemption?

20       MR. SHUMSKY:  Sure.  Let me unpack that in a couple

21  of different ways to Your Honor.

22       What we have from the Department of Education -- and

23  I want to be clear.  We are not solely relying on the letter

24  that the Department of Education released in the Federal

25  Register recently.  But what the Department of Education has

Page 25

1    done there, what it did in the Brannon case in the 9th

2    circuit in 1996 when President Clinton was the head of the

3    executive branch, what it said to the 9th circuit in 1999 in

4    the Chay case when President Clinton was running the

5    Department of Education, is to interpret the scope and the

6    reach of Section 1098g, the express preemption clause that

7    we have invoked in this case.

8         And in Brannon and in Chay the 9th circuit looked at

9    those interpretations of a federal statute, and they said

10   we're in Chevron territory.  That is to say when a federal

11   agency interprets its organic statute, that interpretation

12   is entitled to deference from the judicial branch.  Whether

13   it's state or federal makes no difference because they're

14   the body that was charged by Congress with interpreting and

15   implementing federal law.

16        We are not taking the position that these notices of

17   interpretation, that the positions that the Clinton

18   administration took, positions that now the Trump

19   administration is taking somehow in and of themselves are

20   preemptive.  They relate to the interpretation and meaning

21   of Section 1098g.  And any time a federal agency interprets

22   a statute, that warrants considerable deference from the

23   courts.

24        And so we are looking to those authoritative

25   interpretations of federal law as a guide to what the

1  statute means at the end of the day, not as a sort of

2  independent source of preemptive authority apart from what

3  the statute otherwise provides.

4       There's a second part of this, Your Honor, which is

5  we're not dealing just with express preemption here.  We're

6  dealing with conflict preemption.  As you recognized on your

7  original ruling on the motion to dismiss, there are two

8  different types of conflict preemption, right?  One type of

9  conflict preemption is impossibility preemption.  We're not

10 taking the position in this case that there is impossibility

11 preemption.  We think, at least in theory, it is possible to

12 comply with at least some of the claims that the State might

13 pursue in this case -- more on that in a moment -- and

14 federal law --

15      THE COURT:  That it's possible to actually do this

16 without misrepresenting -- engaging in unfair or deceptive

17 practices as defined by law.  Correct?

18      MR. SHUMSKY:  Sure.  As defined by law, not

19 necessarily what the State argues unfair and deceptive

20 practices are, but yes.  We think that at least for certain

21 of the things that the State is going to argue at trial or

22 may argue at trial -- again, I want to come back to that

23 concept in a moment -- impossibility preemption isn't an

24 issue.

25      There's a second type of conflict preemption called

Page 27

1    purposes and objectives preemption where what the Court has

2    to do is determine whether or not state law claims that the

3    State is pursuing or may pursue at trial are consistent with

4    the purposes and objectives of the legislation that Congress

5    has passed.  The same principles that we're talking about in

6    terms of deference to the agency's authoritative

7    interpretation of 1098g apply to a federal agency's

8    interpretation of what the purposes and objectives of the

9    statutory framework are.

10              THE COURT:  Can I -- and I understand the idea of

11   giving deference to things.  But can I just ask you, if our

12   courts were somehow giving deference to these, for lack of a

13   better word, policy decisions made by individuals appointed

14   by the executive branch, don't we actually run a danger of

15   having these different interpretations vary possibly every

16   four years and not having some continuity and consistency as

17   to how the courts look at this?  I mean, isn't that why, if

18   Congress intended to preempt this, they would have done so?

19              MR. SHUMSKY:  Well, I -- trying to think about the

20   right order to do this in.  But I think I've got three

21   responses to that --

22              THE COURT:  I know that had a lot in it --

23              MR. SHUMSKY:  -- Your Honor.

24              THE COURT:  -- but --

25              MR. SHUMSKY:  So let me try and unpack a few things

Page 28

1    there.  I want to answer the question that you asked very

2    directly up front, which is yes, there is a risk that a

3    federal agency can change its interpretation over time.  The

4    U.S. Supreme Court has recognized that for decades.  What it

5    has said is, look, where the language of a statute is plain,

6    then an agency has no leeway to change its mind because what

7    Congress has explicitly provided for controls.  And,

8    obviously, a federal agency is subservient to Congress and

9    it can't sort of change what it's doing.

10          But where there's ambiguity in the statute, where

11   there's room for an agency to fill a gap or to choose among

12   competing but nonetheless both reasonable interpretations of

13   what federal law is, there are a couple of values that are

14   served by deferring to an agency, even where an agency might

15   change its mind over time.  One of the values that's served

16   by that is agency expertise.  And I don't mean to take

17   anything away from you, Your Honor, but --

18          THE COURT:  Oh, please --

19          MR. SHUMSKY:  -- judges in general are generalist

20   judges.  They deal with all kinds of subject matter.  We

21   were late coming into court this morning because we went

22   down to your old courtroom and watched some of the docent

23   calendar.  Right?  Judges deal with a lot of different kinds

24   of issues.  United States Department of Education deals with

25   the Higher Education Act.  It's a subject matter expert.

Page 29

1          And so there's a value, the Court has said, in the

2     Chevron case in the context of dealing with questions of

3     agency deference, there's an expertise-based rationale for

4     giving some additional leeway to agencies who may well, in

5     light of changed circumstances or evolving conditions,

6     change their mind about how best to effectuate the purposes

7     or how best to resolve an ambiguity in the statute in light

8     of that specialized knowledge.  That's one value that's

9     served by that.

10          The second value that's served by that is there's

11     some democratic accountability, which is at least in the

12     federal system, not in every state but in lots of states

13     too, judges have lifetime or very long appointments to the

14     bench and can't be removed where the people disagree with

15     the policy decision that a judge has made.  But we vote

16     every four years for the president of the United States.

17     The president of the United States chooses the head of the

18     executive branch.  If you don't like what a federal agency

19     is doing, the Supreme Court said in the Chevron case, you

20     can vote him or her out of office at the conclusion of their

21     term, get a new set of executive branch heads, and that way

22     there's a sort of democratic accountability mechanism that

23     solves the counter-majoritarian dilemma, the problem that

24     you might have a judge ossifying the law in a way that's at

25     odds with what the people have chosen through the electoral

Page 30

1    process to put in place.  So big conceptual theoretical

2    answer to your question.

3           Yes, I hear you.  It can change every four years.

4    The Supreme Court has said that's okay when you're dealing

5    with ambiguity in the statute.  For --

6           THE COURT:  But is there ambiguity in the statute?

7    I guess that's the second part of my question.

8           MR. SHUMSKY:  -- those two reasons.  Well, so the

9    second part of that question is, Your Honor, I actually

10   don't think that there is any ambiguity in the statute.

11   Section 1098g says that no federal loan shall be subject to

12   any disclosure requirement of any state law.  It's broad.

13   It's unqualified.  And it's unambiguous.  It says where a

14   state is seeking to require a federal lender to make a

15   disclosure, even if that same disclosure is required by

16   federal law, the State can't enforce that law.  You

17   recognize that in your original decision.  You said, I

18   certainly recognize that there are claims that will be

19   preempted -- let me just read that.  You said -- and in this

20   case, there is 1098g, it does expressly preempt certain

21   things.

22          And this is the point that I wanted to come back to

23   a moment ago.  I know I tried to bracket it a couple of

24   times before, which is as Ben just conceded, right?  The

25   same standard that was at issue on 12(b)(6) and that you

Page 31

1    rely upon in denying our motion to dismiss is the standard

2    that applies to the State's motion here.  Which is if there

3    is any conceivable set of facts, any evidence that the State

4    wants to introduce, any argument that the State wants to

5    make, any claim that the State wants to pursue that would

6    run afoul of that broad and unqualified language in 1098g,

7    you have to deny their motion to effectively strike our

8    affirmative defense, which would have the consequence of

9    preventing us from mounting those objections down the road.

10          And it simply cannot be said that there is no

11   conceivable claim or argument or evidentiary avenue that the

12   State wants to pursue in this case that would run or avoid

13   running into that explicit and unambiguous prohibition of

14   1098g.  But the reason why the deference question comes up,

15   it's sort of a, well, but even, right?  Even if there were

16   some ambiguity, we have a series of decisions where the

17   Department of Education consistently has taken a broad view

18   of 1098g, going, as I said before, all the way back to the

19   Clinton administration.

20          I would point out the 9th Circuit has deferred to

21   the Department of Education's preemptive interpretation or

22   interpretation of the preemptive scope of 1098g twice.  The

23   7th circuit has done it.  I would add, we pointed out, the

24   Great Lakes case from the Northern District of Illinois in

25   our briefing that granted a motion to dismiss similar to the

1   one that we brought in this case, obviously under a federal

2   standard rather than the any-conceivable-set-of-facts

3   standard that you applied.

4          I should tell you, two days ago, the middle district

5   of Florida -- sorry, the Northern District of Florida,

6   federal court, issued another decision, again deferring to

7   the Department of Education's position finding that 1098g

8   expressly preempted claims against a loan servicer there,

9   Great Lakes, one of Navient's competitors.  So you have a

10  growing body of case law, body of case law that's consistent

11  back to the 1990s.  This is even if there were any ambiguity

12  in the broad scope of Section 1098g, I'm going to defer to

13  what the Department of Education has said on this matter.

14         So, you know, at bottom I think what we're asking

15  you to do, Your Honor, is recognize under the standard that

16  the State has conceded that you're bound to apply, there are

17  things that the State may argue at trial down the road that

18  would run afoul of the prohibition that's expressly

19  unambiguously set forth in 1098g, that even if there was

20  some ambiguity in that, we have authoritative

21  interpretations that date back across multiple

22  administrations, Democratic and Republican, that impose or

23  adopt the same broad unqualified interpretation of 1098g.

24  That it certainly can't be said there was nothing that the

25  State was going to argue in this case that would run afoul

Page 33

1    of that.  And allow Navient, if and when we get to trial, to

2    raise our objections.  To say this line of questioning is

3    off limits, this is inappropriate.

4           Very last thing that I want to say about that is --

5    and Mr. Roesch said before -- they were planning to raise

6    these issues on summary judgment.  That's the appropriate

7    time if you're going to wade into this, to wade in --

8           THE COURT:  Well, the issue of preemption isn't

9    going to be decided by a jury.  It's going to be decided by

10   this Court.

11          MR. SHUMSKY:  Oh, certainly not.  But it ought to be

12   decided claim by claim when the State raises certain

13   arguments.  Right?

14          I'll give you just one example, right?  We pointed

15   out in our opening brief -- again, irrespective of this

16   no-conceivable-set-of-facts standard, we have 1098g, which

17   expressly bars any state disclosure requirement.  There are

18   claims that are in the complaint that explicitly fault

19   Navient for failing to make certain disclosures.  And they

20   actually use the words, "failed to disclose."  We said that

21   is clearly preempted.  That should be taken out of the case.

22   And you said it's premature to do that, right?  The standard

23   is, is there anything the State could argue down the road,

24   claim an evidentiary avenue they could pursue that wouldn't

25   be subject to that objection?  If there is, I have to deny

Page 34

1    the motion to dismiss.  But when the time comes, right?

2         If the State starts to argue about nondisclosure or

3    failure to disclose, we want to have the ability to say to

4    the Court, Your Honor, that is preempted.  We're no longer

5    in hypothetical land where is there some conceivable set of

6    facts.  We're confronted with an actual situation in which

7    the State is trying to fault Navient for not making a

8    disclosure.  If so, that's the time, at that point in the

9    case, to resolve those objections.  And that's what we want

10   to preserve the ability to do, Your Honor.

11        THE COURT:  Thank you.

12        MR. SHUMSKY:  Thank you.

13        THE COURT:  Which -- and, again, I think that it

14   would be, in all fairness, easier to start where we left

15   off.  This brings me back to that question, you know that

16   the 12(b)(6) or the 12(c) standard, I think both parties

17   know, this is a pretty high standard.  This is any set of

18   conceivable facts beyond a reasonable doubt.  I mean, it's a

19   pretty high burden, especially when we have statutes that

20   say, yeah, there's certain circumstances under which this

21   can be preempted, and we have other state -- I mean,

22   wouldn't my recognition that other states have engaged in

23   this inquiry automatically say there's reasonable doubt and

24   you don't meet that 12(c) standard?

25        MR. ROESCH:  Your Honor, I don't think so.  And

Page 35

1   let's unpack a couple things.

2          First of all, the State's motion doesn't seek to

3   strike -- seek to dismiss the 1098g express preemption

4   argument in its entirety.  That relates to a specific claim

5   and specific paragraphs in the complaint.

6          I would refer the Court to paragraph 5.138 where the

7   State has alleged Navient made affirmative

8   misrepresentations on its website to borrowers.  Those

9   representations weren't about the loans themselves.  They're

10  not about the loan's terms, conditions, interest rates,

11  anything like that.  These were representations about what

12  Navient was going to do for those borrowers if the borrowers

13  took the action of calling in.  The Court in the CFPD case

14  held that this created an affirmative duty on Navient to act

15  in accordance with those promises.  Navient's failure to do

16  that, Your Honor, its actions in making representations

17  about what its own actions would be and then breaching those

18  representations, can't be characterized in any way as a

19  failure to make disclosures about the loan.

20         The other point regarding the standard relates to

21  the notion of obstacle preemption.  In order for that

22  defense to survive, we need a couple things.  First, we have

23  to establish a purpose of Congress -- and it's key.  We'll

24  get back to the sort of level of deference and how to deal

25  with the Department of Education's pronouncements about

Page 36

1    this.  But we're looking for a purpose of Congress that

2    could even conceivably be thwarted by a prohibition on

3    making misrepresentations to student loan borrowers.  I

4    would submit, Your Honor, there is none, because we simply

5    haven't established that threshold legal issue of what is

6    the purpose.

7         We talked about the HEA's purpose broadly.  We

8    talked about uniformity.  We can talk, if Your Honor would

9    like, about the Department of Education's invocation of the

10   federal fisc.  Again, Congress has spoken about how it wants

11   to manage these loans.  In 20 USC 1082a(1) it specifically

12   says damages will not be passed on to the United States for

13   the actions of student loan services.  So that is, Your

14   Honor, how Congress intended to protect the federal fisc.

15   It also intended to protect the federal fisc by switching

16   from the FELL program to the direct lending program and

17   cutting out the private lender middleman.

18        There's no indication, much less the type of

19   compelling evidence that's required from the 9th Circuit And

20   Supreme Court case law governing preemption that Congress

21   intended to save money by getting rid of traditional state

22   Consumer Protection Acts that impose the same type of

23   prohibitions that are generally applicable under federal

24   law.  In fact, that would be a really strange way to save

25   money, because Navient still has to comply with these same

1   standards, regardless of the application of state law.

2          Finally, Your Honor, in terms of the deference to be

3   accorded to an agency's pronouncements regarding Congress's

4   purposes and Congress's objectives in the statute that it

5   administers, Wyeth v Levine speaks directly to that.  It's

6   not Chevron deference.  It's not our deference.  It's what's

7   called Skidmore deference.  Specifically, the Supreme Court

8   says we have not deferred to an agency's conclusion that

9   state law is preempted.  It recognizes that departments like

10  the Department of Education may have some insight into how

11  state law interacts with the federal scheme.

12         Here's the key passage:  The weight we accord the

13  agency's explanation of state law's impact on the federal

14  scheme depends on its thoroughness, consistency, and

15  persuasiveness.

16         Your Honor, for the reasons we explained in the

17  brief and have talked about here, that interpretation is not

18  entitled to any weight.  It is conclusory, and it entirely

19  ignores any case law that it finds inconvenient.

20         Unless you have any questions, that's it for me.

21         THE COURT:  No.  Thank you.

22         MR. ROESCH:  Thank you.

23         THE COURT:  So then we turn to the 12(c) motions

24  proffered by the defendant.  And in this instance, there's a

25  few things that are at issue.  Number one, the statute of

Page 38

1  limitations that you claim is at issue.  Number two, whether

2  or not injunctive relief is appropriate and whether or not

3  restitution can be applied when there is no injunction and

4  how that impacts this case.  I think I have outlined those

5  three things that you're seeking to have this Court address.

6          So let's start with the statute of limitations.

7          MR. SHUMSKY:  Sure.  Absolutely, Your Honor.  And,

8  you know, that's exactly the order that I want to tackle

9  these issues in.

10         I think the statute of limitations argument is as

11  straightforward an argument as you'll ever see.  Let me

12  start by just saying as a matter of fact, there is no

13  dispute between the parties that the conduct that's

14  challenged in Count 1 of the complaint ceased no later than

15  2009.  It's also undisputed that the State brought this

16  action more than two years after it alleged that the

17  challenged conduct ceased.

18         So the only question in front of the Court from the

19  statute of limitations perspective is, can the State seek

20  the recovery of a civil penalty, despite failing to comply

21  or bring its suit within two years?  And the plain language

22  of the statute addresses that.  RCW 4.16.100(2) gives a two-

23  year statute of limitation in any action upon a statute for

24  a forfeiture or penalty to the State.  And there is no

25  question that Count 1 is an action upon a statute for a

Page 39

1    forfeiture or penalty to the State.  It's a claim brought

2    under the CPA, which provides in RCW 19.86.140 that every

3    person who violates RCW 19.86.020 shall forfeit and a civil

4    penalty to the State.

5         In other words, whereas the statute of limitations

6    applies to any action upon a statute for a forfeiture or a

7    civil penalty to the State, the statute that the State is

8    actually proceeding under provides for a forfeiture and a

9    civil penalty to the State.

10        Second, you can actually look at the claim for

11   relief in the complaint.  It's actually Paragraph 9.4, where

12   the State is seeking an award of a civil penalty in the

13   amount of $2,000, pursuant to 19.86.140.  So we have a

14   situation where the statute of limitations by its express

15   terms mirrors exactly what the substantive relief the State

16   is seeking is, and therefor,e, it's subject to the two-year

17   statute of limitations.

18        THE COURT:  But doesn't the State also except itself

19   in another statute?

20        MR. SHUMSKY:  Right.  So there is another statute

21   that generally says the State is not subject to statute of

22   limitations claims.  Right?  And, fortunately, the

23   Washington Supreme Court has addressed this precise set of

24   arguments twice.  In LG Electronics, the Supreme Court of

25   Washington looked at these provisions and said that general

Page 40

1    rule, which is in RCW 4.16.160, generally bars statute of

2    limitations in actions brought by the State unless there is

3    an express provision to the contrary.  That's at 186 Wn.2d.

4    The pin cite is 13.  And they actually reiterate that at the

5    very conclusion of their opinion.  The pin cite here is 186

6    Wn.2d at 18.  In the absence of an express statute to the

7    contrary, the State's action is barred by the two-year

8    statute of limitations.  We have an express statute to the

9    contrary.  It's the one that deals with precisely the kind

10   of claim that the State is pursuing in this case.  That's

11   4.16.100(2).

12         There's another case where the Supreme Court of

13   Washington addressed this.  It actually predates the LG

14   Electronics case.  It's the U.S. Oil case. I'd like to point

15   you to 96 Wn.2d at pages 88 to 90.  The Court in that case

16   specifically looked at the conflict between these two

17   statute of limitation provisions, the one that we say

18   applies here, which specifically deals with civil penalties

19   to the State, and then the general one that has the nullum

20   tempus doctrine embedded within it.  And it said we're going

21   to draw what we call a remedial penal distinction, that in

22   cases where the State is seeking remedial relief, which U.S.

23   Oil made clear means monetary damages, but not where it's

24   seeking penal relief, i.e. civil penalties, that doctrine

25   applies.  But in cases where the State is seeking civil

Page 41

1    penalties, the express prohibition in 4.16.100(2) applies.

2          And I will say this, I had to read that case a lot

3    of times, because it just talks about the remedial penal

4    distinction without really explaining what it is. But what

5    it says in that opinion, the Supreme Court said we adopt the

6    distinction that was drawn by the Court of Appeals when the

7    Court of Appeals in its decision articulated the remedial

8    penal distinction.  And if you go back and you look at the

9    Court of Appeals opinion where they adopted this remedial

10   penal distinction, this is what the Court of Appeals said

11   that the Supreme Court of Washington in its decision later

12   adopted by express reference.  This will be at 27 Wn.App at

13   107:  Ever since 1854, the legislature has distinguished

14   between an action which imposes a forfeiture or a penalty

15   and any other type of action.  This distinction is described

16   as penal versus remedial.

17         This is a case that involves an action for a

18   forfeiture or a penalty, right?  Again, that's the explicit

19   language set forth in the CPA.  The reference in the U.S.

20   Oil case is to the statute of limitations provision that

21   we're talking about, 4.16.100(2).  It's not a monetary

22   damages action.  It's not anything else.

23         And it is remarkable for the State to be taking a

24   position that an explicit prohibition, a statute of

25   limitations that by definition runs against the State,

Page 42

1    because again, it applies only to a penalty or a forfeiture,

2    so the State somehow isn't subject to that statute of

3    limitations.  It would write that provision of the RCW out

4    of the Washington state code.  So that's our argument on the

5    statute of limitations.

6          But you said there's two other issues.  There are

7    two other issues:  Injunctive relief and restitution.  What

8    I would just like to say very quickly before I transition to

9    those issues is those issues are conceptually distinct from

10   the penalty issue.  Those are not statute of limitations

11   arguments.  They are not subject to your analysis on the

12   statute of limitations.  They are different kinds of claims.

13   They're two different issues that are presented there.

14         The first is the question of whether or not it is

15   appropriate for the State to be seeking injunctive relief

16   here.  And as the Ralph Williams case said, that's the

17   leading case from the Washington Supreme Court on this,

18   injunctive relief is proper only where there's, quote,

19   unquote, a cognizable danger of recurrent violation.  That's

20   87 Wn.2d at 312 to 313.  And the State has not put forward

21   any evidence that there is a cognizable prospect or danger

22   of a recurrent violation in this case.

23         As the complaint itself concedes, and, again, we're

24   moving here for judgment on the pleadings, but as the

25   complaint itself concedes, the conduct that they're

Page 43

1    targeting in this case ended in 2009.  There is no

2    allegation that Navient has engaged in this conduct since

3    the end of 2009.  I mean, I was pretty shocked when I read

4    their reply brief, because the best -- or, sorry, their

5    opposition brief, because the best they can say -- have a

6    bunch of sentences that begin hypothetically, somebody who

7    worked at Sallie Mae is still employed at Navient.

8    Hypothetically Navient might one day begin originating

9    loans.  But there's no allegation that Navient is actually

10   in the process of doing any of the things that are

11   prohibited.  No realistic possibility that Navient is going

12   to engage in the particular conduct that the State is

13   concerned about.

14          As they say in their complaint, and they plead it

15   repeatedly, the preferred lending era ended in 2007.  The

16   use of subprime lending as a loss leader to attract more

17   businesses from colleges ended in 2009.  Those things don't

18   happen anymore.  Schools don't have preferred lender lists.

19   And Navient has no plans now or in the future to engage in

20   the kind of conduct that the State alleges is actionable

21   here.

22          And in the absence of any possibility or prospect,

23   realistic chance or danger that Navient is going to do these

24   things --

25          THE COURT:  Let's address that issue, realistic

Page 44

1    chance.  So certainly you're not engaging in the conduct

2    right now because of a certain agreement that was entered

3    into, correct?

4             MR. SHUMSKY:  Correct.

5             MR. ROESCH:  So that agreement or the conditions of

6    that agreement are no longer in effect as of 2019, which is,

7    what, 60 days away essentially?  90 days away?  Correct?  So

8    as we talk about realistic, isn't there a realistic chance

9    in the -- under our 12(c) -- I'm not -- mind you, I'm under

10   a 12(c) standard.  I'm not under a summary judgment

11   standard.  So I'm not looking at just the facts of this

12   case. I'm looking at hypothetically speaking, which is

13   what --

14            MR. SHUMSKY:  Your Honor, I actually disagree with

15   that, which is the standard here of whether or not an

16   injunction is appropriate.  That's independent of the 12(c)

17   standard.

18            THE COURT:  I understand.

19            MR. SHUMSKY:  And the test for entry of an

20   injunction is there actually has to be a danger that this is

21   going to happen again.  And the State has pointed to nothing

22   beyond the fact that some people who worked at Sallie Mae

23   pre 2009 work at Navient today.  They have given no

24   indication, no evidence, nothing that's come out in

25   discovery, nothing in our documents, nothing in any public

Page 45

1    statements that Navient has made that, boy, you know what?

2    Starting in 2019, we're going to start trying to resuscitate

3    preferred lender arrangements.

4         THE COURT:  Here's where it gets a little murky.

5    So, obviously, under an injunction standard, it's a pretty

6    high standard in and of itself.  You have to essentially

7    show a likelihood, number one, of winning on the merits of

8    the case, most of all.  But then we have that injunction

9    standard put within the context of a 12(c) motion.  You

10   understand?  So those analyses are, while they're

11   intertwined, they're a little bit independent of each other

12   as well.  Because I don't have an injunction before me.

13   Right?  At this point.

14        MR. SHUMSKY:  Well, they do have a claim seeking an

15   injunction in this case.

16        THE COURT:  But --

17        MR. SHUMSKY:  What they don't have and what they

18   have not introduced at any point, whether it's in the

19   complaint or otherwise -- and, again, if we're doing this on

20   12(c) you're supposed to look at the allegations that are in

21   the complaint.  Your Honor, you can read the complaint from

22   top to bottom.  There's not a single sentence in a single

23   paragraph of the complaint that alleges, that in any way

24   remotely alleges that it is likely, that it is probable that

25   Navient's going to engage in this conduct in the future.  So

Page 46

1    we have a situation where the complaint doesn't have any

2    allegations that support the entry of the injunction.

3          We're now months -- a year into the discovery

4    process since our motion to dismiss was denied.  The State

5    has identified no evidence after a year of discovery that

6    would support the proposition that Navient is likely, that

7    there's a reasonable possibility, that this is going to

8    happen in the future.  We put the State to that challenge in

9    our opening brief.  They came back in their response.  And

10   the best they could come up with is hypothetically, Jack

11   Remandi, who was at Sallie Mae, is the CEO of Navient.

12          THE COURT:  And I think that --

13          MR. SHUMSKY:  And, Your Honor, that can't plausibly,

14   reasonably support the entry of an injunction --

15          THE COURT:  And I think that number three --

16          MR. SHUMSKY:  -- in this case -- sorry.

17          THE COURT:  -- folds into your number two argument.

18   I want to give you time for rebuttal.  So I understand that

19   the restitution argument folds into the injunctive relief

20   argument.

21          MR. SHUMSKY:  Sure.  And --

22          THE COURT:  So I'm going to -- anything you want to

23   say before I turn it over?

24          MR. SHUMSKY:  Yeah.  Let me just say one thing about

25   that very quickly.

 1          THE COURT:  Okay.

 2          MR. SHUMSKY:  Which is the State's position on the

 3     restitution question is highly misleading, and I was quite

 4     surprised when I saw it.  The quote that they give you in

 5     their brief at Page 15 is that RCW 19.86.080(2) -- this is a

 6     full quote of their quotation -- grants the Court

 7     wide-ranging equitable authority to issue -- now they have a

 8     quote in this quotation -- orders for judgments as may be

 9     necessary.  Close their quote.  To provide restitution.

10     That is not what the statute says.  What the statute

11     actually says is that the Court may, quote, make such

12     additional orders or judgments as may be necessary.  The key

13     word there, Your Honor, is such additional orders or

14     judgments as may be necessary.  What are those judgments or

15     orders in addition to?  Right?  That's parenthese 2, so

16     Section 2 of the statute, it's the relief that's set forth

17     in Subsection 1, it's injunctive relief --

18          THE COURT:  Injunctive relief.

19          MR. SHUMSKY:  -- and as Ralph Williams said, in the

20     absence of an injunction, there is no free-standing cause of

21     action.  So this is an issue that's been up to the

22     Washington Supreme Court.  It has been squarely addressed

23     and foreclosed by the Washington Supreme Court by 40 years.

24     And the state's selective quotation of the law and refusal

25     to engage with the holding of Ralph Williams can't solve

Page 48

1    that claim.

2           So you're right.  It's pegged back to whether

3    there's a proper case for an injunction, which as we've

4    said, there isn't.  Thank you.

5           THE COURT:  Yes.  Thank you.  That's what I wanted

6    to make sure that I -- it folds into the other one.

7           MR. SHUMSKY:  Yes, Your Honor.

8           THE COURT:  So I'm going to give the State -- good

9    morning.

10          MS. SMITH:  Good morning, Your Honor.

11          THE COURT:  So I'm going to have a couple of

12   questions as well.

13          MS. SMITH:  All right.

14          THE COURT:  How can I grant prospective injunctive

15   relief on something that doesn't currently exist?

16          MS. SMITH:  Well, Your Honor, in our complaint we

17   didn't allege that all of the conduct stopped in 2007.  Some

18   of it did continue beyond that.  We allege that it continued

19   well into 2009.  And we have also addressed in our brief

20   hypothetical facts that show why an injunction is necessary

21   and proper in this case.

22          THE COURT:  Well, let me back that up a little bit.

23   Because even looking at those hypothetical facts,

24   technically somebody could come into court and allege a set

25   of things that might happen in the future, but don't they

Page 49

1  have to have some basis in the present for this Court to

2  take action?

3          MS. SMITH:  Your Honor, no.  They don't have to have

4  a basis in the present.  But what we have are allegations of

5  conduct in the past and --

6          THE COURT:  Eleven years ago, correct?

7          MS. SMITH:  Yes, Your Honor.  And a real possibility

8  that Navient is poised to engage in that conduct in the

9  future.  It has said that it is poised to reenter the loan

10 origination market when its noncompete agreement with Sallie

11 Mae expires.

12         THE COURT:  Well, and let me ask that.  But don't I

13 have to presume, essentially, and I know this isn't a penal

14 thing, but it would be essentially like saying, well, you're

15 poised to be released from jail, so maybe I should just go

16 ahead and have you arrested now so we can avoid any

17 potential crimes in the future?

18         MS. SMITH:  Well, that is sort of like probation,

19 Your Honor.  You're getting out of jail.  I'm going to

20 release you, but I need to put conditions on it because it

21 is certainly possible that you could engage in this conduct

22 in the future.

23         And that's what an injunction is.  It doesn't stop

24 Navient from engaging in loan origination.  It would stop

25 Navient from engaging in the kinds of unfair deceptive acts

Page 50

1    and practices that we have alleged that Navient has engaged

2    in in the past and could very well, when it is released from

3    its noncompete agreement, engage in in the future.

4         So what an injunction will do is it will stop unfair

5    deceptive acts or practices that could possibly occur.

6         THE COURT:  But -- maybe I -- doesn't the law, as

7    this Court has so far ruled in any prior motion, say that

8    the CPA, the state CPA applies to Navient?  That they can't

9    essentially run away from their obligations, duties, and

10   responsibilities under the state Consumer Protection Act?

11   Doesn't the law itself act as a bar from them engaging in

12   those practices?

13        MS. SMITH:  It does, Your Honor, but a lower bar.  A

14   higher bar from -- an organization that we have alleged in

15   the past engaged in significant unfair and deceptive loan

16   origination practices should be held to a set of -- should

17   be held to an injunction that can be enforced much more

18   quickly for the benefit of the public than the State can

19   investigate and file a lawsuit, a brand new lawsuit, under

20   the Consumer Protection Act to once again prove that Navient

21   engaged in conduct that we had alleged in this complaint,

22   Your Honor.  That's why an injunction is so important.  It

23   acts as sidebars on a company that we know has -- or we have

24   alleged has engaged in these practices that, okay, you can't

25   do these things anymore.  These things violate the Consumer

Page 51

1   Protection Act.  You are enjoined from doing that.  Navient

2   would not be enjoined from originating loans so long as

3   those origination practices were not unfair or deceptive.

4        And, Your Honor, you have the authority, you have

5   the equitable power to place that injunction on Navient,

6   should the State prove that it engaged in this conduct.

7        THE COURT:  So -- and as we look at the Ralph

8   Williams case, the big difference between the two that I'm

9   seeing is that when this complaint was filed, those

10  practices were not being engaged in at the time the

11  complaint was filed.  In the Ralph Williams case, for

12  example, the suit was filed, and then the practices were

13  changed in, essentially, response to the lawsuit.  Does that

14  change the burden that this Court has to look at in terms of

15  finding a cognizable danger of recurrent violation?

16       MS. SMITH:  No, it doesn't, Your Honor.  It doesn't

17  change the standard for mootness at all.  It's the same.

18  What it does change is that if Navient had changed its

19  practices, had voluntarily stopped its practices after we

20  filed the lawsuit, its burden would be a little bit heavier

21  to show that there was -- that there is no cognizable

22  danger, but it wouldn't be eliminated.

23       Really, that's the touchstone.  Whether they stopped

24  before we filed the lawsuit or they stopped after we filed

25  the lawsuit, the touchstone is the same for mootness.  It

Page 52

1    doesn't matter.

2            It's also important to note that the state of New

3    York had entered into an assurance of discontinuance with

4    Navient in 2007 before we filed this lawsuit that addressed

5    some of the practices that we allege in our lawsuit.  So

6    there was a response in Navient's behavior to a state

7    enforcement action, the state of New York.  And I would also

8    note to the Court that we allege that some of those

9    practices that Navient engaged in actually continued beyond

10   even the New York assurance of discontinuance.  So that even

11   -- that increases the necessity for an injunction in this

12   case, that there needs to be more with a company like this

13   to stop it from engaging in unfair practices.

14           THE COURT:  And I know that we went backwards.

15           MS. SMITH:  Yes.

16           THE COURT:  And because the restitution issue is --

17   I think everybody agrees married to the injunction issue, I

18   think that those arguments kind of fold into each other.

19           But let's address the statute of limitations.  And

20   let's address the express versus general issues of statutory

21   interpretation.

22           MS. SMITH:  Yes, Your Honor, let's talk about that.

23   That's very important, and it's key in this case.

24           The LG Electrics decision, the state Supreme Court

25   decided in LG Electrics and -- Electronics, and counsel read

Page 53

1    part of the ruling.  I'll read the rest, Your Honor.  It

2    says, we hold that when the attorney general enforces

3    antitrust laws under RCW 1986 080, the exact same statute

4    that we are proceeding under in this lawsuit, he or she acts

5    in the name of or for the benefit of the State within the

6    meaning of RCW 416 160.  In the absence of an express

7    statute to the contrary, the State's action for injunctive

8    relief and restitution pursuant to 080 is exempt from the

9    statute of limitations in RCW 1986 120 that doesn't apply

10   here.

11          And this is the important part.  And from the

12   general statutes of limitations in chapter 416 RCW.  Because

13   in the LG Electronics case, the defendants had argued that

14   other general statutes of limitation set forth in RCW 416

15   put limitations -- put a statute of limitations on the

16   State's ability to file that lawsuit.  Those were general

17   statues of limitations, and the Court held that they didn't

18   apply.  Because this statute was brought for the benefit in

19   the name of the State, they didn't apply.

20          RCW 416 100 subsection 2, the penalty statute of

21   limitations that Navient is arguing, is also a general

22   statute of limitations set forth in RCW 19 -- RCW 416.  The

23   analysis that the Supreme Court engaged in in the LG

24   Electronics case is equally applicable to that general

25   statute of limitation as well.  And the Consumer Protection

Page 54

1   Act does not include an express statute of limitation on

2   attorney general actions to enforce 080.  It contains a

3   separate statute of limitations on private parties when they

4   seek to enforce -- when they bring their actions under 090.

5   There is no express statute of limitations for -- that

6   applies to the attorney general's actions under 090.

7          And it also goes back -- and it ties in very nicely

8   with the Supreme Court's decision in U.S. Oil that counsel

9   also mentioned.  Because in that case, the Court was

10  actually faced with 416 160 that said there is no statute of

11  limitation against the State when it brings a case in the

12  name or for the benefit of the State.  And this other

13  statute of limitation with respect to penalty.  And what the

14  Court looked at, it said, well, in order to give both of

15  these statutes meaning, we're going to decide that the 160

16  statute applies when statutes are remedial and the 19 -- or

17  the 416 100 Subsection 2 statute of limitations on penalties

18  applies when the statute is penal or criminal.

19         The Consumer Protection Act is a remedial statute.

20  All of the equitable remedies in the CPA are designed to

21  protect the public.  They're not intended to punish

22  everybody and anybody.  And those remedies work in tandem,

23  sort of the first remedy, you know, for civil penalties,

24  they operate first because they act to prevent violations of

25  the CPA in the first place.  Injunctions stop or prohibit

1    the continuation of conduct that violates the CPA.  And

2    restitution reestablishes the status quo.  They all work

3    together.

4           And another very important point to make is that in

5    the Ralph Williams case, 82 Wn.2d 265, the Court held that

6    the attorney general could sue for penalties alone under the

7    Consumer Protection Act and asked for no other remedy, and

8    this would further the CPA's beneficial purpose to protect

9    the public and foster fair and honest competition.  The

10   Federal Trade Commission, the federal court decisions

11   interpreting the Federal Trade Commission action, which is

12   the federal analog to the Consumer Protection Act, the

13   federal courts repeatedly held that the FTC act is remedial

14   and not penal.  The purpose -- and those statutes provide

15   for penalties.  The purpose is to protect the public, not to

16   punish.  Many states have also held that their Consumer

17   Protection Acts that also provide for civil penalties are

18   remedial and not penal in nature --

19           THE COURT:  Punitive.

20           MS. SMITH:  Punitive.  Yes.

21           THE COURT:  Anything else that you wish to add with

22   regards to these issues?

23           MS. SMITH:  Well, Your Honor, the argument that

24   Navient makes that this Court is precluded by a statute of

25   limitations from imposing civil penalties, that this Court

September 21, 2018

Page 56

1   is precluded from issuing an injunction, and this Court

2   can't order restitution are arguments that limit this

3   Court's equitable power.  The Court's equitable power needs

4   to be very broad and flexible in cases like this when

5   dealing with remedial statutes.  It shouldn't be -- it

6   shouldn't be narrow and confined.

7        And that is the -- that is really what's at bottom

8   with Navient's argument, is an attempt to restrict the

9   Court's equitable powers to deal with the kind of unfair and

10  deceptive practices that we alleged in Count 1 of our

11  complaint.

12        THE COURT:  All right.  Thank you.  Rebuttal?  Five

13  minutes.

14        MR. SHUMSKY:  Thanks, Your Honor.  I'm going to try

15  and do this in a lot less than five minutes.

16        With respect to the State's characterization of LG

17  Electronics as rejecting the argument that I made a little

18  while ago is expressly rejected by LG Electronics itself.

19  To the extent that the State has just taken the position

20  that LG Electronics forecloses the application of the

21  explicit statute of limitations on which our motion depends,

22  Footnote 4 says we stress that our opinion is limited to the

23  attorney general's 080 claims, insert some ellipses, for

24  damages on behalf of state agencies and restitution for

25  state consumers.  It specifically said we are not addressing

Page 57

1    the attorney general's claims for civil penalties under the

2    provision that's at issue here because that wasn't properly

3    presented to the Court within the question recognized that

4    there, in contrast to the provisions that were in front of

5    the Court, there is an express statute of limitations.

6          And to go back, the Court in U.S. Oil actually dealt

7    with this very issue.  And I think I did a particularly

8    lousy job a few minutes ago of explaining the penal remedial

9    distinction in U.S. Oil.  But let me try that one more time,

10   because I think it's directly relevant to what the State has

11   just argued.

12         The question in determining under U.S. Oil whether

13   or not we're talking about something -- I'm going to talk

14   about what that something is -- is penal or remedial turns

15   not on sort of platitudes and generalities about what the

16   purpose of a statute is, whether or not the purpose is to

17   remediate or the purpose of the statute is to punish.  It

18   turns on the nature of the relief, of the particular relief

19   that's being sought.

20         And the quotation that I read you before from the

21   Washington Court of Appeals opinion in the U.S. Oil case,

22   that the Supreme Court of Washington relied upon, makes that

23   entirely clear.  That what matters is whether or not the

24   relief being sought is penal or remedial.  I don't take any

25   issue with the State's claim that restitution is a remedial

September 21, 2018

Page 58

1  form of relief, that injunctive relief, if it's appropriate.

2  I don't know that we need to talk about that anymore -- has

3  a remedial purpose to it.  But we're not talking about that

4  in the context of the statute of limitations argument.

5        As I said before, this is separate.  The statute of

6  limitations issue is specific to the civil penalties.  And

7  civil penalties are just that.  They're penal.  They're not

8  remedial in nature.  And saying that as a general matter of

9  the Washington -- the Bureau pursuing a CPA claim means that

10  what it's doing is remedial sort of is blind to the reality

11  of what it's actually seeking in this case.  What U.S. Oil

12  recognized a penalty is, and what LG Electronics both

13  explicitly reserved on the one hand in Footnote 4 and on the

14  other hand in its actual holdings, its interpretation of how

15  you reconcile these provisions, says essentially the

16  specific governs over the general.  And that's how to

17  resolve these issues in our view.

18        And I appreciate your indulgence while I try to

19  redeem my otherwise flawed attempt to walk through that.

20        THE COURT:  No.  It was fine.  Thank you.

21        So as I indicated on the 12(c) issues, I'm going to

22  issue an opinion in writing, because I imagine no matter

23  what opinion I issue, I want to make sure that this record

24  is a little bit more clear than mud and that the subsequent

25  courts understand this Court's reasoning.  I am gone next

Page 59

1    week, so it will not be in the very near future.  But look

2    for it at least two weeks after that, so certainly by the

3    middle of the next month.  Just kind of wanted to give you a

4    time line.  Okay?  Anything else?

5           MR. ROESCH:  Your Honor, just very briefly, we have

6    a proposed order on the motion to compel.

7           THE COURT:  Please pass that forward.

8           MR. ROESCH:  It's the same one that we submitted

9    before.  It just includes reference to the opposition --

10          THE COURT:  And just so the parties understand,

11   within the context of the orders, the opinion that I write,

12   I will also include what adjudicative facts this Court is

13   taking notice of.  Okay?

14          MR. SHUMSKY:  And then, Your Honor, if I could, one

15   thing about this order -- just on quick look, reserving my

16   parties' right to address this, there's a blank for the

17   number of days within which this information needs to be

18   produced.  I don't know, as a practical matter, how quickly

19   Navient can produce this information, but more important,

20   this is something that is incredibly important to Navient.

21          And our intention at this point, although I can't

22   tell you we've made a decision about that, is at least we're

23   going to be considering seeking interlocutory review of that

24   order in front of the Court of Appeals --

25          THE COURT:  So why don't I make it 30 days.

Page 60

1          MR. SHUMSKY:  If you can make it 30 days, that will

2    give us an opportunity to do what we need to do to seek

3    appellate review if that's the decision that my client

4    makes, but I'd be remiss not to ask for a little bit of time

5    there.

6          THE COURT:  Completely understood.  Any objection to

7    days?

8          MR. ROESCH:  I don't object to 30 days, Your Honor.

9          THE COURT:  All right.  So 30 days.  Today is the

10   21st.  Okay.

11         MR. SHUMSKY:  Thank you so much, Your Honor.

12         THE COURT:  If at some point you realize that it may

13   take longer than 30 days, please just let the Court know and

14   we can amend that if necessary.

15         Thank you all.

16         (Recording ends 11:25 a.m.)

17

18

19

20

21

22

23

24

25

Page 61

1

2                     C E R T I F I C A T E

3

4    STATE OF WASHINGTON    )

5    COUNTY OF KING         )

6

7          I, the undersigned, under my commission as a

8    Notary Public in and for the State of Washington, do hereby

9    certify that the foregoing audiotape, videotape, and/or

10   hearing was transcribed under my direction as a

11   transcriptionist; and that the transcript is true and

12   accurate to the best of my knowledge and ability; and that I

13   am not a relative or employee or any attorney or counsel

14   employed by the parties hereto, nor financially interested

15   in its outcome.

16          IN WITNESS WHEREOF, I have hereunto set my hand

17    and seal this 27th day of September, 2018.

18

19

20                    /s/Grace Hitchman

21                    Grace Hitchman, AAERT, CET-663
                      In and for the State of Washington,
22                    residing at Seattle.
                      Commission expires April 27, 2020
23

24

25

# Exhibit B

The Honorable Veronica Alicea-Galván
Noted for Consideration: September 21, 2018
With Oral Argument

## STATE OF WASHINGTON
## KING COUNTY SUPERIOR COURT

STATE OF WASHINGTON,

                   Plaintiff,

      v.

NAVIENT CORPORATION;
NAVIENT SOLUTIONS, INC.;
PIONEER CREDIT RECOVERY, INC.;
and GENERAL REVENUE
CORPORATION,

                  Defendants.

NO.  17-2-01115-1 SEA

~~(PROPOSED)~~ ORDER GRANTING
STATE OF WASHINGTON'S MOTION
FOR AN ORDER COMPELLING
PRODUCTION OF DOCUMENTS

**(Clerk's Action Required)**

THIS MATTER, having come before the Court on Plaintiff's Motion for an Order Compelling Production of Documents, and the Court having reviewed the foregoing Motion, responses, if any, and considered the following material:

    1.    Motion for an Order Compelling Production of Documents;

    2.    The Declaration of Benjamin J. Roesch and the exhibits thereto;

    3.    The Declaration of Trisha L. McArdle and the exhibits thereto;

    4.    Defendants' Opposition to Plaintiff's Motion for an Order Compelling Production of Documents;

    5.    Declaration of Angelo J. Calfo in Support of Defendants' Opposition to Plaintiff's Motion for an Order Compelling Production of Documents and the exhibits thereto;

(PROPOSED) ORDER GRANTING
STATE OF WASHINGTON'S MOTION
FOR AN ORDER COMPELLING
PRODUCTION OF DOCUMENTS - 1

66

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

6.      Reply in Support of State of Washington's Motion for an Order Compelling Production of Documents; and

7.      The papers and pleadings on file in this case.

The Court hereby ORDERS that the Motion for an Order Compelling Production of Documents is GRANTED. Navient Solutions, LLC is directed to produce all documents responsive to Request for Production 55 and 73 within 30 days of this Order. Furthermore, in order to eliminate the need for further motions practice on this issue, the Court Holds and all discovery in this matter is made pursuant to an order of a court of competent jurisdiction.

DATED this 21 day of September, 2018.

 

HONORABLE VERONICA ALICEA-GALVÁN
King County Superior Court

Presented by:

ROBERT W. FERGUSON
Attorney General

/s/ Benjamin J. Roesch
BENJAMIN J. ROESCH, WSBA # 39960
CRAIG J. RADER, WSBA #50300
MINA SHAHIN, WSBA #46661
HEIDI ANDERSON, WSBA #37603
JULIA K. DOYLE, WSBA #43993
Assistant Attorneys General
Attorneys for the State of Washington

(PROPOSED) ORDER GRANTING
STATE OF WASHINGTON'S MOTION
FOR AN ORDER COMPELLING
PRODUCTION OF DOCUMENTS - 2

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

# Exhibit C

KeyCite Yellow Flag - Negative Treatment
Declined to Follow by In re JPMorgan Chase Mortg.
Modification Litigation, D.Mass., November 27, 2012

61 F.3d 465
United States Court of Appeals,
Sixth Circuit.

In re BANKERS TRUST
COMPANY, Petitioner.

No. 95–3199.
|
Argued June 13, 1995.
|
Decided Aug. 3, 1995.

**Synopsis**

Bank petitioned for writ of mandamus to vacate discovery order issued by the United States District Court for the Southern District of Ohio, Carl B. Rubin, J., directing bank to produce confidential information concerning Federal Reserve examination for use against bank in pending suit alleging fraud, misrepresentation, violations of Commodities Exchange Act, and various other causes of action arising from bank's leveraged derivative transaction business. The Court of Appeals, Bailey Brown, Circuit Judge, held that: (1) documents prepared by Federal Reserve and bank during bank examination were subject to discovery despite Federal Reserve's ownership of documents, in light of apparent relevance of documents and fact that bank had possession of documents; (2) Federal Reserve regulation that precluded discovery of information about bank examination exceeded authority of Federal Reserve, was inconsistent with rule governing scope of discovery, and could not be enforced; (3) qualified bank examination privilege existed but protected only deliberative material and could be overridden upon showing of good cause; and (4) bank examination privilege belonged to Federal Reserve and, thus, Federal Reserve had to be allowed opportunity to assert privilege.

Petition granted in part, order vacated in part, and case remanded with instructions.

Merritt, Chief Judge, filed a concurring opinion.

West Headnotes (10)

**[1]**  **Mandamus**
    Matters of discretion
    Mandamus review must be confined to matters of usurpation of judicial power or clear abuse of discretion.

    5 Cases that cite this headnote

**[2]**  **Mandamus**
    Presumptions and burden of proof
    Petitioner has burden of showing that its right to issuance of writ of mandamus is clear and undisputable.

    15 Cases that cite this headnote

**[3]**  **Federal Civil Procedure**
    Existence, possession, custody, control and location
    Parties in possession of documents forwarded to them by federal agency have "possession, custody or control" within meaning of rule governing scope of discovery, notwithstanding fact that agency retains ownership of documents and restricts disclosure by regulation. Fed.Rules Civ.Proc.Rule 34(a), 28 U.S.C.A.

    189 Cases that cite this headnote

**[4]**  **Federal Civil Procedure**
    Investigations, reports and records of in general
    **Privileged Communications and Confidentiality**
    Regulation of financial institutions;bank examination privilege
    Documents prepared by Federal Reserve and bank during Federal

Reserve's examination of bank's leveraged derivative transaction business were subject to discovery in action arising from bank's derivative contracts, despite Federal Reserve's ownership of documents, in light of apparent relevance of documents, and in light of fact that bank had possession of documents. Fed.Rules Civ.Proc.Rule 34(a), 28 U.S.C.A.

26 Cases that cite this headnote

[5] **Administrative Law and Procedure**
  ➤ Force of law

**Administrative Law and Procedure**
  ➤ Enforcement

Federal regulations should be adhered to and given full force and effect of law whenever possible and, thus, federal agency's regulation should be enforced as long as it is based upon permissible construction of enabling statute.

4 Cases that cite this headnote

[6] **Finance, Banking, and Credit**
  ➤ Federal Reserve System

Language in Federal Reserve regulation that required party served with subpoena, order, or other judicial process continually to decline to disclose information or testimony about Federal Reserve's examination of bank exceeded congressional delegation of general or housekeeping authority to Federal Reserve, was plainly inconsistent with rule governing scope of discovery, and could not be enforced. 5 U.S.C.A. § 301; Federal Reserve Act, § 11(i), 12 U.S.C.A. § 248(i); Bank Holding Company Act of 1956, § 5(b), 12 U.S.C.A. § 1844(b); Fed.Rules Civ.Proc.Rule 34(a), 28 U.S.C.A.; 12 C.F.R. § 261.14.

21 Cases that cite this headnote

[7] **Finance, Banking, and Credit**
  ➤ Investigations and examinations

**Privileged Communications and Confidentiality**
  ➤ Regulation of financial institutions;bank examination privilege

Bank examination privilege exists but is only qualified, rather than absolute, privilege which accords agency opinions and recommendations, and banks' responses thereto, protection from disclosure in order to preserve candor in communications between bankers and examiners and thereby promote effective functioning of agency.

18 Cases that cite this headnote

[8] **Finance, Banking, and Credit**
  ➤ Investigations and examinations

**Privileged Communications and Confidentiality**
  ➤ Regulation of financial institutions;bank examination privilege

Purely factual material falls outside qualified bank examination privilege and must be produced if relevant, and privilege's protection of deliberative material also may be overridden if good cause is shown.

24 Cases that cite this headnote

[9] **Finance, Banking, and Credit**
  ➤ Investigations and examinations

**Privileged Communications and Confidentiality**
  ➤ Regulation of financial institutions;bank examination privilege

In determining whether bank examination privilege precludes disclosure, court must balance competing interests of party seeking

bank examination documents and those of government and, at minimum, must consider relevance of evidence sought to be protected, availability of other evidence, seriousness of litigation and issues involved, role of government in litigation, and possibility of future timidity by government employees who will be forced to recognize that their secrets are violable.

23 Cases that cite this headnote

[10]    **Finance, Banking, and Credit**
⚷    Federal Reserve System

Bank examination privilege belonged to Federal Reserve and, thus, if claim of privilege was appropriate, Federal Reserve had to be allowed opportunity to assert privilege and opportunity to defend its assertion.

12 Cases that cite this headnote

**Attorneys and Law Firms**

*466 Daniel J. Buckley, Vorys, Sater, Seymour & Pease, Columbus, OH, Michael A. Cooper (argued), Sullivan & Cromwell, New York City, for Bankers Trust Co.

John D. Luken, Thomas S. Calder (argued), Dinsmore & Stohl, Stanley M. Chesley (argued), Waite, Schneider, Bayless & Chesley, Cincinnati, OH, for Procter & Gamble Co.

Norman R. Nelson (briefed), New York Clearing House Ass'n, New York City, for amicus curiae New York Clearing House Ass'n.

Richard Ashton (briefed), Federal Reserve Bd., Legal Div., Stephen L. Siciliano, Katherine H. Wheatley (argued), Federal Reserve System, Bd. of Governors, Washington, DC, for amicus curiae Federal Reserve System.

Before: MERRITT, Chief Judge; BROWN and MARTIN, Circuit Judges.

**Opinion**

BROWN, J., delivered the opinion of the court, in which MARTIN, J., joined. MERRITT, C.J. (p. 472), delivered a separate concurring opinion.

BAILEY BROWN, Circuit Judge.

The petitioner, Bankers Trust Company, the defendant in a pending securities action, seeks a writ of mandamus to vacate a discovery order directing it to produce to the plaintiff, Procter and Gamble Company, certain documents which constitute or contain "confidential supervisory information" under federal regulations promulgated by the Federal Reserve System.[1] Bankers Trust contends that the discovery order is in error because: 1) Procter and Gamble Company failed to comply with the clearly applicable governing regulations of the Federal Reserve in attempting to obtain the documents from Bankers Trust, and 2) the documents are, in any event, protected by the Federal Reserve's bank examination privilege which the district court refused to consider. We grant the writ in part, vacate the discovery order, and remand the case to the district court with instructions.

*467 I.

The Procter and Gamble Company ("P & G") sued Bankers Trust and BT Securities Corporation (collectively "Bankers Trust"), alleging fraud, misrepresentation, violations of the Commodities Exchange Act, and various other causes of action arising from two derivative contracts entered into with Bankers Trust. P & G claims approximately $195 million in damages.

The petition for writ of mandamus focuses on a single discovery issue in this litigation which is otherwise still in the discovery phase. At issue is P & G's demand that Bankers Trust produce all documents submitted to or received from the Federal Reserve, including "any and all documents relating to any and all regulatory reports of examination and inspection which

32 Fed.R.Serv.3d 85, 1995 Fed.App. 0235P

relate to or refer to Bankers Trust's [leveraged derivative transaction] Business." [2] Thus, P & G is seeking Federal Reserve examination reports and documents prepared by both the Federal Reserve and Bankers Trust during the examination process. Bankers Trust contends that the documents P & G seeks are property of the Federal Reserve Board and that under the applicable Board regulations, Bankers Trust is prohibited from disclosing the documents to P & G. Bankers Trust therefore contends that it has been thrust into an untenable position. If it complies with the district court's order, it violates the Board's regulations prohibiting disclosure and risks criminal penalties. If, on the other hand, it does not comply with the court order, it is subject to being held in contempt and to possible sanctions under Rule 37 of the Federal Rules of Civil Procedure.

The relevant regulation in the instant case is 12 C.F.R. § 261 *et seq.* Section 261 first defines "confidential supervisory information" as, among other things, "reports of examination and inspection" as well as "documents prepared by, on behalf of, or for the use of the [Federal Reserve] Board, [or] a Reserve Bank...." 12 C.F.R. § 261.2(b). The regulations provide that such information is and shall always remain "the property of the Board." 12 C.F.R. § 261.11(g). The regulations further provide the procedures to be followed to obtain access to confidential supervisory information. A person seeking access shall file a written request with the general counsel of the Board of Governors of the Federal Reserve System. 12 C.F.R. § 261.13(b). The general counsel may then approve the request if: 1) the person making the request has shown a substantial need for confidential supervisory information that outweighs the need to maintain confidentiality; and 2) disclosure is consistent with the supervisory and regulatory responsibilities and policies of the Board. 12 C.F.R. § 261.13(c). Making a request under this section and a denial thereof is considered to be an exhaustion of administrative remedies for discovery purposes in any civil proceeding. 12 C.F.R. § 261.13(d). If a party has exhausted such remedy to no avail, it may then file against the Federal Reserve either a Freedom of Information Act (FOIA) action or subpoena the documents

under Rule 45 of the Federal Rules of Civil Procedure. [3] What a party may not do under the procedures set out in the regulations, however, is seek the documents from some other party without the Board's approval or permission. Likewise, any person or organization that has documents which may not be disclosed under these regulations and is served with a "subpoena, order, or other judicial process ... requiring the production of documents or information" is directed to promptly advise the Board's general counsel of such request and must continually "decline to disclose the **\*468** information...." 12 C.F.R. § 261.14. The Federal Reserve contends, in its *amicus curiae* brief, that the procedures set out in the regulations are the exclusive means of obtaining confidential supervisory information.

In this case, P & G made a discovery request in which it asked for documents of Bankers Trust relating to its leveraged derivative business. Bankers Trust objected to the production of the documents, relying on the regulations summarized above. Unknown to Bankers Trust, P & G also had made a written request to the Federal Reserve Board, pursuant to § 261.13 of the regulations, for the documents in question. The Board took the position that any report or document sent by the Federal Reserve to Bankers Trust as part of the examination process, and any document created by Bankers Trust and sent to the Federal Reserve as part of that process, constituted "confidential supervisory information" which could not be disclosed by Bankers Trust. In a letter to P & G, the Board denied P & G's request for the documents on the ground that P & G had not shown a substantial need for the information that outweighed the need to maintain confidentiality. P & G took that letter to be an exhaustion of administrative remedies, and instead of then proceeding directly against the Federal Reserve through a Rule 45 subpoena or FOIA action, it turned to the district court in which its action against Bankers Trust was pending and sought to compel production of the documents directly from Bankers Trust. P & G served a motion to compel production upon Bankers Trust, and a telephonic conference on the motion was conducted by the district court. P & G advised the Board by letter that this conference would be taking place.

The Board, however, did not participate in the conference.

In the conference, the district court made it clear that the Federal Reserve's regulations could in no way interfere with the normal operation of the judicial branch of government. To this end, the court concluded that it was not bound to follow the Board's regulations to the extent that the regulations posed a barrier to the court's ability to control discovery. Thus, because Bankers Trust was in possession of the requested documents, the court concluded that P & G could have discovery of the documents from Bankers Trust. Moreover, the district court did not analyze the documents in question under the bank examination privilege upon which Bankers Trust also relied, because, in the court's opinion, the privilege "doesn't exist." On February 21, 1995, the district court entered an order granting P & G's request to compel production of the documents. It ordered Bankers Trust to produce three categories of documents: 1) all business records or other pre-existing documents which Bankers Trust had submitted to the Board relating to the leveraged derivatives products business; 2) all documents concerning the leveraged derivatives business prepared by Bankers Trust relating to the examination process; and 3) the Federal Reserve's examination reports relating to the leveraged derivatives business. The first two categories were to be turned over to P & G; the last category was to be turned over to the district court for *in camera* inspection.

Bankers Trust now objects to the production of the documents in the latter two categories, and claims that the order is clearly erroneous as a matter of law.[4] First, Bankers Trust contends that the Board's regulations prohibit it, in all events, from disclosing such documents and dictate that P & G seek the documents in question directly from the Federal Reserve. Second, Bankers Trust alleges that the documents are protected under the Federal Reserve's bank examination privilege, a privilege the existence of which the district court refused to recognize. As stated, the Federal Reserve has filed an *amicus curiae* brief in support of the petition for writ of mandamus.[5]

**\*469** II.

[1] [2] Mandamus review must be confined to matters of usurpation of judicial power or clear abuse of discretion. *Schlagenhauf v. Holder,* 379 U.S. 104, 111, 85 S.Ct. 234, 238–39, 13 L.Ed.2d 152 (1964). Thus, mandamus is not to be used to reverse a decision made by a court in the exercise of legitimate jurisdiction. *In re Aetna Cas. & Sur. Co.,* 919 F.2d 1136, 1140 (6th Cir.1990) (en banc). Moreover, the petitioner has the burden of showing that its right to the issuance of the writ is "clear and undisputable." *Federal Deposit Ins. Corp. v. Ernst & Whinney,* 921 F.2d 83, 86 (6th Cir.1990).

A.

Bankers Trust notes that the Federal Reserve's regulations provide that the documents in question remain the property of its Board, that a party seeking those documents must request them directly from the Federal Reserve, and that any organization or institution in possession of such documents, if called upon to produce them, shall decline to do so pursuant to the regulations. Bankers Trust contends that because the requested documents constitute or contain confidential supervisory material, P & G must obtain them, if at all, from the Federal Reserve, presumably in a separate action in a district court in Washington, D.C., rather than from Bankers Trust. *See, e.g., Colonial Sav. & Loan Ass'n v. St. Paul Fire & Marine Ins. Co.,* 89 F.R.D. 481 (D. Kan.1980)(Regulations of Federal Home Loan Bank Board held valid even though court recognized some hardship in requiring the relief to be sought in the District of Columbia where jurisdiction could be obtained). Bankers Trust therefore contends that because the discovery order is plainly inconsistent with the governing regulations, it is erroneous as a matter of law warranting mandamus relief.

[3] [4] We disagree. As an initial matter, we point out that the discovery order is consistent with the requirements of Rule 34 of the Federal Rules of Civil Procedure. Federal Rule 34(a)

states that: "Any party may serve on any other party a request (1) to produce ... any designated documents ... or to inspect and copy, test, or sample any tangible things ... which are in the *possession, custody or control* of the party upon whom the request is served." FED.R.CIV.P. 34(a)(emphasis added). Moreover, federal courts have consistently held that documents are deemed to be within the "possession, custody or control" for purposes of Rule 34 if the party has *actual* possession, custody or control, or has the legal right to obtain the documents on demand. *Resolution Trust Corp. v. Deloitte & Touche,* 145 F.R.D. 108, 110 (D. Colo.1992); *Weck v. Cross,* 88 F.R.D. 325, 327 (N.D. Ill.1980). Thus, legal ownership of the document is not determinative. *In re Sunrise Sec. Litig.,* 109 B.R. 658, 661 (E.D.Pa.1990); *Weck,* 88 F.R.D. at 327. It necessarily follows, then, that parties in possession of documents forwarded to them by a federal agency have "possession, custody or control" within the meaning of Rule 34, notwithstanding the fact that the agency by regulation retains ownership and restricts disclosure. *See Resolution Trust Corp.,* 145 F.R.D. at 110 ("Rule 34, which focuses on a party's ability to obtain documents on demand ... is not affected by the [federal agency's] retention of ownership or its *unilaterally* imposed restrictions on disclosure.")(emphasis added). Therefore, because Bankers Trust has possession of the documents in question, and because they appear to be relevant, they are discoverable under the terms of Rule 34 and P & G should be entitled under that Rule to have discovery of those documents.

We are confronted, however, with a situation in which the Board's regulations conflict with the Federal Rules of Civil Procedure with respect to a district court's authority, under the Federal Rules, to control discovery. Rule 34, as enforced through Rule 37, clearly authorizes the district court to order Bankers Trust to turn over those documents in its possession while the Board's regulations specifically prohibit such a disclosure.

[5]    At bottom, federal regulations should be adhered to and given full force and effect of law whenever possible. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). As long as the federal agency's **\*470** regulation is based upon a permissible construction of the enabling statute, the regulation should be enforced. *Id.* The statutory authorities upon which the Federal Reserve relies, however, simply do not give it the power to promulgate regulations in direct contravention of the Federal Rules of Civil Procedure. Section 261 itself identifies as its statutory authority 12 U.S.C. § 248(i) and (k), and 5 U.S.C. § 552. The Federal Reserve also relies upon 5 U.S.C. § 301, and 12 U.S.C. § 1844(b). These statutes are broad, general grants of authority. For example, 12 U.S.C. § 1844(b) authorizes the Board to issue regulations "as may be necessary to enable [the Federal Reserve] to administer and carry out the purposes of this chapter and prevent evasions thereof." 12 U.S.C. § 248(i) provides that the Board "shall perform the duties, functions, or services specified in this chapter, and make all rules and regulations necessary to enable said board effectively to perform the same." 5 U.S.C. § 301, which is the most specific of the statutes, provides that the Federal Reserve may prescribe regulations "for the government of his [sic] department, the conduct of its employees, the distribution and performance of its business, and the custody, use and preservation of its records, papers, and property." Section 301, however, is nothing more than a general housekeeping statute and does not provide "substantive" rules regulating disclosure of government information. *Exxon Shipping Co. v. United States Dep't of Interior,* 34 F.3d 774 (9th Cir.1994). In *Exxon,* five federal agencies sought to prohibit their employees from testifying in depositions, arguing that § 301 authorized it to withhold documents or testimony from federal courts. The court of appeals disagreed. The court noted that according to the legislative history, Congress was concerned that the statute had been "twisted from its original purpose as a 'housekeeping' statute into a claim of authority to keep information from the public." *Id.* at 777 (citation omitted). To correct the situation, Congress amended the statute, adding the following sentence: "This section does not authorize withholding information from the public or limiting the availability of records to the public." 5 U.S.C. § 301. Thus, the court concluded that nothing in

the text of the statute empowers a federal agency to withhold documents or testimony from federal courts.

**[6]**   We likewise conclude that Congress did not empower the Federal Reserve to prescribe regulations that direct a party to deliberately disobey a court order, subpoena, or other judicial mechanism requiring the production of information. We therefore hold that the language in [12 C.F.R. § 261.14](#) that requires a party that is served with a subpoena, order, or other judicial process to continually decline to disclose information or testimony exceeds the congressional delegation of authority and cannot be recognized by this court. [6] Such a regulation is plainly inconsistent with [Rule 34](#) and cannot be enforced. To allow a federal regulation issued by an agency to effectively override the application of the Federal Rules of Civil Procedure and, in essence, divest a court of jurisdiction over discovery, the enabling statute must be more specific than a general grant of authority as found here. *Resolution Trust Corp.,* [145 F.R.D. at 111](#) (holding that the Federal Rules of Civil Procedure cannot be abrogated by agency regulations); *Merchants Nat'l Bank & Trust Co. v. United States,* [41 F.R.D. 266, 268 (D.N.D.1966)](#)("While the statute gives the Secretary the right to restrict disclosure, judicial control over the evidence in a case cannot be abdicated to the caprice of executive officers."); *Sperandeo v. Milk Drivers & Dairy Employees Local Union No. 537,* [334 F.2d 381, 383 (10th Cir.1964)](#)(holding that federal agencies are bound by discovery rules in the same manner as any other litigant).

Moreover, we find no compelling reason to discard the relatively straightforward discovery methods outlined in the Federal Rules of Civil Procedure simply because the Federal Reserve has attempted to mandate a different **\*471** procedure. It seems illogical to this court to require P & G to initiate the much more cumbersome procedure of serving a subpoena on the Federal Reserve in Washington, D.C. simply to enable P & G to obtain the same documents that defendant Bankers Trust possesses. P & G would incur needless delays with such maneuvering and would be forced to litigate any

objections to the subpoena before a D.C. district court that may not be as fully informed of the underlying facts and circumstances of the case. Thus, we hold that the district court's discovery order was a legitimate exercise of jurisdiction under [Rule 34](#) and Bankers Trust's first contention of error is without merit.

### B.

Having determined that the federal regulations upon which Bankers Trust relies cannot divest the district court of its authority to apply [Rule 34 of the Federal Rules of Civil Procedure](#), we now turn to Bankers Trust's second issue of whether the district court's treatment of the bank examination privilege constitutes clear error warranting mandamus relief. [Rule 26 of the Federal Rules of Civil Procedure](#) provides that "[p]arties may obtain discovery regarding any matter, *not privileged,* which is relevant to the subject matter involved in the pending action." [FED.R.CIV.P. 26(b)(1)](#) (emphasis added). Bankers Trust contends that the requested documents are protected from disclosure by what is referred to as the bank examination privilege.

In issuing the discovery order, the district court stated, citing no authority, that the bank examination privilege "doesn't exist." Contrary to the district court's belief, however, the privilege does exist and warrants that the court apply the appropriate test for determining whether the privilege should be honored or overridden. *Schreiber v. Society for Sav. Bancorp, Inc.,* [11 F.3d 217 (D.C.Cir.1993)](#); *In re Subpoena Served Upon the Comptroller of the Currency, and the Secretary of the Bd. of Governors of the Fed. Reserve Sys.* (*In re Subpoena*), [967 F.2d 630 (D.C.Cir.1992)](#); *Delozier v. First Nat'l Bank,* [113 F.R.D. 522 (E.D.Tenn.1986)](#). We hold that this was clear error and a usurpation of judicial power.

**[7]**   First and foremost, the bank examination privilege is a qualified rather than absolute privilege which accords agency opinions and recommendations and banks' responses thereto protection from disclosure. *Schreiber,* [11 F.3d](#)

at 220. The primary purpose of the privilege is to preserve candor in communications between bankers and examiners, which those parties consider essential to the effective supervision of banking institutions. The privilege is firmly grounded in practical necessity. *In re Subpoena,* 967 F.2d at 633. As the court in *In re Subpoena* explained:

> Bank safety and soundness supervision is an iterative process of comment by the regulators and response by the bank. The success of the supervision therefore depends vitally upon the quality of communications between the regulated banking firm and the bank regulatory agency.... Because bank supervision is relatively informal and more or less continuous, so too must be the flow of communication between the bank and the regulatory agency. Bank management must be open and forthcoming in response to the inquiries of bank examiners, and the examiners must in turn be frank in expressing their concerns about the bank. These conditions simply could not be met as well if communications between the bank and its regulators were not privileged.

*Id.* at 634. Thus, the privilege is designed to promote the effective functioning of an agency by allowing the agency and the regulated banks the opportunity to be forthright in all communications.

**[8]    [9]**    As stated, however, the privilege is a qualified one. Purely factual material falls outside the privilege, and if relevant, must be produced. *Id.; Schreiber,* 11 F.3d at 220. Likewise, the privilege may be overridden as to its protection of deliberative material if good cause is shown. [7]

In this inquiry, the **\*472** court must balance the "competing interests" of the party seeking the documents and those of the government. *At minimum,* the court must consider:

> 1) the relevance of the evidence sought to be protected;
>
> 2) the availability of other evidence;
>
> 3) the 'seriousness' of the litigation and the issues involved;
>
> 4) the role of the government in the litigation; and
>
> 5) the possibility of future timidity by government employees who will be forced to recognize that their secrets are violable.

*Schreiber,* 11 F.3d at 220; *In re Subpoena,* 967 F.2d at 634. While this list does not purport to be an exhaustive list of factors a court might consider, it is at least a floor upon which to balance sufficiently the competing interests of the parties and the federal agency.

We therefore vacate the discovery order inasmuch as the district court failed to weigh whether the privilege should or should not be honored. On remand, the first task of the district court is to determine what documents, or portions thereof, are factual in nature. All factual material, if relevant, must be produced to P & G. The district court must then balance all relevant factors and determine whether the privilege should be honored or overridden as to all other information in the documents in question. We also note that if the privilege is overridden, the district court should consider other possible protective safeguards such as redaction and protective orders to minimize any harm that might otherwise occur from disclosure.

**[10]**    As a final matter, we note that the district court on remand must provide the Federal Reserve with notice and allow the Federal Reserve the opportunity to intervene. The bank examination privilege belongs to the Federal Reserve, and therefore, where a claim of the privilege is appropriate, the Federal Reserve must be allowed

32 Fed.R.Serv.3d 85, 1995 Fed.App. 0235P

the opportunity to assert the privilege and the opportunity to defend its assertion.

We grant the petition for writ of mandamus in part, vacate the discovery order, and remand the case to the district court for further proceedings consistent with this opinion.

MERRITT, Chief Judge, concurring.

I concur in full in the court's opinion, but I would point out an additional consideration. Even if Congress had given the Federal Reserve Board specific statutory authority—which it certainly has not—to withhold documents that contain "confidential supervisory information" under whatever circumstances the Board deems appropriate (including a situation when a federal court had issued a Rule 37 discovery order), it is questionable whether such a statute would be constitutional. The Supreme Court has indicated that delegations of rulemaking authority to Article I agencies may implicate separation of powers concerns. See Northern Pipeline Construction Co. v. Marathon Pipe Line Co., 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). As the Supreme Court has noted "we have not hesitated to strike down provisions of a law that ... undermine the authority and independence of one or another

coordinate Branch." Mistretta v. United States, 488 U.S. 361, 382, 109 S.Ct. 647, 660, 102 L.Ed.2d 714 (1989). As Justice Brennan has observed, "A Judiciary free from control by the Executive and Legislature is essential if there is a right to have claims decided by judges who are free from potential domination by other branches of government." Marathon, 458 U.S. at 58, 102 S.Ct. at 2865 (plurality opinion) (quoting United States v. Will, 449 U.S. 200, 217–18, 101 S.Ct. 471, 482, 66 L.Ed.2d 392 (1980)). If Congress were to limit a federal district judge's authority to order discovery according to the interest of the Federal Reserve, the ability of a federal court to perform its most basic function of deciding "cases and controversies" under Article III of the Constitution would be notably impaired. Courts cannot fairly decide cases if they cannot have access to the information needed for a fair, objective decision. Even when National Security is at stake, federal **473 courts still review documents to determine whether disclosure is warranted. See 18 U.S.C.App. §§ 1–16 (1994) (Classified Information Procedures Act).

**All Citations**

61 F.3d 465, 32 Fed.R.Serv.3d 85, 1995 Fed.App. 0235P

Footnotes

1   Pursuant to the discovery order, the documents were to be turned over on February 24, 1995. Because it appeared that the mandamus petition would be moot in the absence of a stay, however, a panel of this court issued a temporary stay until the mandamus petition is resolved.

2   The Federal Reserve is charged by Congress to prevent and/or remedy unsafe and unsound banking practices and to ensure economic stability. See 12 U.S.C. § 301. Thus, as a condition of membership in the Federal Reserve System, banks are subject to periodic supervisory inspections and examinations by the Federal Reserve. In the course of an annual examination of Bankers Trust, the Federal Reserve did engage in a particularized inquiry with respect to Bankers Trust's derivatives transactions business.

3   Rule 45 would presumably require P & G to serve a subpoena on the Federal Reserve in Washington, D.C., directing the Federal Reserve to produce the relevant documents in its possession. The Federal Reserve, if it chose to do so, could then rely on any privileges it may be entitled to and litigate those objections before the district court in which the subpoena was filed.

4   Bankers Trust subsequently received the Federal Reserve's permission to produce the pre-existing business records provided by Bankers Trust to the Federal Reserve, i.e., the first category of documents. Bankers Trust, therefore, is not contesting paragraph 1 of the district court's order which had ordered Bankers Trust to produce such documents.

5   This court also granted the Federal Reserve permission to present a brief argument and to respond to questions at oral argument.

32 Fed.R.Serv.3d 85, 1995 Fed.App. 0235P

6    We are by no means indicating that the other portions of § 261.14 are likewise unenforceable. To the contrary, we think it advisable if not necessary for a party in litigation that possesses "confidential supervisory information" to inform the Federal Reserve of any requests for production so the Federal Reserve will have notice and the opportunity to intervene and protect any interests, arguments, or concerns it may have.

7    The *In re Subpoena* case noted several examples when such a situation may arise, including, for example, exposing "government malfeasance," *In re Franklin Nat'l Bank Sec. Litig.,* 478 F.Supp. 577, 582 (E.D.N.Y.1979), or when the government seeks justice between the litigants. *Northrop Corp. v. McDonnell Douglas Corp.,* 751 F.2d 395, 407 (D.C.Cir.1984).

**End of Document**        © 2018 Thomson Reuters. No claim to original U.S. Government Works.