## THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **COMMONWEALTH OF PENNSYLVANIA,** | : |
| | : |
| | : |
| **Plaintiff,** | : |
| | : **3:17-CV-1814** |
| **v.** | : **(JUDGE MARIANI)** |
| | : |
| **NAVIENT CORPORATION, et al.,** | : |
| | : |
| **Defendants.** | : |

### MEMORANDUM OPINION

#### I. INTRODUCTION AND PROCEDURAL HISTORY

Through this lawsuit, the Commonwealth of Pennsylvania (the "Plaintiff" or

"Commonwealth") seeks to hold Navient Corporation and Navient Solutions, LLC,

(collectively, "Defendants" or "Navient") liable for conduct that has allegedly harmed student

loan borrowers in Pennsylvania, as well as student loan borrowers nationwide.  Specifically,

the Commonwealth contends that Navient has committed a variety of unfair, deceptive, and

abusive practices in connection with the origination and servicing of student loans in

violation of the Consumer Financial Protection Act ("CFPA"), 12 U.S.C. § 5536, and the

Pennsylvania Unfair Trade Practices and Consumer Protection Law ("CPL"), 73 Pa Stat.

and Cons. Stat. Ann. § 201-1, *et seq.*  (Doc. 1).  The Commonwealth's case is similar to a

parallel action before the Court involving the Consumer Financial Protection Bureau

("CFPB") and Navient, *CFPB v. Navient Corp.*, No. 17-cv-101 (M.D. Pa. filed Jan. 18, 2017)

(hereinafter, the "*CFPB-Navient* matter"), and references to the Court's previous ruling on Navient's Motion to Dismiss the CFPB's Complaint are made in the body of this Opinion. Mem. Op., *CFPB v. Navient Corp.*, No. 17-cv-101 (M.D. Pa. filed Aug. 4, 2017), ECF No. 57.

The Commonwealth filed its Complaint on October 5, 2017. (*Id.*) On December 5, 2017, Navient filed a Motion to Dismiss the Commonwealth's Complaint Under Rule 12(b)(6) for failure to state a claim upon which relief can be granted (the "Motion"). (Doc. 16). Navient submitted its Memorandum of Law in Support of its Motion to Dismiss on December 22, 2017 (Navient's "Brief in Support"). (Doc. 24). The Commonwealth responded on February 2, 2018 with its Memorandum of Law in Support of its Opposition to Navient's Motion to Dismiss (the Commonwealth's "Opposition"). (Doc. 25). Navient submitted a reply brief in response to the Commonwealth's Opposition on March 5, 2018 (Navient's "Reply").[1] (Doc. 26).

Since fully briefing the Motion, the parties have submitted several Notices of Supplemental Authority to the Court pursuant to Local Rule 7.36. On March 13, 2018, Navient filed a Notice of Supplemental Authority informing the Court of published notice from the Department of Education ("ED") on ED's position on "Federal Preemption and State Regulation of [ED]'s Federal Student Loan Programs and Federal Student Loan

---

[1] Per the Court's December 7, 2017 Order (Doc. 22), the parties were granted an extended briefing schedule and expanded word limits for their submissions to the Court in support of, and opposition to, the Motion.

Servicers," 83 Fed. Reg. 10619 (Mar. 12, 2018). (Doc. 27). The Commonwealth followed

by filing Notices of Supplemental Authority on June 28, 2018 (Doc. 33) and July 12, 2018

(Doc. 34), informing the Court of recent court decisions in the Middle District of Florida,

*Daniel v. Navient Sols., LLC*, No. 8:17-cv-2503, 2018 WL 3343237 (M.D. Fla. June 25,

2018), and the Circuit Court of Cook County, Illinois, *People v. Navient Corp.*, No. 17 CH

761 (Ill. Cir. Ct. July 10, 2018), involving disputes regarding Navient's student loan-related

practices. Most recently, Navient filed a Notice of Supplemental Authority on September 25,

2018 informing the Court of a recent court decision in the Northern District of Florida,

*Lawson-Ross v. Great Lakes Higher Educ. Corp.*, No. 1:17-CV-253 (N.D. Fla. Sept. 20,

2018), involving claims against a federal student loan servicer.

The Motion is ripe for decision. For the reasons stated below, the Court will deny

Navient's Motion to Dismiss in its entirety.

## II. FACTUAL ALLEGATIONS

### A. BACKGROUND

The Commonwealth's Complaint (Doc. 1) alleges the following facts which, for the

purposes of resolving Navient's Motion, the Court takes as true:

Defendants were or currently are in the business of originating, marketing, servicing,

and collecting federal and private student loans. (*Id.* ¶ 2). "Defendants Navient Corporation

and Navient Solutions, LLC have two corporate predecessors: a parent company (SLM

Corporation) and a subsidiary (Sallie Mae, Inc.)." (*Id.* ¶ 19). "In April 2014, Defendants

3

Navient Corporation and Navient Solutions, LLC assumed the liabilities of their predecessors, SLM Corporation and Sallie Mae, Inc." (*Id.* ¶ 21). Defendant Navient Corporation shares corporate officers with Defendant Navient Solutions, LLC, and controls and directs the hiring of employees at Navient Solutions, LLC, which is a subsidiary of Navient Corporation. (*Id.* ¶¶ 22-23). Defendant "Navient Corporation often makes no meaningful distinction between Navient Corporation and its subsidiaries," and "consented to, has knowledge of, has materially participated in, and/or has controlled the activities of Navient Solutions, LLC with respect to the conduct alleged in [the] Complaint." (*Id.* ¶¶ 24-25).

The conduct alleged in the Complaint involves Navient's origination and servicing of federal and private student loans, some of which occurred at Navient's corporate predecessors before the transfer of corporate liabilities in 2014. (*Id.* ¶¶ 4, 45-172). Federal student loans offer features distinct from other loan products, most notably, the availability of repayment options that are tied to the borrower's income. (*Id.* ¶ 28). "Until approximately 1994, federal student loans were originated and funded by private lenders such as Defendants, and guaranty agencies insured those funds, which were reinsured by the government pursuant to the Federal Family Education Loan Program (FFELP)." (*Id.* ¶ 30). Starting in 1994, the federal government also began lending directly to borrowers through the Direct Loan Program, and ceased the FFELP program in 2010. (*Id.* ¶¶ 31-32). Whether a federal student loan was originated through the FFELP or Direct Loan Program, the

4

servicing of federal student loans is handled by private entities like Navient. (*Id.* ¶ 33). "Federal student loan servicers handle a multitude of issues for borrowers, including: collecting payments, providing repayment options to borrowers, facilitating the loan's payoff, and collecting on delinquent loans." (*Id.* ¶ 35).

Unlike federal student loans, private student loans are not guaranteed by the government and are issued "based on the lender's assessment of the borrower's creditworthiness/likelihood of repaying the loan." (*Id.* ¶ 39). They are often more expensive than federal student loans, with higher interest rates, and often require cosigners who are "equally responsible for the payments on the loan." (*Id.* ¶¶ 40-41). They do not offer standard repayment plan options, such as the income-driven repayment options provided by federal student loans, which can prevent borrowers from defaulting on their loans and suffering serious financial consequences. (*Id.* ¶¶ 42-43).

## B. NAVIENT'S LOAN ORIGINATION-RELATED CONDUCT

"As far back as the year 2004," Navient's corporate predecessors "originated both FFELP and private student loans nationwide, including in Pennsylvania." (Doc. 1 ¶ 45). The lending landscape for student loan originators has changed over the years: until about 2007, when federal regulations changed, many schools "maintained a list of 'preferred lenders' to provide guidance to students who had to choose between the different lenders offering federal and private student loans." (*Id.* ¶¶ 49-50). Preferred lenders "typically received in aggregate up to 90% of the loans taken out by the institution's students and their

parents, giving the preferred lender exclusive or near-exclusive access to a school's population of borrowers." (*Id.* ¶ 52). Navient "sought to establish [itself] at the top of preferred lending lists in order to obtain" this exclusive access, and created custom packages of loans to market to schools to obtain their business. (*Id.* ¶¶ 52-53). "These packages consisted of a variety of loan products including: FFELP loans; private loans for borrowers who qualified for [Navient's] standard private student loan products (prime loans); and private loans for borrowers who were ineligible for [Navient's] standard private student loan products (subprime loans)." (*Id.* ¶ 54). Both schools and Navient had a motivation to include private loans as part of a package deal, because more students could obtain financing to attend school and because it meant Navient could obtain a greater volume of FFELP loans, which were a larger part of the market and were lower risk for Navient due to a 100% federal government guarantee. (*Id.* ¶¶ 55-56). In general, private student loans were also more lucrative for Navient, because of their higher interest rates. (*Id.* ¶ 57). However, subprime loans, which suffered from high levels of default and were not profitable for Navient, were merely included in the loan packages as a marketing tool to gain access to schools' preferred lender lists. (*Id.* ¶ 58). Internal communications evidence Navient's motivation to use subprime loans as a tool to win prime and FFELP business, despite the poor performance of the subprime loan portfolio:

> In February 2007, Defendants internally described their subprime lending strategy and implications as follows: "Current Strategy is Working: - Use subprime to win school deals and secure FFELP and standard private volume – View economics on an all-in basis[]"; . . . [and] [o]ne of Defendants' January

17, 2007 emails entitled "Subprime Lending workgroup meeting attachments," describes one of Defendants' subprime loan programs as "the baited hook to gain [FFELP] volume."

(*Id.* ¶¶ 64, 67).

Navient's desire to obtain access to preferred lender lists and the associated benefit of increased FFELP and prime loan volume led it to loosen its credit standards downward and lend to borrowers who attended schools with low graduation rates (less than 50%, in some instances). (*Id.* ¶¶ 74-76). Navient pursued subprime loan borrowers despite the likelihood that some or many of these borrowers would not graduate and would be unable to repay their student loans; these borrowers were responsible for a large percentage of Navient's "credit losses." (*Id.* ¶¶ 77-78, 82-83, 85). As Navient's loan originations grew rapidly from 2000 to 2006, much of the increase was due to growth in subprime loan originations to risky borrowers who attended for-profit or non-profit schools with less than 50% graduation rates, with FICO scores of 640 or less, and who were charged high interest rates. (*Id.* ¶¶ 80-81). Within these particularly risky loan cohorts, "in every year from 2000 to 2007, between 68% and 87% of . . . [l]oans defaulted." (*Id.* ¶¶ 81-82). Borrowers who took out subprime student loans with Navient "were not told, and had no idea, that they were far more likely to default than pay back their loans." (*Id.* ¶ 84). Additionally, these borrowers were not told about steps that Navient took to insulate itself from the credit risk of defaults, including "credit enhancement" or "recourse" arrangements, in which schools agreed to accept some of the default risk of the subprime loans. (*Id.* ¶¶ 88-92). The

7

Commonwealth asserts that subprime borrowers were harmed by Navient's loan origination-related conduct, including by having to delay starting a family, save for a down payment on a house, or start their own business "and actually apply the education for which they borrowed." (*Id.* ¶ 87).

## C. NAVIENT'S LOAN SERVICING-RELATED CONDUCT

### 1. ALLEGED FORBEARANCE STEERING

As noted above, federal student loans come with certain protections for borrowers that are not standard features of private student loans. (Doc. 1 ¶¶ 28, 42-43, 97-103). One of these protections is income-driven repayment ("IDR") plans, which are linked to borrowers' income and family size, and are intended to make monthly payments more affordable (sometimes $0 per month) and sometimes offer interest payment benefits, depending on the type of federal student loan. (*Id.* ¶¶ 96-100). Borrowers enrolled in IDR plans can also obtain loan forgiveness if they enroll in the plans and make qualifying payments for 20-25 years "for most IDR plans or 10 years of qualifying payments while working full time for certain employers, under the Public Service Loan Forgiveness (PSLF) program." (*Id.* ¶ 101).

"Federal student loans are generally also eligible for **forbearance**, which is a short-term, temporary postponement of payment. With forbearance, a borrower experiencing financial hardship or illness may be able to stop making payments or reduce his or her monthly payment for a defined period of time, which can be multiple consecutive months.

8

Borrowers may be entitled to multiple forbearances over the course of a loan, up to 36 months in total." (*Id.* ¶ 103) (emphasis in the Commonwealth's Complaint). Forbearance is generally only appropriate for borrowers facing temporary financial hardship, due to the "accumulation of unpaid interest and the addition of that unpaid interest to the principal balance": "[Navient's] website states that forbearance is appropriate for borrowers 'who have a problem making on-time payments due to a *temporary* financial difficulty.'" (*Id.* ¶¶ 104-05) (emphasis in the Commonwealth's Complaint). IDR plans are usually a better option for borrowers. (*Id.* ¶ 107).

Despite this, the Commonwealth alleges that since at least July 2011, Navient affirmatively steered borrowers facing long-term financial hardship into forbearance rather than exploring more appropriate IDR options. (*Id.* ¶¶ 109-10). Navient took this course of action despite telling borrowers to contact it to obtain help in evaluating repayment options, placing statements on its website that included:

- "If you're experiencing problems making your loans payments, please contact us. Our representatives can help you by identifying options and solutions, so you can make the right decision for your situation."
- "We can help you find an option that fits your budget, simplifies payment, and minimizes your total interest cost."

(*Id.* ¶ 108). The Commonwealth alleges that Navient's motivation in steering borrowers to forbearance rather than evaluating IDR options is rooted in a desire to cut down on lengthy customer-service interactions and processing of forms, which are more likely when enrolling a borrower in an IDR plan versus a forbearance. (*Id.* ¶¶ 110-16).

9

"Between January 2010 and March 2015, the number of borrowers that Defendants enrolled in forbearance has generally exceeded the number of borrowers enrolled in IDR repayment plans." (*Id.* ¶ 117). Navient steered borrowers having problems making a payment on their loans into voluntary forbearance rather than advising them about IDR plans; "many of those borrowers would have likely qualified for a $0 payment in an IDR plan." (*Id.* ¶ 118). "Defendants also enrolled many borrowers in multiple consecutive forbearances, even though they had clearly demonstrated a long-term inability to repay their loans, rather than the short-term financial hardship appropriate for forbearances." (*Id.* ¶ 121). Hundreds of thousands of borrowers were enrolled in extended periods of forbearance lasting two or three years, or more. (*Id.* ¶ 123).

"Because Defendants placed IDR borrowers into forbearance before ultimately enrolling them in IDR plans with a $0 payment, the borrowers had delayed access to the benefits of IDR and were negatively impacted by consequences of forbearance, including the addition of interest to the principal and lost months that would have otherwise counted toward forgiveness. This may have been avoided had Defendants enrolled borrowers in IDR initially." (*Id.* ¶ 120).

## 2. ALLEGED INCOME RECERTIFICATION FAILURES

Borrowers enrolled in IDR plans for their federal student loans must recertify their income and family size every twelve months, as an IDR payment is only valid for that period of time. (Doc. 1 ¶ 131). Borrowers will suffer negative consequences if they do not timely

10

recertify their IDR payment, including: an increased monthly payment; the addition of unpaid, accrued interest to the loan principal; the potential loss of an interest subsidy for subsidized federal loans; and delayed progress towards loan forgiveness. (*Id.* ¶ 132).

The Commonwealth alleges that Navient, in issuing notices to borrowers regarding their IDR plans, did not advise borrowers of the negative consequences of failing to submit timely, complete, and correct recertifications to renew borrowers' IDR plans. (*Id.* ¶¶ 134-45). For example, in the "initial disclosure notice" provided to borrowers enrolled in an IDR plan, Navient did not include a specific renewal deadline or advise of negative consequences for failing to timely meet recertification requirements. (*Id.* ¶¶ 133-34). "From at least January 1, 2010 until December 2012, Defendants' annual renewal notices for IDR plans sent through U.S. mail" did not include a specific renewal deadline or advise borrowers of negative consequences for failing to timely meet recertification requirements, instead providing vague and incomplete information. (*Id.* ¶¶ 135-39).

Navient's electronic annual renewal notices (sent to most of Navient's federal loan borrowers, as they had consented to receiving electronic communications) required borrowers to log into Navient's website to view the full renewal notice, and the email containing the link to Navient's website did not provide information regarding the purpose of the notice. (*Id.* ¶¶ 140-41). Navient tracked the number of borrowers who clicked on hyperlinks in Navient emails sent to them, and so "knew or should have known that many borrowers did not view the electronic renewal notices." (*Id.* ¶ 144). "Between at least July

11

2011 and March 2015, the percentage of borrowers who did not timely renew their enrollment in IDR plans regularly exceeded 60%." (*Id.* ¶ 145). Starting in March 2015, Navient "made several enhancements" to their email renewal notices, and the renewal rate for IDR plans "has more than doubled." (*Id.* ¶ 146).

### 3. ALLEGED COSIGNER RELEASE MISREPRESENTATIONS

"A cosigner is generally necessary for a borrower to obtain a private student loan, or to obtain that loan with more favorable terms. Once a borrower enters repayment on his/her private student loan with Defendants, he/she generally can apply to release the cosigner from the loan after meeting certain eligibility criteria." (Doc. 1 ¶ 149). "Since at least January 2010, one of the eligibility criteria that Defendants have required private student loan borrowers to meet before they can apply to release a cosigner is that the borrower must make a minimum number of **consecutive, on-time payments** consisting of both principal and interest." (*Id.* ¶ 150) (emphasis in the Commonwealth's Complaint). Depending on the time period (prior or subsequent to January 21, 2014), Navient has required borrowers to make a varying number of "consecutive, on-time principal and interest payments before applying for cosigner release," but Navient has failed "to specifically define for borrowers 'consecutive' or 'on-time' payments." (*Id.* ¶ 151). This has led to confusion for borrowers who have made monthly payments on their loans that are in excess of what they owe. (*Id.* ¶¶ 152-161).

12

In particular, borrowers who have made payments in excess of the amount due for a given month that have been a multiple of their monthly payment (e.g., paying $300 when the monthly payment is $100), have been marked in a "paid ahead" status for following months for their "multiplier overpayment." (*Id.* ¶¶ 152-53). Navient has told borrowers in "paid ahead" status in any given month that the amount due for that month is $0, but until at least mid-2015, if those borrowers did not make a payment during that month, Navient treated the "lack of payment by a borrower in response to a $0 bill as a failure to make a 'consecutive, on-time principal and interest payment' that month" and reset the borrower's progress towards cosigner release to zero months. (*Id.* ¶¶ 154-56). "Nothing on Defendants' billing statement, their website, nor any other borrower-facing document advised borrowers that making no payment in response to a $0 bill could impact their eligibility for cosigner release." (*Id.* ¶ 158). The Commonwealth asserts that after discovery, the evidence will show that delayed cosigner release caused by this confusion has negatively impacted borrowers. (*Id.* ¶ 159).

### 4. ALLEGED PAYMENT PROCESSING ERRORS

"One of Defendants' primary responsibilities as a student loan servicer is to process payments made by borrowers on their student loan accounts. Defendants, however, do not have adequate processes and procedures in place to sufficiently address certain errors they make in the processing of payments they receive or to prevent errors from recurring." (Doc. 1 ¶ 162). These errors have included errors in the allocation of payments, or how a

13

payment is distributed across multiple loans, and application of payments, or how a payment is applied to a specific loan or loans. (*Id.* ¶¶ 163-72). "Since at least July 2011, many borrowers and cosigners, primarily those who pay by mailing a check or through an external bill payment system, have complained that Defendants misallocated or misapplied submitted payments." (*Id.* ¶ 165). "One source for payment processing errors appears to be Defendants' default payment allocation methodology which Defendants did not disclose on any billing statement, promissory note, or printed or online resource available to borrowers." (*Id.* ¶ 166). "Because Defendants did not make their default allocation methodologies clear or public until at least late 2013, prior to that time, borrowers generally had no way of knowing in advance how Defendants might allocate payments." (*Id.* ¶ 167).

Because of issues with Navient's mail reading equipment, Navient has not always properly detected and applied written instructions placed by borrowers on their paper checks. (*Id.* ¶ 168). "Many borrowers and cosigners have complained that a payment processing error was not an isolated event, but rather that the same payment processing error recurred time and again, even after they contacted Defendants to correct the error." (*Id.* ¶ 170). Navient has not systematically categorized or tracked many borrower inquiries regarding payment processing errors that were not escalated to supervisors, and has not identified or fixed underlying issues surrounding such errors, leading to some borrowers facing the same errors in numerous months. (*Id.* ¶¶ 170-71). These errors "have resulted in: (1) borrowers and cosigners incurring improper late fees and increased interest charges,

14

and (2) the furnishing of inaccurate negative information to consumer reporting agencies."
(*Id.* ¶ 169).

## III. STANDARD OF REVIEW

A complaint must be dismissed under Federal Rule of Civil Procedure 12(b)(6) if it
does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl.
Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). "A claim
has facial plausibility when the plaintiff pleads factual content that allows the court to draw
the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft
v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need
detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement
to relief requires more than labels and conclusions, and a formulaic recitation of the
elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal citations,
alterations, and quotations marks omitted). A court "take[s] as true all the factual allegations
in the Complaint and the reasonable inferences that can be drawn from those facts, but . . .
disregard[s] legal conclusions and threadbare recitals of the elements of a cause of action,
supported by mere conclusory statements." *Ethypharm S.A. France v. Abbott Labs.*, 707
F.3d 223, 231 n.14 (3d Cir. 2013) (internal citation, alteration, and quotation marks omitted).
Thus, "the presumption of truth attaches only to those allegations for which there is
sufficient 'factual matter' to render them 'plausible on [their] face.'" *Schuchardt v. President*

*of the U.S.*, 839 F.3d 336, 347 (3d Cir. 2016) (alteration in original) (quoting *Iqbal*, 556 U.S. at 679). "Conclusory assertions of fact and legal conclusions are not entitled to the same presumption." *Id.*

"Although the plausibility standard 'does not impose a probability requirement,' it does require a pleading to show 'more than a sheer possibility that a defendant has acted unlawfully.'" *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal citation omitted) (first quoting *Twombly*, 550 U.S. at 556; then quoting *Iqbal*, 556 U.S. at 678). "The plausibility determination is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Id.* at 786-87 (quoting *Iqbal*, 556 U.S. 679).

However, even "if a complaint is subject to Rule 12(b)(6) dismissal, a district court must permit a curative amendment unless such an amendment would be inequitable or futile." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 245 (3d Cir. 2008).

> [E]ven when plaintiff does not seek leave to amend his complaint after a defendant moves to dismiss it, unless the district court finds that amendment would be inequitable or futile, the court must inform the plaintiff that he or she has leave to amend the complaint within a set period of time.

*Id.*

## IV. ANALYSIS

Navient raises numerous arguments in seeking to dismiss the Commonwealth's Complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6). Navient's first two sets of arguments are based on preclusion and preemption theories. First, Navient contends

16

that a proper reading of the CFPA bars the Commonwealth from bringing a "copycat" action under the CFPA where the CFPB has already filed a similar lawsuit alleging identical claims under the CFPA (Counts III, V, VII, & IX).[2]  Next, Navient argues that certain federal laws, the Higher Education Act ("HEA"), 20 U.S.C. § 1001 *et seq.*, and the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*, preempt the Commonwealth's loan origination, forbearance steering, and recertification conduct claims brought under the CPL (Counts I, II, & IV).  Finally, Navient asserts a litany of arguments against most of the Commonwealth's claims to contend that the Commonwealth has failed to state a claim upon which relief can be granted (Counts I-V, VIII-IX).  The Court will address each set of arguments in turn.

## A. THE CFPA AND STATE "COPYCAT" ACTIONS (COUNTS III, V, VII, & IX)

Navient begins its attack on the Commonwealth's Complaint by arguing that "the Commonwealth's complaint is an unauthorized 'copycat' lawsuit." (Doc. 24 at 1).  This argument is specifically focused on the Commonwealth's CFPA claims, which Navient asserts impermissibly "parrot allegations from a materially indistinguishable lawsuit filed by the Consumer Financial Protection Bureau ("CFPB") nearly a year ago." (*Id.*)  While Navient agrees that the CFPA allows a state to file a civil action under the statute, 12 U.S.C.

---

[2] In a footnote in its Brief in Support, Navient states that it "does not seek dismissal of the Commonwealth's private-loan servicing claims regarding 'cosigner release' (Counts VI and VII) at the present time." (Doc. 24 at 22 n.8).  However, Navient's first argument in its Brief in Support, its CFPA "copycat" argument, arguably applies to Count VII, as it is a claim under the CFPA that was also in the *CFPB-Navient* matter. *See* Compl. at 56-57, *CFPB v. Navient Corp.*, No. 17-cv-101 (M.D. Pa. filed Jan. 18, 2017), ECF No. 1.  Despite this minor confusion, the result is the same, because as discussed *infra*, the Court rejects Navient's "copycat" argument.

§ 5552(a)[3], it argues that the text and structure of the remainder of § 5552 should lead the

Court to conclude that § 5552(a) does not permit a state to bring an action "where, as here,

the CFPB itself has been pursuing materially indistinguishable claims against Navient for

more than nine months." (*Id.* at 9-10). Navient's complex statutory interpretation argument

relies on "three features of the statute":

> (1) "the CFPA's pre-suit notice provisions, which condition state-initiated CFPA claims on the [state] AG 'provid[ing] a copy of the complete complaint to be filed and written notice describing such action or proceeding to the Bureau,'" 12 U.S.C. § 5552(b)(1)(A); *see also* § 5552(b)(1)(C) (describing what should be included in the written notice, including "the alleged facts underlying the proceeding and whether there may be a need to coordinate the prosecution of the proceeding so as not to interfere with any action, including any rulemaking, undertaken by the Bureau, a prudential regulator, or another Federal agency");
>
> (2) "the statute's intervention provisions, which authorize the CFPB to intervene as a party-plaintiff in any state-initiated CFPA litigation," 12 U.S.C. § 5552(b)(2)(A); and
>
> (3) "the lack of statutory authorization for state intervention in pending CFPB cases."

---

[3] In relevant part, § 5552(a) states:

> [T]he attorney general (or the equivalent thereof) of any State may bring a civil action in the name of such State in any district court of the United States in that State or in State court that is located in that State and that has jurisdiction over the defendant, to enforce provisions of this title or regulations issued under this title, and to secure remedies under provisions of this title or remedies otherwise provided under other law.

12 U.S.C. § 5552(a)(1).

(Doc. 24 at 10-14). Essentially, Navient argues that that the CFPA does not make sense if a court allows what it characterizes as a "copycat" lawsuit. "Pre-suit notice" from a state AG is irrelevant if the CFPB is conducting its own identical lawsuit, (*id.* at 11), and allowing intervention by the CFPB in a state-initiated CFPA case would be prohibited by the traditional "rule that a single-party plaintiff cannot simultaneously maintain two actions against the same defendant(s)," (*id.* at 12). And it argues that congressional intent to exclude a "copycat" action is shown because Congress did not specifically authorize a state to intervene in a pending CFPB case, when it has provided for a state right of intervention in other federal statutes. (*Id.* at 13-14). Navient closes its line of argument with a policy-based argument that allowing "copycat" lawsuits would burden courts and risk inconsistent rulings, which would work against what it says is an avowed purpose of the CFPA, to "enforce Federal consumer financial law *consistently*." (*Id.* at 14 (citing 12 U.S.C. § 5511(a) (emphasis added in Navient's Brief in Support)).

The Commonwealth responds in its Opposition by affirmatively arguing that the "plain and unambiguous meaning" of § 5552 permits concurrent state claims, and that if Congress had wanted to explicitly preclude concurrent state claims, it would have done so. (Doc. 25 at 4). In making this argument, the Commonwealth references two other sections of the CFPA: 12 U.S.C. § 5514(c)(3)(B)(i), which prohibits either the FTC or CFPB from filing an action if the other agency has already filed an action based on the same legal claims; and 12 U.S.C. § 5515(c)(3), which provides "backup enforcement" authority for the

federal banking regulators over "very large" depository institutions if the CFPB does not use its primary enforcement authority. (Doc. 25 at 5). The Commonwealth also cites other federal consumer protection statutes to "exemplify Congress' ability to authorize state enforcement and prohibit concurrent state claims when it so intends." (Id.) And the Commonwealth emphasizes that "Navient cannot point to any court that has *blocked* concurrent CFPA claims," and cites to a case in the District of New Mexico where a federal court allowed a state AG to "pursue CFPA claims based on the same underlying conduct of a previously-filed CFPB consent order," *New Mexico ex rel. King v. Capital One Bank (USA) N.A.*, 980 F. Supp. 2d 1314 (D.N.M. 2013). (Id. at 6 & n.4).

The Commonwealth also responds to Navient's CFPA statutory interpretation arguments by arguing that Navient "misses the point of the notice provision" of the CFPA; that the "intervention provision" in the CFPA does not imply that the CFPA prohibits concurrent state claims, because similar provisions also exist in other statutes that prohibit or allow concurrent state actions; and that "the CFPA's omission of an unconditional state intervention right has no bearing on whether states may file concurrent claims." (Id. at 7-9). Finally, in response to Navient's argument that allowing concurrent state lawsuits will burden the courts, the Commonwealth states that "[d]ismissing Pennsylvania's CFPA claims would not appreciably reduce the scope of this case because the CPL counts rely on similar underlying facts as the CFPA claims," and that the risk that the CFPB will drop its lawsuit

makes it important to allow the Commonwealth to continue its case in order to protect consumers. (*Id.* at 9-10).

Navient argues in its Reply that the Commonwealth's reliance on the provisions in the CFPA that prohibit federal regulators from engaging in concurrent actions is misplaced because those provisions are solely focused on federal agencies and the division of enforcement responsibility "among *federal* agencies with otherwise-concurrent enforcement jurisdiction in a post-CFPB world" which it asserts was one of the purposes of the CFPA. (Doc. 26 at 1-2). Instead, § 5552, it contends, exists only to allow states to step in if the CFPB is not acting, and Navient cites the legislative history of the provision, which Navient argues establishes that Congress was focused on situations when "federal regulators are not 'asleep at the switch.'" (Doc. 26 at 2). Navient also counters the Commonwealth's citation to other federal statutes which explicitly prohibit concurrent state actions by questioning the application of the *Russello* presumption, *Russello v. United States*, 464 U.S. 16, 23 (1983), of ascribing meaning to congressional silence because Navient asserts that other textual and contextual evidence here point to congressional intent. (Doc. 26 at 3). Navient further argues that the Commonwealth's responses to its statutory interpretation arguments are deficient, and, in reply, mainly restates or rephrases arguments it presented in its Brief in Support. (*Id.* at 3-5). Navient sums up its position as "one that makes sense of the whole" CFPA, "preserves a meaningful role for state-initiated claims," and "avoids unnecessary follow-on litigation." (*Id.* at 6).

21

While Navient's arguments are creative, they do not convince the Court that the

CFPA prohibits concurrent state enforcement actions. Following Navient's position would

require the Court to accept an amalgam of tenuous postulates regarding several provisions

of the CFPA and a strained reading of the plain text of the statute.

The Court begins its analysis with an examination of the statutory language in 12

U.S.C. § 5552, as required by basic principles of statutory interpretation:

> As with all questions of statutory interpretation, we first turn to the statutory
> language "to determine whether the language at issue has a plain and
> unambiguous meaning with regard to the particular dispute in the case."
> *Marshak v. Treadwell,* 240 F.3d 184, 192 (3d Cir. 2001) (citations and internal
> quotation marks omitted). We discern "[t]he plainness or ambiguity of statutory
> language . . . by reference to the language itself, the specific context in which
> that language is used, and the broader context of the statute as a whole." *Id.*
> (citations and internal quotation marks omitted). Where "the statutory meaning
> is clear, our inquiry is at an end." *Ki Se Lee v. Ashcroft,* 368 F.3d 218, 222 (3d
> Cir. 2004); *Marshak,* 240 F.3d at 192.

*Gordon v. Wawa, Inc.,* 388 F.3d 78, 81 (3d Cir. 2004).

The Court notes that there is no relevant case law on the interpretive task presented

here with respect to § 5552, perhaps due to the relatively short history of the CFPA, and so

the Court writes on a blank slate.[4] To start, the "language itself" of § 5552(a)(1) is

---

[4] The Court also notes that it does not appear that a state has previously brought an action under
the CFPA against a party while the CFPB has been concurrently pursuing its own action against that same
party. In its Opposition, the Commonwealth refers to a 2013 case from the District of New Mexico where
the court "permitted that state's AG to pursue CFPA claims based on the same underlying conduct of a
previously-filed CFPB consent order." (Doc. 25 at 6 n.4); Amended Complaint ¶ 6, *New Mexico ex rel. King
v. Capital One Bank (USA) N.A.,* No. 13-cv-513 (D.N.M. filed July 2, 2013); *New Mexico ex rel. King v.
Capital One Bank (USA) N.A.,* 980 F. Supp. 2d 1314 (D.N.M. 2013). However, as Navient states in its
Reply, that case did not involve a concurrent state/CFPB action, nor did the defendant appear to raise the
"copycat" argument that Navient has raised here, and so the *King* court did not consider the argument in

unambiguous: it authorizes a state attorney general or equivalent state official to "bring a civil action in the name of such State in any district court of the United States in that State or in State court located in that State and that has jurisdiction over the defendant" to enforce the CFPA or regulations issued under the CFPA. 12 U.S.C. § 5552(a)(1). The text of § 5552(a)(1) does not contain a bar on a concurrent state enforcement under the CFPA, nor is such a bar contained in any other provision of § 5552 or the remainder of the CFPA.

However, finding ambiguity in otherwise clear statutory language, Navient refers to what it claims is the problematic operation of other provisions of § 5552 in the event of a concurrent state enforcement action: the pre-suit notice provision in § 5552(b)(1)(A) and the intervention provision in § 5552(b)(2). (Doc. 24 at 10-13). Considered separately or in tandem, neither provision renders any part of § 5552 superfluous or contradictory in the event of a concurrent state enforcement action under the CFPA. *See Tatis v. Allied Interstate, LLC*, 882 F.3d 422, 429 (3d Cir. 2018) (noting that in interpreting statutory language, the task is "to give effect, if possible, to every clause and word of a statute," and avoid the result of surplusage) (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)).

The pre-suit notice provision in § 5552(b)(1)(A) merely requires a state to notify the CFPB "[b]efore initiating any action in a court or other administrative or regulatory proceeding" under the CFPA or a regulation promulgated under the CFPA. 12 U.S.C. §

---

making its decision to deny dismissal of New Mexico's federal law claim. (Doc. 26 at 5-6); *King*, 980 F. Supp. 2d at 1321-22.

5552(b)(1)(A). This provision is not rendered meaningless in the event the CFPB already has its own action underway against the same defendant. A state seeking to bring a concurrent action may have a different litigation strategy than the CFPB, even if it alleges the same or similar claims in its own case. In that case, the notice would provide the CFPB with an opportunity to advise the state, perhaps with lessons learned from its own experience in its concurrent action. More importantly, as the Commonwealth points out in its Opposition, § 5552(b)(1)(C), which specifies the minimum contents of the written notice a state must provide to the CFPB before initiating an action, contains language which explicitly contemplates that the CFPB may already have its own action underway: "[the written notice should describe] whether there may be a need to coordinate the prosecution of the proceeding so as not to interfere with *any action*, including any rulemaking, *undertaken by the Bureau*, a prudential regulator, or another Federal agency." 12 U.S.C. § 5552(b)(1)(C)(iii) (emphasis added).

The intervention provision in § 5552(b)(2) also does not suggest that concurrent state enforcement actions are barred by the CFPA. This provision permits, but does not require, the CFPB to intervene in an action brought by a state under the CFPA or a regulation promulgated under the CFPA. 12 U.S.C. § 5552(b)(2)(A) ("In any action described in [§ 5552(b)(1)], the Bureau *may*—(A) intervene in the action as a party") (emphasis added). Indeed, in its rulemaking proceedings establishing the specific

24

requirements of the state notice procedure, 12 C.F.R. § 1082.1, the CFPB acknowledges

that its intervention power is discretionary and may be subject to certain limits:

> Section 1042(b)(2) of the Dodd-Frank Act authorizes the Bureau to intervene
> in any action brought by a State Official pursuant to the authority granted to the
> State under section 1042(a) of the Dodd-Frank Act. The Bureau reserves the
> right to intervene or otherwise participate in any action *where it lawfully may do
> so*, whether under section 1042(b)(2) of the Dodd-Frank Act or under another
> provision of law (including the Federal Rules of Civil Procedure). As a result,
> the Bureau declines to amend the Interim Final Rule as recommended and *will
> determine which actions are appropriate for intervention on a case-by-case
> basis*.

State Official Notification Rule, 77 Fed. Reg. 39,112, 39,114 (June 29, 2012) (emphasis

added) (refusing to amend interim rule to provide specific standards for when intervention

would be appropriate). Thus, Navient is mistaken when it argues that the application of this

provision in the event of a concurrent state action would make the CFPB run afoul of the

"rule that a single party-plaintiff cannot simultaneously maintain two actions against the

same defendant(s)." (Doc. 24 at 12).

Navient's reliance on this single-party plaintiff "rule" is also based on a misreading

and misapplication of the relevant case law in *Walton v. Eaton Corp.*, 563 F.2d 66, 70 (3d

Cir. 1977) (en banc). *Walton* involved a plaintiff who filed an employment discrimination suit

in the Eastern District of Pennsylvania. *Id.* at 69. The first complaint filed by the plaintiff

expressly waived the right to a jury trial. *Id.* at 70. One year after the filing of the first

complaint, rather than amending the first complaint, the plaintiff's new counsel filed a new

complaint against the same defendant, which was nearly indistinguishable from the first

complaint. *Id.* In the second complaint, unlike the first, the plaintiff sought a jury trial and compensatory damages and included allegations of "emotional and mental injury." *Id.* The district court, *sua sponte*, consolidated the two actions, and later found for the defendant after a bench trial. *Id.* at 68-70. The Third Circuit noted that the plaintiff "had no right to maintain two separate actions involving the same subject matter at the same time in the same court and against the same defendant." *Id.* at 70 (citing *United States v. Haytian Republic*, 154 U.S. 118, 123-24). However, the Third Circuit noted that the district court's decision to consolidate the plaintiff's two actions was not objectionable, and that it also could have avoided a conflict between the actions by dismissing the second complaint without prejudice or staying proceedings in the second action until after the first action was decided.[5] *Id.* at 70-71. The primary concern of the court appeared to be "insur[ing] that the plaintiff does not use the incorrect procedure of filing duplicative complaints for the purpose of circumventing the rules pertaining to the amendment of complaints, Fed. R. Civ. Proc. 15, and demand for trial by jury, Fed. R. Civ. Proc. 38." *Id.* at 71. The factual circumstances at play in *Walton* do not present themselves here. And, in fact, *Walton* cuts against Navient's position that there is an irreconcilable conflict between the CFPA's intervention provision

---

[5] The Third Circuit stated that if the district court had dismissed the second complaint without prejudice or stayed the case, *res judicata* would have barred the second action after the district court ruled in favor of the defendant in the first action. *Walton*, 563 F.2d at 71 n.4.

26

and the "single-party plaintiff" bar because the Third Circuit indicated that consolidation can

be an appropriate solution to avoid violating the "single-party plaintiff" bar.[6]  *Id.*

Navient's other contentions in support of its "copycat" argument also do not

persuade the Court to disregard the plain text of § 5552(a)(1) and its approach permitting

concurrent state CFPA lawsuits.  Navient cites to no on-point case law in support of its

argument that Congress would have inserted express language into the CFPA to permit

state intervention in ongoing CFPB cases.[7]  More importantly, Navient fails to clearly explain

how such an argument has relevance here, as the Commonwealth is not seeking to

intervene in the CFPB's case, but rather, is seeking to use its own authority under §

5552(a)(1), which by its plain language explicitly authorizes states to bring their own actions

---

[6] Navient argues in its Reply that allowing courts to consolidate ongoing state and CFPB actions "would effectively grant the state a right to intervene in the CFPB's lawsuit even though the CFPA provides no such authorization and despite the fact that any such intervention would be untimely [and] [t]hat hardly could be what Congress had in mind." (Doc. 26 at 4). Navient provides no legal support for this argument. And as detailed, *infra*, Navient fails to explain how the issue of a state's possible intervention in an ongoing CFPB lawsuit has anything to do with the clear grant of authority in the CFPA for a state to bring its own action under the statute.

[7] Navient's reference to *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 184 (1994) in support of this argument is unavailing. In *Central Bank of Denver*, the Supreme Court analyzed whether the Securities Exchange Act of 1934 allowed a private plaintiff to bring a civil action against those who aid and abet a primary violator of section 10(b) of the Act. *Id.* at 167. The Court ruled that the text of section 10(b) was silent on the issue of liability for aiding and abetting primary violations and thus did not provide a cause of action to assert such liability, nor did any of the other express private causes of action in the Act. *Id.* at 173-76. The Court noted that Congress showed that it knew how to provide for a cause of action for secondary liability in the statute, because in a separate section of the Act (Section 20), it imposed liability on "controlling persons." *Id.* at 183-85. *Central Bank of Denver* had nothing to do with state intervention rights in federal agency lawsuits, at issue here. And the *Central Bank of Denver* court's approach to statutory interpretation, examining parts of a statute to determine what Congress intended in another part of the same statute, is more aligned with the Commonwealth's position, as noted *infra*.

27

under the CFPA. Thus, contrary to Navient's argument, the existence of other statutes

which establish the right of a state to intervene in a federal case, such as 28 U.S.C. §

2403(b), which allows a non-party state to intervene in a case if the constitutionality of a

state statute is called into question, has no bearing on the Commonwealth's ability to bring

its own case under a statute which explicitly grants the Commonwealth the right to bring its

action.

Finally, Navient's policy argument that permitting "copycat" lawsuits creates burdens

for courts and risks inconsistent rulings on issues of federal consumer financial law also

does not contravene the plain text of § 5552(a)(1). Navient cites to the CFPA's statement of

the purpose of the CFPB in 12 U.S.C. § 5511(a) in support of this argument:

### (a) Purpose
The Bureau shall seek to implement and, where applicable, enforce Federal
consumer financial law consistently for the purpose of ensuring that all
consumers have access to markets for consumer financial products and
services and that markets for consumer financial products and services are fair,
transparent, and competitive.

Notably absent from any part of § 5511(a) or the rest of § 5511 is any indication that

enforcing "Federal consumer financial law consistently" precludes a state from bringing its

own action under the CFPA. While the federal courts are indeed inundated with cases,

adjudicating this case is a burden the Court is required to assume, absent a recognized

statutory or procedural basis that precludes the Commonwealth from bringing its action.

The Court is bolstered in its rejection of Navient's arguments and in its

understanding of the plain meaning of § 5552(a)(1) by the presence of other sections of the

CFPA which clearly bar concurrent enforcement of the statute in other situations, but which is absent in § 5552. As the Commonwealth notes, 12 U.S.C. § 5514(c)(3)(B)(i) prohibits either the FTC or CFPB from filing an action if the other agency has already filed an action based on the same legal claims, and 12 U.S.C. § 5515(c)(3) provides "backup enforcement" authority for the federal banking regulators over "very large" depository institutions if the CFPB does not use its primary enforcement authority. (Doc. 25 at 5). By contrast, another provision of the CFPA, 12 U.S.C. § 5538(b), provides for a state right of action to enforce mortgage rules promulgated by the CFPB, but contains an explicit prohibition on concurrent actions by states when the CFPB has already initiated its own action against a party. 12 U.S.C. § 5538(b)(6). Here, applying the canon of statutory interpretation highlighted in *Russello*, 464 U.S. at 23, is particularly appropriate, especially when the plain text of § 5552(a)(1) is unambiguous in granting a state a right to bring an enforcement action under the CFPA as are the other sections of the CFPA that bar concurrent enforcement actions. *See also Port Authority Trans-Hudson Corp. v. Sec'y.,United States Dep't of Labor*, 776 F.3d 157, 164-65 (3d Cir. 2015) (finding that *Russello* presumption would apply when two provisions of a statute "are sufficiently distinct" and also when the context of the statute indicates "careful draftsmanship") (citations omitted).

In sum, the plain meaning of § 5552(a)(1) and the CFPA support the Commonwealth's position that it can maintain its concurrent CFPA claims against Navient.

To rule otherwise would require the Court to rewrite the CFPA to achieve Navient's desired outcome. The Court cannot undertake such a task.

### B. FEDERAL PREEMPTION UNDER THE HEA AND TILA (COUNTS I, II, & IV)

Navient's next set of arguments employ preemption doctrine against some of the Commonwealth's state law claims under the CPL. Navient first contends that the Higher Education Act ("HEA") preempts the Commonwealth's loan servicing claims (Counts II & IV), and further argues that the Truth in Lending Act ("TILA") preempts the origination claims (Count I).

"The Supremacy Clause of the United States Constitution, U.S. Const. art. VI, cl. 2, invalidates state law that 'interferes with or is contrary to federal law.'" *Farina v. Nokia Inc.*, 625 F.3d 97, 115 (3d Cir. 2010) (quoting *Free v. Bland,* 369 U.S. 663, 666, 82 S.Ct. 1089, 8 L.Ed.2d 180 (1962)). The Third Circuit, in *Farina*, summarized federal preemption doctrine:

> Federal law can preempt state law in three ways: (1) express preemption, (2) field preemption, and (3) conflict preemption. *Hillsborough Cty. v. Automated Med. Labs., Inc.,* 471 U.S. 707, 713, 105 S. Ct. 2371, 85 L. Ed. 2d 714 (1985). Express preemption applies where Congress, through a statute's express language, declares its intent to displace state law. *Id.* Field preemption applies where "the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Id.* (internal quotation marks omitted). Conflict preemption nullifies state law inasmuch as it conflicts with federal law, either where compliance with both laws is impossible or where state law erects an "obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (internal quotation marks omitted).

*Farina*, 625 F.3d at 115. In evaluating a preemption challenge, courts are guided by the "intent of Congress[, which] is the 'ultimate touchstone.'" *Id.* (quoting *Medtronic, Inc. v.*

30

Lohr, 518 U.S. 470, 485-86, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) (further noting that

courts should look to the "structure and purpose of the statute as a whole, as revealed not

only in the text, but through the reviewing court's reasoned understanding of the way in

which Congress intended the statute and its surrounding regulatory scheme to affect

business, consumers, and the law")). And courts also start with an assumption that

Congress did not intend to displace state law (the "presumption against preemption"),

especially in cases where the affected field is within the traditional police power of the state.

Farina, 625 F.3d at 116 (quoting Lohr, 518 U.S. at 485 ("[B]ecause the States are

independent sovereigns in our federal system, we have long presumed that Congress does

not cavalierly pre-empt state-law causes of action.")). As consumer protection is within the

traditional police power of the state, the Court will apply the presumption against preemption

in analyzing Navient's preemption arguments against the Commonwealth's CPL claims.

See In re Nortel Networks, Inc., 669 F.3d 128, 137-38 (3d Cir. 2011) (noting, in considering

the police power exception to an automatic bankruptcy stay under 11 U.S.C. § 362(b)(4),

that consumer protection is part of governmental police powers); In re Burns, No. 5-BK-07-

50140 RNO, 2008 WL 3246244, at *3-4 (Bankr. M.D. Pa. Aug. 7, 2008) (finding the same, in

considering a CPL action brought by the Commonwealth).

## 1. THE HEA (COUNTS II & IV)

Navient argues that the Commonwealth's state law loan servicing claims under the

CPL regarding Navient's forbearance steering (Count II) and income-driven repayment plan

31

recertification practices (Count IV) are preempted by the HEA. Navient contends that these claims are essentially that Navient made improper disclosures, and that the HEA expressly bars state law disclosure claims, citing 20 U.S.C. § 1098g. (Doc. 24 at 15-19). Navient also argues that the claims are conflict preempted by the HEA because the HEA establishes "clear, uniform standards" for federal loan programs, and allowing state consumer protection lawsuits would threaten the uniformity and efficiency of federal student lending. (*Id.* at 19-20). For both arguments, Navient relies heavily on a Ninth Circuit case, *Chae v. SLM Corp.*, 593 F.3d 396 (9th Cir. 2010), which found that certain class action claims brought under California state consumer protection law were expressly preempted by § 1098g of the HEA and that other state law claims were conflict preempted by the HEA. (Doc. 24 at 16-20); *Chae*, 593 F.3d at 942-43, 947-50.

The Commonwealth responds that the Court should apply the "presumption against preemption" with respect to the CPL and accept the reading of § 1098g that disfavors preemption. (Doc. 25 at 12). The Commonwealth argues that its loan servicing claims are distinct from loan origination claims, and were not brought in an attempt to impose state law disclosure requirements, citing *Genna v. Sallie Mae, Inc.*, No. 11-cv-7371, 2012 WL 1339482 (S.D.N.Y. Apr. 17, 2012) in support of its argument that express preemption should not apply. (Doc. 25 at 12-16). The Commonwealth focuses much of its rebuttal on Navient's reliance on *Chae*, contending that *Chae* is distinguishable from the present matter because "*Chae* dealt with 'billing statements, coupon books, and standardized forms' that

32

'complied with federal regulations governing such instruments.'" (*Id.* at 13-14 (quoting *Genna*, 2012 WL 1339482, at \*8)). The Commonwealth further asserts, "the primary concept arising out of *Chae*—that a misrepresentation claim is merely the converse of a disclosure claim and, therefore, subject to preemption—is based upon an incomplete reading" of *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504 (1992). (Doc. 25 at 14-15). The Commonwealth also argues that the legislative history of the HEA suggests that § 1098g was intended to exempt federal student loans from TILA requirements. (*Id.* at 16). Finally, the Commonwealth asserts that the HEA does not conflict preempt its CPL loan servicing claims, arguing against the adoption of the "uniformity" preemption rationale from *Chae*, citing other sections of the HEA that expressly preempt certain types of state laws to contend that "Congress intentionally did not preempt state law generally, or in respects other than those it addressed," and citing other cases where it contends that "[o]ther courts have not reached *Chae*'s conclusion that the goal of the HEA uniformity conflicts with the application of state law." (*Id.* at 17-20). The Commonwealth closes by stating it "does not seek a specific disclosure regimen that would conflict with the HEA; it merely seeks compliance with the CPL." (*Id.* at 20-21).

Navient replies that the Court should not apply any "presumption against preemption" here because "Congress made its intent to preempt state law clear[,]" it is improper to apply such a presumption to "state laws seeking to regulate federal programs[,]" and there is nothing in the cases that the Commonwealth cites to suggest that § 1098g

applies only to "standardized forms." (Doc. 26 at 7-10). Navient also challenges the Commonwealth's reliance on *Genna* and cites another case that found express preemption of similar claims at issue in the present matter, *Nelson v. Great Lakes Educ. Loan Servs., Inc.*, No. 3:17-CV-00183, 2017 WL 6501919 (S.D. III. Dec. 19, 2017). (Doc. 26 at 9-11). Navient further attacks the Commonwealth's use of *Cipollone*, arguing that the "portions invoked by the Commonwealth were joined only by four Justices—*and expressly rejected by five*[,]" (Doc. 26 at 11-12 (emphasis in Navient's Reply)), and that the Commonwealth's resort to the legislative history of § 1098g is not only inappropriate, but incorrect, as the Commonwealth cited the Senate Report that applies to the wrong section of the statute (*id.* at 12-13). Finally, Navient responds to the Commonwealth's conflict preemption rebuttal by arguing there can be "implied preemption of claims that fall outside the scope of an express preemption clause" and emphasizing that the objective of the HEA is to establish "clear, uniform standards" and "ensure the stability in the loan program," and that those "objectives would be jeopardized if lenders and servicers are subjected 'to lawsuits under fifty separate sets of laws and court systems.'" (*Id.* at 14). Navient closes that "the only way a servicer or originator could comply with the CPL, as construed by the Commonwealth, would be to make additional disclosures" that are not required by the HEA, and so the CPL claims conflict with the objectives of the HEA. (*Id.* at 16).

The Court will address Navient's HEA express preemption arguments first before turning to Navient's conflict preemption arguments. Despite the complexity of the parties'

34

preemption arguments, the express preemption clause from the HEA that is at the crux of

the express preemption dispute is relatively simple:

§ 1098g. Exemption from State disclosure requirements
Loans made, insured, or guaranteed pursuant to a program authorized by Title
IV of the Higher Education Act of 1965 (20 U.S.C. § 1070 *et seq.*) shall not be
subject to any disclosure requirements of any State law.

20 U.S.C. § 1098g. The parties' dispute thus hinges on the meaning of "any disclosure

requirements of any State law." Navient would have the Court take an expansive view of

the phrase, whereas the Commonwealth urges a more restrained application based on its

reading of the statute and preemption case law.

The Court finds that Navient's suggested interpretation of Section 1098g goes too

far: the phrase "any disclosure requirements of any State law" does not apply to the sort of

claims alleged by the Commonwealth here under the CPL, which are allegations of unfair

and deceptive conduct related to forbearance steering and recertification. The HEA and its

associated regulations only require that particular disclosures are to be made in the delivery

of federal student loans and generally prescribes how those disclosures should be made.

*See, e.g.,* 20 U.S.C. § 1083 (disclosure requirements for FFELP loans). It does not preempt

the enforcement of a statute of general applicability under a state's traditional police power,

here, the Commonwealth's state consumer protection law, the CPL, which proscribes unfair

and deceptive acts or practices in commerce. *Cf. Poskin v. TD Banknorth, N.A.*, 687 F.

Supp. 2d 530, 555-57 (W.D. Pa. 2009) (absent direct conflict, CPL is not preempted under

by the National Bank Act, as it is "a law of general applicability, and not targeted directly at

35

banking or lending"); *Mwantembe v. TD Bank, N.A.*, 669 F. Supp. 2d 545, 553 (E.D. Pa. 2009) (CPL not preempted by National Bank Act or OCC regulations in case involving gift cards as "[t]he duty to refrain from deceptive and misleading conduct is imposed on all businesses").

To further explain the Court's reasoning, it is necessary for the Court to address the central cases cited by the parties in their briefs and supplementary submissions to the Court, particularly *Chae v. SLM Corp.*, 593 F.3d 936 (9th Cir. 2010). *Chae* was a class action against one of Navient's corporate predecessors, Sallie Mae, regarding FFELP loans issued and serviced by the company. *Id.* at 940-41. The plaintiffs brought claims under state law, including California state consumer protection law (the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, and the California Consumer Legal Remedies Act, Cal. Civ. Code § 1770(a)), and for breach of contract, breach of the implied covenant of good faith and fair dealing, and unjust enrichment. *Id.* Three specific practices were challenged by the plaintiffs: (1) Sallie Mae's method of interest calculation; (2) the assessment of late fees; and (3) the method of setting the first repayment date on a federal Consolidation or PLUS loan. *Id.* The United States filed a motion to intervene and argued that the HEA preempted plaintiffs' state law claims. *Id.* at 941. The district court granted the motion to intervene, and granted summary judgment for Sallie Mae, holding that all of the plaintiffs' claims were preempted by the HEA. The Ninth Circuit agreed and ruled that Section 1098g of the HEA expressly preempted the California state consumer protection

law claims regarding the method of interest calculation and the method of setting the first repayment date, finding that "[a]t bottom, the plaintiff's misrepresentation claims are improper-disclosure claims." *Id.* at 942. The Ninth Circuit noted that plaintiffs' allegations focused on billing statements, coupon books, and standardized loan applications that were allegedly misleading, and that "[i]n this context, the state-law prohibition on misrepresenting a business practice 'is merely the converse' of a state-law requirement that alternate disclosures be made". *Id.* at 942-43 (quoting *Cipollone*, 505 U.S. at 527).[8] However, the Ninth Circuit also concluded that the plaintiffs' other claims, including those for the "use of fraudulent and deceptive practices apart from the billing statements," were not expressly preempted by Section 1098g. 593 F.3d at 943.

Neither *Chae*, nor any of the other cases cited by the parties as to Section 1098g, including those cited by Navient that adopt the reasoning in *Chae* to find express preemption of claims against loan servicers under Section 1098g, are binding on this Court. Regardless, the Court finds that the Commonwealth's allegations in this case are distinct from those ruled preempted by the Ninth Circuit in *Chae*, which were wholly centered on the alleged deficiencies in what were essentially highly prescribed standardized forms, rather than the affirmative misconduct alleged in the instant matter. Similarly, *Linsley v. FMS*

---

[8] The Court questions the authority of *Cipollone* on this point, as it is contained in a part of the Supreme Court's opinion that was only joined by a plurality of the justices. *See* 505 U.S. at 508, 527. Although the parties vigorously contest the holding and applicability of *Cipollone* to the instant dispute, it is sufficient for the Court to note that under either party's conception of the *Cipollone* decision, the claims at issue in this matter are not preempted.

*Investment Corp.*, No. 11-cv-961, 2012 WL 1309840 (D. Conn. April 17, 2012), involved

claims under Connecticut state consumer protection law for failures to disclose accurate

information regarding options to cure loan default made by the defendant, a federal student

loan debt collector, in a letter sent to the plaintiff, and that were explicitly governed by HEA

regulations that addressed the options available to cure loan default. *Linsley*, 2012 WL

1309840, at *1, 3, 6. And the Connecticut state court in *Brooks v. Sallie Mae, Inc.*, No.

FSTCV096002530S, 2011 WL 6989888 (Conn. Super. Ct. Dec. 20, 2011) only found

express preemption of claims regarding a failure to disclose options if the plaintiff was

unable to comply with economic deferment requirements, an issue that was squarely and

extensively governed by HEA regulations. *Brooks*, 2011 WL 6989888, at *5-7 (noting that

allegations that were "not improper-disclosure claims" were not expressly preempted by

Section 1098g).[9]

The Court finds particularly persuasive the reasoning set forth by the Illinois state

court in rejecting the express HEA preemption argument based on *Chae* set forth by

Navient in a parallel case brought by the State of Illinois under its consumer protection

statute that challenges much of the same conduct at issue in this case:

> After review of the allegations, it is clear that the State's servicing claims are
> not improper disclosures and therefore not expressly preempted under Section
> 1098g of the HEA. Indeed, the State's claims concerning practices related to

---

[9] For the reasons stated herein, the Court rejects the reasoning of an unpublished, non-binding case that involved apparently the same type of forbearance steering claims at issue here and that was cited by Navient in its Reply, *Nelson v. Great Lakes Educational Loan Services, Inc.*, No. 17-cv-183, 2017 WL 6501919 (S.D. Ill. Dec. 19, 2017).

enrolling borrowers in repayment plans (Compl., ¶ 469 (a)-(d)) are not "re-
styled disclosures' because the core of the State's allegations is that Navient
schemed to steer borrowers into forbearances, not just that Navient failed to
disclose the availability of IDR plans. Additionally, express preemption does
not apply to the claims related to recertification in IDR plans because complying
with the principles of the law does not mean that deceptive and unfair practices
cannot be analyzed or questioned. Navient's own conduct of providing notices
that vaguely stated when the borrower's renewal period would expire in both
written and electronic notifications and misrepresenting the consequences of
failing to renew removed itself from the context of what is an appropriate
disclosure.

*People v. Navient Corp.*, No. 17 CH 761, at 12-13 (Ill. Cir. Ct. July 10, 2018); *see also State*

*of Washington v. Navient Corp.*, No. 17-2-01115-1 SEA (Wash. Super. Ct. July 7, 2017)

(disagreeing with Navient's preemption argument in similar case brought by the State of

Washington and rejecting Navient's motion to dismiss); *Genna v. Sallie Mae, Inc.*, No. 11

Civ. 7371, 2012 WL 1339482, at *8 (S.D.N.Y. April 17, 2012) (rejecting motion to dismiss

based on express preemption and finding "[t]here is nothing in the HEA that standardizes or

coordinates how a customer service representative of a third-party loan servicer like Sallie

Mae shall interact with a customer like Genna in the day-to-day servicing of his loan outside

of the circumstance of pre-litigation informal collection activity"); *Daniel v. Navient Sols.,*

*LLC*, No. 8:17-cv-2503, 2018 WL 3343237, at *2-3 (M.D. Fla. June 25, 2018) (no HEA

preemption when affirmative misrepresentations are made). Thus, the Court finds that

39

Section 1098g does not expressly preempt the Commonwealth's CPL forbearance steering and recertification claims in Counts II and IV.[10]

Nor are these claims conflict preempted by the HEA. Navient's conflict preemption argument hinges on a rationale for the HEA, uniformity, that has not been universally recognized as a goal of the statute and is not clearly harmed by allowing the types of claims at issue in this case. Although the Ninth Circuit in *Chae* recognized that uniformity was a goal of the HEA, 593 F.3d at 944-47, many other courts have not. *See College Loan Corp. v. SLM Corp.*, 396 F.3d 588, 597 (4th Cir. 2005) ("We are unable to confirm that the creation of 'uniformity,' a goal relied upon by the district court in its Preemption Ruling, was actually an important goal of the HEA."); *Daniel*, 2018 WL 3343237, at *3 ("Uniformity, however, is not one of Congress's expressed goals in enacting the HEA, and broadening the scope of the preemption statute would not rest upon a 'fair understanding of congressional purpose.'") (quoting *Cipollone*, 505 U.S. at 530); *Brooks*, 2011 WL 6989888, at *9 (purpose of uniformity not harmed by allowing state consumer protection law claim and also finding "[i]f Congress intended that uniformity be a goal of the HEA, and FFELP in particular, then it easily could have stated that objective [in the statute]"). *Cf. Cliff v. Payco Gen. Am. Credits, Inc.*, 363 F.3d 1113, 1127, 1129 (11th Cir. 2004) (in construing HEA conflict preemption,

---

[10] While the Court agrees with Navient that the Commonwealth cited to an inapplicable portion of the legislative history of Section 1098g, S. Rep. No. 97-536, at 42 (1982), in support of its argument, this does not disturb the Court's overall finding that the HEA does not preempt the Commonwealth's claims.

finding that state consumer causes of action can coexist and noting "[A]n entire state statute is not preempted because some of its provisions may actually conflict with federal law").

Despite this lack of consistency in the case law, Navient points to a recent Interpretation issued by the Department of Education regarding HEA preemption generally and Section 1098g specifically. Federal Preemption and State Regulation of the Department of Education's Federal Student Loan Programs and Federal Student Loan Servicers, 83 Fed. Reg. 10,619 (Mar. 12, 2018) (hereinafter, the "Interpretation"); *see also Lawson-Ross v. Great Lakes Higher Educ. Corp.*, No. 17-cv-253, 2018 WL 5621872, at *3-4 (N.D. Fla. Sept. 20, 2018) (finding the Interpretation persuasive and applying it in finding HEA preemption). The Interpretation explains ED's view that uniformity is a goal of the HEA; that permitting state regulatory regimes, particularly licensing requirements, runs afoul of this goal; and that Section 1098g's use of the term "disclosure requirements" applies broadly "to encompass informal or non-written communications to borrowers as well as reporting to third parties such as credit reporting bureaus." Interpretation, 83 Fed. Reg. at 10,620-21. However, the Court is not required to adopt this post-litigation commencement Interpretation whole cloth, as it is an informal statement of interpretation of the HEA. *See Skidmore v. Swift*, 323 U.S. 134, 139-40 (1944); *United States v. Mead Corp.*, 533 U.S. 218, 226-28 (2001) (deference due under *Skidmore* depends on persuasiveness, among other factors). To the extent that the Interpretation suggests that all state consumer protection

laws are somehow preempted because they are supposedly predicated on "disclosures," the Court does not find the Interpretation persuasive.

Whether or not "uniformity" is actually a goal of the HEA, the Court is not convinced by Navient's argument that allowing the Commonwealth's claims to proceed will harm the goal of uniformity or that it somehow makes it impossible for loan servicers to comply with both the HEA and state consumer protection laws like the CPL. The uniformity of the HEA in setting its requirements for the standard parameters of the federal student loan programs is not harmed by prohibiting unfair or deceptive conduct in the operation of those programs that is not explicitly permitted by the HEA, as is the case with the Commonwealth's CPL claims here. Following Navient's line of argument would require the Court to find that the HEA imposes an expansive and unsupported level of preemption that would reach the level of field preemption. which courts interpreting the HEA have rejected. *Chae*, 593 F.3d at 941-942 (no field preemption); *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 653 (7th Cir. 2005) (citing numerous cases noting that the presence of a regulatory scheme does not imply that field preemption exists). Accordingly, the HEA does not preempt Counts II and IV of the Complaint.

## 2. TILA (COUNT I)

In addition to preemption by the HEA, Navient argues that another federal statute, TILA, conflict preempts the Commonwealth's CPL claims against Navient's loan origination practices in Count I because of the "careful balance TILA and its implementing regulations

42

struck regarding loan originations." (Doc. 24 at 2). Navient asserts that TILA only requires lenders to disclose certain credit terms to prevent "informational overload." (*Id.* at 20-21 (quoting *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 568-69 (1980)). Navient contends that, in contrast, the allegations in the Commonwealth's Complaint would require Navient to "disclose additional details regarding 'preferred lender' agreements, school graduation rates, default potential, and the effect of default on credit scores," and thus conflict with TILA's "comprehensive disclosure rules that Congress decided to impose—and, equally important, not to impose—on private loan originators." (Doc. 24 at 21-22). Navient also asserts that "subsequent actions by Congress indicate that it never intended to impose such disclosure obligations on private education lenders." (*Id.* at 21).

The Commonwealth responds that Navient "mischaracterizes Count I (origination) by restyling it simply as a request for additional disclosures while ignoring the breadth of averments detailing a comprehensive predatory lending scheme." (Doc. 25 at 21). The Commonwealth further contends that the cases cited by Navient in its Brief in Support did not involve TILA preemption issues or hold that TILA would preempt state consumer protection laws, and that "in instances where a preemption analysis has been applied to TILA, state consumer protection laws have been found compatible." (*Id.* at 21-22). In its Reply, Navient echoes the argument it made in favor of HEA conflict preemption and asserts that the Commonwealth's CPL claims, including its loan origination claim, seek to impose additional disclosure requirements on Navient that are not required by TILA, and

that this would "directly undermine the goals, objectives, and specifics" of TILA. (Doc. 26 at 16).

The Court finds that TILA does not preempt the Commonwealth's loan origination claim because the requirements of TILA do not conflict with the requirements of the CPL. At its heart, "TILA is a disclosure statute. It does not substantively regulate consumer credit but rather 'requires disclosure of certain terms and conditions of credit before consummation of a consumer credit transaction.'" *Rendler v. Corus Bank, N.A.*, 272 F.3d 992, 996 (7th Cir. 2001) (quoting *Valencia v. Anderson Bros. Ford*, 617 F.2d 1278, 1282 (7th Cir. 1980), *rev'd on other grounds*, 452 U.S. 205, 101 S.Ct. 2266, 68 L.Ed.2d 783 (1981)). "TILA is a strict liability, remedial statute that is to be construed liberally in favor of borrowers." *Jefferies v. Ameriquest Mortg. Co.*, 543 F. Supp. 2d 368, 378 (E.D. Pa. 2008) (citing *Smith v. Fid. Consumer Disc. Co.*, 898 F.2d 896, 898 (3d Cir. 1990)).

TILA contains an express preemption clause that essentially replicates a statement of conflict preemption doctrine, noting that TILA does not preempt state law governing credit disclosures "except to the extent that those laws are inconsistent with" TILA. 15 U.S.C. § 1610(a)(1); 12 C.F.R. § 226.28(a)(1) ("A State law is inconsistent if it requires a creditor to make disclosures or take actions that contradict the requirements of the Federal law. A State law is contradictory if it requires the use of the same term to represent a different amount or a different meaning than the Federal law, or if it requires the use of a term different from that required in the Federal law to describe the same item."). Directly contrary

44

to Navient's argument, "State law requirements that call for the disclosure of items of information not covered by the Federal law, or that require more detailed disclosures, do not contradict the Federal requirements." 12 C.F.R. Part 226, Supp. I, 28(a)(3) (Commentary on Regulation Z, the regulation promulgated pursuant to TILA). And beyond the issue of disclosures, numerous courts interpreting the CPL and other similar state consumer protection statutes prohibiting unfair and deceptive conduct have found that absent a direct conflict, the state statutes are not preempted by TILA. *See, e.g.*, *Johnson v. Metlife Bank, N.A.*, No. CIV. A. 11-800, 2011 WL 4389582, at *7 (E.D. Pa. Sept. 21, 2011) ("[T]he [CPL] is only preempted *'to the extent that [it is] inconsistent with the provisions of [the TILA],'* 15 U.S.C. § 1610(a)(1) . . . .") (emphasis in original); *Jordan v. Paul Fin., LLC*, 745 F. Supp. 2d 1084, 1095 (N.D. Cal. 2010) ("[W]hile TILA protects creditors from inconsistent state disclosure requirements, it does not protect creditors from state statutes prohibiting unfair or deceptive practices."); *Therrien v. Resource Fin. Group, Inc.*, 704 F. Supp. 322, 329 (D.N.H. 1989) ("TILA and Regulation Z specify only the required disclosures by a creditor. They do not permit or otherwise regulate the particulars of a loan agreement. Conduct that complies with the federal disclosure requirements still could constitute an unfair or deceptive practice.").

In the instant matter, the Commonwealth has not alleged in Count I that Navient has failed to make required TILA disclosures, nor is it basing its allegations on a provision of state law that conflicts with TILA. As the Illinois state court recently found in evaluating and

45

rejecting a similar invocation of TILA preemption by Navient in the similar ongoing case

brought by the State of Illinois under its state consumer protection statute regarding

Navient's student loan practices, "the State has not alleged that Navient failed to accurately

disclose an interest rate, or failed to put certain terms in certain boxes on a TILA form."

*People v. Navient Corp.*, No. 17 CH 761, at 24 (Ill. Cir. Ct. July 10, 2018). Rather, the

Commonwealth alleges that Navient has engaged in "unfair acts or practices" in violation of

the CPL while originating private subprime student loans. (*See* Doc. 1 ¶¶ 174-75).

According to the Commonwealth, Navient's unlawful conduct included originating subprime

student loans to high risk borrowers to attend colleges with poor graduation and

employment rates and failing to disclose or concealing material facts from borrowers, such

as Navient's relationships with schools and the high likelihood of default and damage to

credit for borrowers who took out the subprime loans. (*Id.* ¶ 174). The Commonwealth

alleges that this conduct violated Sections 201-2(4)(vii) and (xxi) of the CPL. (*Id.* ¶ 175); 73

Pa. Stat. and Cons. Stat. Ann. § 201-2(4)(vii), (xxi).[11]  Neither of these provisions requires

that Navient act contrary to TILA, as neither specifies that Navient must make disclosures

that contradict the requirements of TILA, even if they suggest that additional disclosures

---

[11] Section 201-2(4)(vii) labels as an "[u]nfair method[] of competition" and an "unfair or deceptive act[] or practice[]" "[r]epresenting that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another," and 201-2(4)(xxi) as "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 Pa. Stat. and Cons. Stat. Ann. § 201-2(4)(vii), (xxi).  These provisions will be discussed in greater detail, *infra*.

may have made the origination of the loans less likely to be an unfair or deceptive practice. Thus, TILA does not preempt the Commonwealth's CPL claim in Count I.

## C. FAILURE TO STATE A CLAIM ARGUMENTS (COUNTS I-V, VIII-IX)

In the final section of its Brief in Support of its Motion to Dismiss, Navient raises numerous additional arguments against the majority of the Commonwealth's claims under the CPL and the CFPA, asserting that these claims should be dismissed because they fail to allege "unfair" or "deceptive" practices. (Doc. 24 at 22-30). The first three of these arguments focus on the Commonwealth's loan origination claim brought under the CPL in Count I: the Commonwealth cannot bring a CPL claim to enjoin allegedly ceased conduct; the claim does not allege actionable "deceptive" or "unfair" conduct; and the Commonwealth is barred by laches from alleging that it was "unfair" for Navient to lend to students attending Commonwealth-approved schools. Navient's fourth argument is that the Commonwealth's forbearance steering and income-driven repayment recertification claims under the CPL and the CFPA in Counts II-V fail to allege actionable deceptive conduct, and its fifth argument raises what is essentially a puffery defense to the Commonwealth's forbearance steering claims in Counts II and III. Navient's final argument is that the Commonwealth's payment processor claims in Counts VIII and IX challenge "mistakes" or "errors" that are non-actionable.

### 1. INJUNCTIVE AUTHORITY OVER ALLEGEDLY CEASED CONDUCT (COUNT I)

Navient argues that Count I of the Commonwealth's Complaint seeks to enjoin conduct that, it asserts as alleged in the Complaint, ceased in 2007. Navient contends that the CPL only provides the Commonwealth with the authority to seek an injunction for conduct that is "imminent or ongoing." (Doc. 24 at 23). And, Navient asserts, other relief that can be sought in the CPL, such as restitution and civil penalties, "hinges on [the Commonwealth] first securing injunctive relief." (Id.) Thus, Navient concludes, Count I must be dismissed as a matter of law. (Id.) The Commonwealth responds that Navient misreads the CPL and that "case law supports the granting of injunctive relief for violations of the CPL based on past illegal conduct," because otherwise, one could merely claim that the conduct had been discontinued and avoid liability. (Doc. 25 at 22-23). Navient replies that the cases cited by the Commonwealth in support of its position are mere "garden-variety application[s] of voluntary-cessation principles drawn from the mootness doctrine," and involved the cessation of conduct for much shorter periods of time than the alleged ten years at issue in the present matter. (Doc. 26 at 17-18). Navient argues that "the Commonwealth has not even alleged that there is any danger of reoccurrence of the conduct giving rise to these claims," and that it was Navient's predecessors that originated loans, not it. (Id. at 18).

The plain text of the CPL grants the Commonwealth the authority to bring an action to seek a temporary or permanent injunction when it "has reason to believe that any person

48

is using or about to use any method, act or practice declared by . . . this act to be unlawful, and that proceedings would be in the public interest." 73 Pa. Stat. and Cons. Stat. Ann. § 201-4. Navient seizes upon the phrase "is using or about to use" in support of its argument that the Commonwealth cannot seek an injunction for past misconduct. However, as Navient later concedes its Reply, the fact that purported unlawful conduct has allegedly ceased is not a complete bar to seeking injunctive relief under the CPL. (*See* Doc. 26 at 17-18). Instead, numerous courts interpreting the CPL and other related state and federal consumer protection statutes, such as the Federal Trade Commission Act, which courts have recognized is the model for the CPL, have found that an injunction can issue even if alleged unlawful conduct has ceased:

> Specifically, we conclude: 1) that an injunction can issue to restrain future conduct based on prior unlawful activity; 2) that cessation of the offending conduct does not, in and of itself, bar a claim for injunctive relief; and 3) the Court may consider whether the offending conduct is likely to reoccur absent the grant of an injunction.

*Commonwealth v. TAP Pharm. Products, Inc.*, 36 A.3d 1197, 1238-43 (Pa. Commw. Ct. 2011) (also noting that the CPL is modeled on the FTC Act), *vacated on other grounds*, 94 A.3d 350 (Pa. 2014); *see also Commonwealth v. Percudani*, 844 A.2d 35, 45-46 (Pa. Commw. Ct. 2004); *In re Fleet*, 95 B.R. 319, 339 (E.D. Pa. 1989) (injunction under New Jersey consumer protection law appropriate even when defendant had been not conducting business for over five years); *Beneficial Corp. v. FTC*, 542 F.2d 611, 617 (3d Cir. 1976) ("[T]his and other courts have held that at least where a discontinued deceptive trade

49

practice could be resumed, the prior practice may be the subject of a cease and desist order.").

Here, at the motion to dismiss stage, with only the allegations in the Commonwealth's Complaint available for Court consideration, the Court cannot find that Navient has established as a matter of law that it is impossible that its alleged misconduct will reoccur. *See Percudani*, 844 A.2d at 46 (rejecting similar argument when evaluating the defendants' preliminary objections and noting "[w]hether the Commonwealth is able to sustain its burden of proof and the appropriateness of any remedy imposed is a matter to be heard at another time"). While the Commonwealth's allegations appear to suggest that Navient's alleged unlawful loan origination conduct may have ceased in 2007 (Doc. 1 ¶¶ 49-50, 77), this is not a concession that the Commonwealth believes that an injunction is unnecessary because the conduct is unlikely to reoccur. The Commonwealth instead alleges that Navient is "using, [has] used, or [is] about to use methods, acts or practices declared unlawful" by the CPL and that "citizens of the Commonwealth are suffering and will continue to suffer harm unless the acts and practices complained of herein are permanently enjoined." (*Id.* ¶¶ 5, 12). The Commonwealth also alleges that Navient is a corporate successor to the entities that originated private student loans and has assumed liability for those practices. (*Id.* ¶¶ 19-21). There is no indication in the Complaint that Navient has promised to never again engage in loan origination or that it would be impossible for them to do so. To the Court's knowledge, Navient has not entered into a legally-binding "assurance

of voluntary compliance" with the Commonwealth, 73 Pa. Stat. and Cons. Stat. Ann. § 201-5, that could provide some evidence that the conduct has definitively ceased and will not reoccur, *see TAP Pharm. Products, Inc.*, 36 A.3d at 1242-43. Indeed, Navient is vigorously contesting the Commonwealth's loan origination claims on multiple grounds, indicating that it believes that its conduct was legal. Thus, the Court will reject Navient's argument against Count I relating to the Commonwealth's ability to seek an injunction.[12]

## 2. FAILURE TO ALLEGE "DECEPTIVE" OR "UNFAIR" CONDUCT IN LOAN ORIGINATION (COUNT I)

Navient continues its argument for dismissal of the Commonwealth's loan origination claim under the CPL by asserting that the claim cannot be sustained as a matter of law because it does not allege any misrepresentations about the terms of the loans extended to borrowers. (Doc. 24 at 24-25). Navient asserts that "[t]he Complaint does not allege Navient represented to any borrower that she would be able to repay her loans, nor could a borrower reasonably have relied on such representation," and that the Complaint does not allege that Navient entered into a fiduciary position with respect to its borrowers that would

---

[12] Despite this finding, the Court understands Navient's position and notes that, at the least, it is unusual for a plaintiff to seek injunctive relief against conduct that may have ceased over ten years ago. In the event the parties file motions for summary judgment, the Court will examine the factual record carefully to determine if the alleged unlawful conduct has ceased and is likely to reoccur absent an injunction. The Court is not convinced by the Commonwealth's argument that Section 201-8(b) of the CPL, which allows the Commonwealth to recover civil penalties if a defendant "is willfully using or has willfully used a method, act, or practice declared unlawful by section 3 of [the CPL]" means that the Commonwealth can seek an injunction and other relief if the unlawful conduct has definitively ceased. 73 Pa. Stat. and Cons. Stat. Ann. 201-8(b). Section 201-8(b) applies to "any action brought under section 4 of [the CPL]," which contains the "is using or is about to use" language at issue here. *Id.* The Commonwealth cites no definitive case to the contrary, and the Court was also unable to find one.

have necessitated more disclosures. (*Id.* at 25). The Commonwealth responds that Navient "mischaracterizes Count I's allegations[,and that] [t]he alleged misconduct does not relate to the terms of the loans or federal loan disclosures but rather to the unfair and deceptive manner in which Navient's subprime loans were originated and implemented." (Doc. 25 at 23). The Commonwealth further asserts that "opportunistic and unfair lending practices violate the CPL," and that "where a loan provider targets a vulnerable group of people and does not account for their ability to repay, then a court is likely to find there was predatory lending." (*Id.* at 24). Navient replies that the cases relied upon by the Commonwealth only demonstrate that "making false statements or unfairly inflating fees or interest rates violates the CPL," and that the Commonwealth's allegations essentially place Navient in the role of borrowers' fiduciary, which is "fundamentally inconsistent with long-settled Pennsylvania law." (Doc. 26 at 19).

Evaluating Navient's argument requires the Court to analyze the CPL to determine if Count I states a claim for relief under the statute. "The [CPL] was created to even the bargaining power between consumers and sellers in commercial transactions, and to promote that objective, it aims to protect the consumers of the Commonwealth against fraud and unfair or deceptive business practices." *Commonwealth by Shapiro v. Golden Gate Nat'l Senior Care LLC*, 194 A.3d 1010, 1023 (Pa. 2018) (citing *Commonwealth by Creamer v. Monumental Props., Inc.*, 329 A.2d 812, 815-16 (Pa. 1974)); 73 Pa. Stat. and Cons. Stat. Ann. § 201-3 (declaring unlawful "unfair or deceptive acts or practices in the conduct of any

trade or commerce"). In general, "[a]n act or practice is deceptive or unfair if it has the

capacity or tendency to deceive." 194 A.3d at 1023 (quoting *Commonwealth ex rel. Corbett*

*v. Peoples Benefit Servs., Inc.*, 923 A.2d 1230, 1236 (Pa. Commw. Ct. 2007)). The CPL

itself, in Section 201-2(4), also specifically enumerates certain categories of what

constitutes unfair or deceptive acts or practices, and the Commonwealth specifically pleads

two of these provisions, Section 201-2(4)(vii) and (xxi), in challenging Navient's conduct in

Count I and in the other CPL counts (II, IV, VI, VIII):

> (vii) Representing that goods or services are of a particular standard, quality or
> grade, or that goods are of a particular style or model, if they are of another;
> ...
> (xxi) Engaging in any other fraudulent or deceptive conduct which creates a
> likelihood of confusion or of misunderstanding.

73 Pa Stat. and Cons. Stat. Ann. § 201-2(4)(vii), (xxi). Section 201-2(4)(xxi) has been

characterized as a "catch-all" provision. *See, e.g., Hemphill v. Nationstar Mortg.*, No. 18-cv-

2451, 2018 WL 4929864, at *5 (E.D. Pa. Oct. 10, 2018).

As Navient argues, typically under Pennsylvania law, lenders do not owe a fiduciary

duty towards borrowers. *See Conquest v. WMC Mortg. Corp.*, 247 F. Supp. 3d 618, 634

(E.D. Pa. 2017) (citing *Allen v. Wells Fargo, N.A.*, No. 14-5283, 2015 WL 5137953, at *5

(E.D. Pa. Aug. 28, 2015)). However, this does not exempt lenders from compliance with the

CPL, and, as the Commonwealth points out, some courts have found the conduct of lenders

in loan origination or servicing to be so egregious and unconscionable as to constitute unfair

conduct under the CPL. *See In re Milbourne*, 108 B.R. 522, 537-38 (Bankr. E.D. Pa. 1989);

*In re Barker*, 251 B.R. 250, 261-62 (Bankr. E.D. Pa. 2000); *In re Smith*, 866 F.2d 576, 584-85 (3d Cir. 1989). In *Milbourne*, the Bankruptcy Court of the Eastern District of Pennsylvania ruled that a lender engaged in unfair conduct in violation of the CPL when it "consistently proposed to customers that they refinance their previous loans instead of making new loans and failed to disclose to them, in any manner, the advantages to [the lender] and the disadvantages to them from this practice." *Milbourne*, 108 B.R. at 537. The debtor in that case obligated herself to repay several thousand dollars more to the lender versus the alternative course of taking out a new loan, which the bankruptcy court ruled was a "distinct and unfair benefit" for the lender. *Id.* ("There is clearly authority for the proposition that a lender's failure to disclose available options to a borrower which would decrease the borrower's cost of obtaining credit may be an unfair trade practice."); *see also Barker*, 251 B.R at 261-62; *Besta v. Beneficial Loan Co. of Iowa*, 855 F.2d 532, 535-36 (8th Cir. 1988) (evaluating similar conduct under Iowa consumer protection law). The same bankruptcy court also reached the same conclusion in *Barker* when evaluating the conduct of a mortgage broker, which, the bankruptcy court admitted, owed a fiduciary duty to its client:

> In any event, the Broker clearly violated the "catch-all" provision barring it from "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding," 73 P.S. § 201–2(4)(xxi), by (1) failing to disclose to the Debtor the detrimental effect of refinancing a loan with a nine (9%) percent interest rate for a loan with a 17.99% interest rate; (2) failing to give notice to the Debtor that the loan amount was \$19,500 when she requested a loan for \$10,000; (3) failing to adequately disclose to the uneducated Debtor that executing a Balloon Note would result in a final large

54

lump sum payment; (4) failing to disclose or estimate the amount of the lump sum payment in the Balloon Note. (*Compare In re Fricker,* 115 B.R. 809, 822 (Bankr. E.D. Pa. 1990)); (5) failing to inform the Debtor that the proceeds that she would ultimately receive from a $19,500 loan were less than $500, an amount clearly insufficient to complete the intended home improvements; and (6) failing to notify the Debtor that the loan approved by Gelt on March 10, 1998, limited cash disbursements to $1,950, representing 10% of the total loan, which is an amount clearly insufficient to cover the intended home improvements.

*Barker,* 251 B.R. at 259-60, 261-62. In *Smith,* the Third Circuit found that the failure of a mortgage lender to properly serve a foreclosure complaint when it had "lulled [the borrower] into a false sense of reliance, ultimately permitting [the lender] to obtain a default judgment and to foreclose on the property" was "'unfair' in the most basic sense of the word and fraudulent within the meaning of the [CPL]." *Smith,* 866 F.2d at 584-85 (also noting that "[a] borrower of money, especially the owner of a residential property mortgaged to a lending institution, may reasonably expect that he or she will receive fair and above-board treatment in their dealings and that no undue advantage will be taken by the lender").[13]

The Court is unwilling to dismiss Count I at this early stage of the litigation. The Complaint presents an account of a subprime student lending operation that presents the types of unfair and unconscionable conduct in lending that has previously been found to state a colorable claim under the CPL. For example, the Complaint alleges that Navient only maintained its subprime student lending business to gain access to more profitable

---

[13] As noted above, in its Reply, Navient's response to some of these and similar cases is that they only stand for the proposition that "making false statements or unfairly inflating fees or interest rates violates the CPL" and that "the Commonwealth has not made any such allegations here." (Doc. 26 at 19). However, as detailed herein, the Complaint alleges that Navient engaged in an unfair subprime student lending scheme with similarities to the cited cases.

FFELP and prime private student loans. (Doc. 1 ¶¶ 54-59, 65). The Complaint further alleges that, similar to the unfair self-serving conduct in *Milbourne*, Navient did not disclose to subprime borrowers that the loans had a high likelihood of default, and that, essentially, subprime borrowers served as pawns in Navient's quest for profits. (*Id.* ¶¶ 60, 66-69, 84). Certain subprime loans experienced astonishingly high levels of default, ranging from 68%-87% in every year from 2000 to 2007. (*Id.* ¶ 82). The Complaint notes that the high likelihood of default would have been material to borrowers' decision to take out a subprime student loan from Navient. (*Id.* ¶ 73). Additionally, the Complaint alleges that Navient failed to disclose additional facts that may have been material to subprime borrowers, including "credit enhancement" and "recourse" arrangements that minimized Navient's risks from engaging in subprime lending. (*Id.* ¶¶ 88-92). The subprime borrowers which Navient targeted had low credit scores and often attended schools with low graduation rates and gainful employment rates. (*Id.* ¶¶ 81, 174c.-d). These allegations are not wholly dissimilar from the claims in *Milbourne*, *Barker*, or *Smith*, which all involved lenders taking undue advantage of borrowers. Viewed in their totality, the Court cannot say that these allegations definitively fail to state a claim for relief for unfair conduct under the CPL, which should be interpreted broadly to protect consumers. *Golden Gate*, 194 A.3d at 1023 (citing *Creamer*, 329 A.2d at 816)).

### 3. APPLICABILITY OF LACHES TO LOAN ORIGINATION CLAIM (COUNT I)

Navient's final argument for dismissal of Count I is that laches should bar the Commonwealth's claim because the Commonwealth itself "deemed" the schools that borrowers attended "fit for enrollment." (Doc. 24 at 26). Thus, the Commonwealth should be estopped from claiming that it was "unfair" to lend to borrowers to attend the schools. (*Id.*). The Commonwealth responds that laches is generally an inappropriate basis for dismissal of an action, and also that asserting laches against the Commonwealth generally cannot be sustained when the Commonwealth is acting under its police power, as it is doing here in enforcing the CPL. (Doc. 25 at 25). The Commonwealth also argues that "[i]n the rare case in which the defense is available against Pennsylvania, the defendant must show a 'stronger case of delay or acquiescence,'" which Navient has not done. (*Id.* (quoting *St. Clair Area Sch. Dist. Bd. of Educ. v. E.I. Assocs.*, 733 A.2d 677, 681 (Pa. Commw. Ct. 1999))). The Commonwealth further asserts that it believes that discovery will show that "many of the subprime loans were issued to students attending schools not accredited or licensed by Pennsylvania." (Doc. 25 at 25-26). Navient replies that laches should apply in this case even though the Commonwealth may be exercising its police power because the Commonwealth itself assisted and expressly approved of Navient's lending by accrediting the schools. (Doc. 26 at 20). Navient closes that it "hardly can be faulted for supporting students who wished to attend the very schools that the Commonwealth's Director of Consumer Protection reviewed and approved." (*Id.* at 21).

57

"Laches arises when a defendant's position or rights are so prejudiced by length of time and inexcusable delay, plus attendant facts and circumstances, that it would be an injustice to permit presently the assertion of a claim against him." *Commonwealth v. Folcroft Landfill Corp.*, 1 Pa. Commw. 356, 359-60 (1971) (quoting *In re Trust Estate of Grote*, 135 A.2d 383, 387 (Pa. 1957)). Pennsylvania courts have held that asserting laches against the Commonwealth requires "a stronger case of delay or acquiescence . . . than when a mere private right is involved," and "is only imputed to the Commonwealth in rare cases." *St. Clair Area School Dist. Bd. of Educ. v. E.I. Assocs.*, 733 A.2d 677, 681 (Pa. Commw. Ct. 1999) (citing *Breisch v. Locust Mountain Coal Co.*, 110 A. 242, 243 (Pa. 1920)). Additionally, "laches may not be raised as a defense in situations where the Commonwealth is attempting to enforce duties and obligations under its police power." *St. Clair*, 733 A.2d at 682 (citing *Clearview Land Development Co. v. Commonwealth*, 327 A.2d 202, 205 (1974)). Crucially, laches is typically an inappropriate basis for dismissing a complaint. *Folcroft*, 1 Pa. Commw. at 360 ("[U]sually the question of laches can be determined only after the court has had an opportunity to appraise the evidence and so determine whether a valid reason exists for the delay in bringing suit.") (quoting *Rush v. Butler Fair & Agric. Ass'n*, 137 A.2d 245, 248 (Pa. 1958)).

The Court rejects Navient's laches argument. As an initial matter, the Court notes that Navient's laches argument might be also characterized as an equitable estoppel argument, where Navient is asserting that it should not be punished for relying on what it

thought was the approval of the Commonwealth. *See Wayne Moving & Storage of N.J., Inc. v. Sch. Dist. of Phila.*, 625 F.3d 148, 155-56 (3d Cir. 2010) (noting the elements of equitable estoppel and that it can be asserted against the Commonwealth); *Fredericks v. Comm'r of Internal Revenue*, 126 F.3d 433, 438 (3d Cir. 1997) (requiring that claimants establish "affirmative misconduct on the part of government officials") (quoting *United States v. Asmar*, 827 F.2d 907, 911 n.4, 912 (3d Cir. 1987)). However, regardless of what equitable defense is being raised by Navient, the factual record is simply not developed enough at this stage to rule that the Commonwealth should be equitably barred from exercising its authority to police unfair or deceptive commercial conduct. Viewing only the well-pleaded allegations in the Complaint, there is no mention of Commonwealth licensing and approval of schools. Thus, the Court has no factual basis upon which to find laches applies.

Even if there were allegations in the Complaint that could assist the Court in analyzing the application of laches, the Court is not convinced by Navient's argument because it is based on an excessively broad reading of the case law. In its Reply, Navient quotes a footnote of dicta from *Clearview* to suggest that laches can be asserted against the Commonwealth when exercising its police power "in the limited situation where agents of the Commonwealth have actively aided in and expressly approved of the continued operation of a business later alleged to constitute a public nuisance." (Doc. 26 at 20-21 (quoting *Clearview*, 327 A.2d at 205 n.7)). *Clearview* itself did not involve such a situation. Nor did the case that *Clearview* cited for this proposition, *Folcroft Landfill*, definitively

establish that proposition, because the Commonwealth Court of Pennsylvania ruled that it did not have enough facts to rule that laches applied in the context of ruling on the parties' preliminary objections. 1 Pa. Commw. at 361. *Folcroft Landfill* involved a landfill operator being sued by the Commonwealth for violations of state environmental laws. *Id.* at 357. The landfill operator asserted laches against the Commonwealth because it alleged it had been operating for eight years, certain state officials assisted the landfill operator in obtaining initial approvals for the project from the local authorities, and the landfill regularly passed state inspections. *Id.* at 358. Despite Navient's rhetorical flourishes urging to the contrary in its Reply, *Folcroft Landfill* is not analogous to the situation here because, according to the parties, the Commonwealth only accredited educational institutions and not lenders, such as Navient's predecessor. (*See* Doc. 25 at 25-26, Doc. 26 at 20-21). If Navient plans to raise laches again in this case, it will have to convince the Court that the undisputed material facts establish the stringent requirements for such an equitable defense.

Because the Court rejects all of Navient's arguments to dismiss Count I, it will deny Navient's motion to dismiss this count.

### 4. FAILURE TO ALLEGE ACTIONABLE CONDUCT IN FORBEARANCE STEERING AND RECERTIFICATION CLAIMS (COUNTS II-V)

Navient raises similar arguments against the Commonwealth's forbearance steering (Counts II & III) and recertification claims (Counts IV & V) under the CPL and CFPA. With respect to the forbearance steering claims, Navient asserts that the Complaint does not

allege that Navient "failed to disclose all material facts regarding the availability of IDR plans, or that Navient failed to comply with any of the extensive federal disclosure requirements regarding IDR plans," just that "borrowers were not provided this information *enough times* or *through a preferred medium* (i.e., by phone)." (Doc. 24 at 27 (emphasis in Navient's Brief in Support)). And, Navient claims, the material facts at issue were disclosed in writing, and so the Commonwealth cannot sustain a CPL claim for "deceptive" conduct. (*Id.*) Similarly, Navient argues that the Commonwealth's claims regarding recertification are legally deficient because federal law authorized Navient to provide disclosures thorough secure email or electronic links, and that the Commonwealth does not explain how borrowers who consented to those types of notifications were deceived by them. (*Id.* at 28). As a result, Navient asserts, the Commonwealth has failed to state an actionable claim for unfair or deceptive conduct under either the CFPA or CPL.

The Commonwealth responds that Navient mischaracterizes its forbearance steering and recertification claims, noting that they are not only about failing to disclose pertinent, material information to borrowers, but that they allege steering borrowers into forbearance and misrepresenting the suitability of repayment options. (Doc. 25 at 26). The Commonwealth additionally argues that nothing in the CPL permits "bait-and-switch marketing" involving fine-print disclaimers. (*Id.* at 27). And the Commonwealth contends that even though federal regulations may permit email notifications, "Navient is still obliged to ensure such notifications are not deceptive." (*Id.*) Navient replies that the

Commonwealth's forbearance steering claims are premised on a failure to provide "IDR-related information by phone, every time a borrower called," and is thus not "a 'bait-and-switch' marketing situation, but rather a claim that a federal loan servicer giving proper written disclosures is nonetheless engaged in 'deceptive' conduct under the CPL." (Doc. 26 at 20).

With respect to both the forbearance steering and recertification claims, the Court agrees with the Commonwealth that Navient has both misconstrued the allegations in the Complaint and the relevant applicable law. Navient's focus on purported compliance with federal disclosure requirements regarding IDR plans misses the thrust of the Commonwealth's claims, which are not predicated on establishing that Navient violated ED disclosure regulations, but instead, whether Navient's conduct constituted an unfair or deceptive act or practice, or, additionally in the case of the CFPA forbearance steering claim, an abusive act or practice. (Doc. 1 ¶¶ 176-89).

At the pleading stage, the forbearance steering and recertification claims state viable claims for relief under the CPL and CFPA. First, the Commonwealth alleges that Navient's purported steering borrowers into forbearance is "unfair" under the CPL (Count II) and "unfair" and "abusive" under the CFPA (Count III). As noted previously, under the CPL, unfair or deceptive acts or practices are those which have the "capacity or tendency to deceive." *Golden Gate*, 194 A.3d at 1023 (quoting *Commonwealth ex rel. Corbett v. Peoples Benefit Servs., Inc.*, 923 A.2d 1230, 1236 (Pa. Commw. Ct. 2007)); *see also CFPB*

*v. Gordon*, 819 F.3d 1179, 1192-93 (9th Cir. 2016) (providing analogous CFPA definition of deception as "(1) 'there is a representation, omission, or practice that,' (2) 'is likely to mislead consumers acting reasonably under the circumstances,' and (3) 'the representation, omission, or practice is material.'" (quoting *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994)). Unfair acts or practices are defined as "caus[ing] or [are] likely to cause substantial injury to consumers which is not reasonably avoidable by consumers . . . and such substantial injury is not outweighed by countervailing benefits to consumers or to competition." 12 U.S.C. § 5531(c)(1)(A)-(B). And, in relevant part, abusive acts or practices are defined as "tak[ing] unreasonable advantage of the reasonable reliance by the consumer on a covered person to act in the interests of the consumer." 12 U.S.C. § 5531(d)(2)(C).

The Commonwealth's forbearance claims are that Navient actively "steered" borrowers into forbearance and misrepresented the suitability of loan repayment options after representing to borrowers that it would help them select the lowest cost repayment plan. (*See* Doc. 1 ¶¶ 108-110, 116, 118, 125-30). The Commonwealth further alleges that this conduct substantially harmed borrowers and that Navient took advantage of the reasonable reliance that borrowers placed on Navient. (*Id.* ¶¶ 181-82). Based on these allegations alone, the Court finds that the Commonwealth has stated a claim under the CPL and CFPA for unfair and abusive conduct. It is simply not necessary for the Commonwealth to have alleged that Navient violated ED disclosure regulations, as Navient argues in its

Brief in Opposition. Finding otherwise would improperly predicate liability under the CPL or

CFPA on an underlying violation of ED disclosure regulations. Additionally, to the extent

that Navient's purported compliance with ED disclosure regulations has bearing on the

Commonwealth's forbearance steering claims, that evidence is not before the Court, and

cannot be considered at the motion to dismiss stage. See Mem. Op. at 49, CFPB v.

Navient Corp., No. 17-cv-101 (M.D. Pa. filed Aug. 4, 2017), ECF No. 57 (refusing to dismiss

similar CFPB forbearance steering unfairness claim because relevant facts not present and

noting "[e]ven assuming [that Navient complied with ED disclosure regulations], dismissing

Count II would require this Court to rule, as a matter of law, that borrowers understood the

disclosures that were made to them so they had reason to anticipate the impending harm

and the means to avoid it") (internal quotation omitted).

Likewise, the Commonwealth's recertification claims in Counts IV and V state

claims for relief under the CPL and CFPA. The recertification claims are essentially that

Navient made a host of misrepresentations to consumers regarding IDR recertifications,

including the date certain to recertify income and the negative consequences for failing to

timely recertify income. (See Doc. 1 ¶¶ 131-48, 183-89). The Commonwealth alleges that

Navient's conduct led more than 60% of borrowers to miss their recertification deadlines

between at least July 2011 and March 2015. (Id. ¶ 145). Borrowers were deceived and

unfairly harmed by Navient's conduct. (Id. ¶¶ 183-89). Contrary to Navient's argument that

the Commonwealth does not explain how consumers were deceived by purportedly ED

compliant electronic notices, the Commonwealth's allegations posit that the bare-bones

notices effectively misrepresented information about IDR recertification deadlines and

consequences for failing to meet those deadlines. (Id. ¶¶ 140-46). The Complaint alleges

that once Defendants made "several enhancements to their email that provides access to

the electronic renewal notice," the recertification renewal rate "more than doubled,"

suggesting that the previous notices failed to provide enough information to borrowers. (Id.

¶ 146). The Complaint also alleges that the postal mail notices Navient sent to borrowers

failed to inform borrowers of material information about their IDR plans and thus were

misleading. (Id. ¶¶ 133-39). Thus, these allegations in Counts IV and V are enough to

state a claim for unfair or deceptive conduct under the CPL and CFPA. Navient's urging to

the contrary based on purported compliance with ED disclosure regulations is not

persuasive to the Court for the same reasons addressed above with respect to the

forbearance steering claims. Only the Commonwealth's allegations and not the actual

disclosures are before the Court at this stage, and Navient again fails to convincingly

explain how compliance with the disclosure regulations would preclude liability under the

CPL and CFPA.[14]

---

[14] Navient's citation in its Brief in Opposition to an ED Notice of Proposed Rulemaking regarding the ED disclosure regulations and that required disclosures can be made through electronic links is unavailing, as it provides nothing more than general guidance regarding the disclosures. (Doc. 24 at 28 (citing 74 Fed. Reg. 36,572)).

### 5. PUFFERY DEFENSE TO FORBEARANCE STEERING CLAIMS (COUNTS II-III)

Navient asserts what is essentially a puffery defense to the Commonwealth's forbearance steering claims in Counts II and III, arguing that "Navient's statements that it would 'work with' borrowers, 'help . . . make the right decision,' and 'help . . . by identifying options and solutions,'" are not specific and measurable claims that are actionable as a matter of law. (Doc. 24 at 29). Additionally, Navient argues that its "general statements are not actionable under the [CPL] because they are 'not likely to make a difference' in borrowers enrollment in IDR plans." (*Id.* (quoting *Commonwealth v. Golden Gate Nat'l Senior Care LLC*, 158 A.3d 203, 222 (Pa. Commw. Ct. 2017)). The Commonwealth responds that the Court has already rejected this argument in the *CFPB-Navient* matter and that the statements "are distinguishable from puffery because they falsely represented specific characteristics of Navient's services," including by stating that Navient would minimize borrowers' total interest cost. (Doc. 25 at 28-29).

It is true that certain statements of "exaggeration or overstatement expressed in broad language" may be non-actionable puffery under the CPL. *Golden Gate*, 194 A.3d at 1023. Recently, in *Golden Gate*, the Pennsylvania Supreme Court summarized the characteristics of puffery:

> There are two basic categories of "puffing" statements. The first involves hyperbolic boasting or bluster that no reasonable consumers would believe to be true; for example, a statement that a weight loss product will cause the pounds to "melt away in the blink of an eye." *See* 5 McCarthy on Trademarks and Unfair Competition § 27:38 (5th ed.). The second category involves claims of superiority over a competitor's product, *id.*, such as statements that a

laboratory imaging device provided "unprecedented clarity," or the advertisement of a product as "the complete sports drink." *See Cytyc Corp. v. Neuromedical Systems, Inc.*, 12 F. Supp. 2d 296, 300-01 (D. Neb. 1998); *Stokely-Van Camp, Inc. v. Coca-Cola Co.*, 646 F. Supp. 2d 510, 526 (S.D.N.Y. 2003). A salient characteristic of statements deemed to be "puffery" is that consumers understand that the statements are not to be taken literally. . . . It is these characteristics – the patently hyperbolic or excessively vague character that dissuades any reasonable consumer from placing reliance thereon as fact – that render puffery non-actionable under the UTPCPL. [citation omitted].

194 A.3d at 1023-24. "Puffery is distinguishable from misdescriptions or false

representations of specific characteristics of a product." *Castrol Inc. v. Pennzoil Co.*, 987

F.2d 939, 945 (3d Cir. 1993). Whether or not a statement is puffery is typically a question of

fact, "except in the unusual case where the answer is so clear that it may be decided as a

matter of law." 194 A.3d at 1023 (citing various federal and state cases).

    At this point, with only the allegations in the Complaint before the Court, it is

inappropriate to dismiss the Commonwealth's forbearance steering counts on the basis that

they are premised on statements of puffery. However, the Court notes that the statements

that Navient appears to argue are problematic do not resemble the type of "hyperbolic or

excessively vague" statements that courts typically find to constitute puffery. The Complaint

alleges that Navient's website "states that forbearance is appropriate for borrowers 'who

have a problem making on-time payments due to a *temporary* financial difficulty'" (Doc. 1 ¶

104 (emphasis in Complaint)), creating the fair implication that forbearance is not

appropriate for those who face a long-term or permanent financial difficulty. (*See also id.* ¶¶

105-06 (detailing negative consequences of extended forbearance)). The Complaint further

alleges that Navient made statements on their website that Navient would "help [borrowers] by identifying options and solutions, so [borrowers] can make the right decision for their situation" and that Navient could "help [borrowers] find an option that fits [their] budget, simplifies payment, and minimizes [borrowers'] total interest cost." (*Id.* ¶ 108). As the Court previously ruled in the *CFPB-Navient* matter, these are specific statements (Navient will help borrowers select the lowest cost, best repayment option for their student loans) that are measurable against a standard (forbearance is only appropriate for those facing temporary financial hardship). *See* Mem. Op. at 47 n.9, *CFPB v. Navient Corp.*, No. 17-cv-101 (M.D. Pa. filed Aug. 4, 2017), ECF No. 57 ("In contrast [to puffery], the case at hand involves the allegation that Navient made a specific statement that it would give a borrower sufficient information to make an informed decision about which repayment plan would be best for his or her situation and then failed to follow through with that promise.")). Thus, the Complaint sufficiently alleges that Navient failed to deliver on these claims by unfairly and abusively steering borrowers into forbearance.[15] (Doc. 1 ¶¶ 125-30 (detailing conduct of Navient customer service representatives), 176-82).

---

[15] Navient does not explain their argument that their "general statements are not actionable under the [CPL] because they are 'not likely to make a difference' in borrowers' enrollment in IDR plans" other than citing to an inapposite part of the Commonwealth Court of Pennsylvania's reversed in part *Commonwealth v. Golden Gate National Senior Care LLC* decision. *Commonwealth v. Golden Gate Nat'l Senior Care LLC*, 158 A.3d 203, 222 (Pa. Commw. Ct. 2017), *rev'd in part,* 194 A.3d 1010 (Pa. 2018). However, as the Court understands Navient's argument, it rejects it because here the Commonwealth has alleged that Navient affected borrowers' repayment plan enrollment decision by actively steering them into forbearance.

### 6. MISTAKE OR ERROR DEFENSE TO PAYMENT PROCESSING CLAIMS (COUNTS VIII-IX)

Navient's final argument is that the Commonwealth's payment processing claims brought under the CPL in Counts VIII and IX are legally deficient because they are based on unintentional mistakes and errors that are not actionable as a matter of law. (Doc. 24 at 29-30). The Commonwealth responds that "wrongful intent is not a required element of a claim under the CPL." (Doc. 25 at 29-30).

The Court agrees. As an initial matter, Navient's argument mischaracterizes Count IX of the Complaint, which is a claim brought under the CFPA for unfair conduct, not a state law claim under the CPL. In the *CFPB-Navient* matter, in evaluating the CFPB's deception claims related to Navient's loan rehabilitation-related conduct, the Court cited numerous other courts in ruling that CFPA claims should not be understood as common law fraud claims, and thus, do not require a showing of intent. *See* Mem. Op. at 55-58, *CFPB v. Navient Corp.*, No. 17-cv-101 (M.D. Pa. filed Aug. 4, 2017), ECF No. 57. Here, the Commonwealth pleads unfair conduct under the CFPA, which, likewise, requires no showing of intent on the part of the plaintiff. 12 U.S.C. §§ 5531, 5536(a)(1) (defining unfair conduct as "the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers . . . and such substantial injury is not outweighed by countervailing benefits to consumers or to competition").

Similarly, the CPL does not require a showing of intent when the Commonwealth pleads unfair or deceptive conduct, as it has done in Count VIII. *See e.g., Golden Gate*,

69

194 A.3d at 1023 ("[n]either the intention to deceive nor actual deception must be proved; rather, it need only be shown that the acts and practices are capable of being interpreted in a misleading way") (quoting *Peoples Benefit Servs., Inc.*, 923 A.2d at 1236). Thus, the Court will deny Navient's motion to dismiss Counts VIII and IX.

## V. CONCLUSION

For the reasons outlined above, the Court will deny Navient's Motion in its entirety. A separate Order follows.

Robert D. Mariani
United States District Judge

70