# Exhibit B

**ATTORNEY GENERAL OF THE STATE OF NEW YORK**

-----------------------------------------------------------------X

        **In the Matter of**

**SLM Corporation,**

                                    **Respondent.**

-----------------------------------------------------------------X

## ASSURANCE OF DISCONTINUANCE

        **WHEREAS** the Office of Attorney General of the State of New York (the "OAG") has commenced an investigation pursuant to Executive Law § 63(12) and General Business Law §§ 349 and 350 into practices related to higher education loans offered to students and parents (the "Investigation");

        **WHEREAS** in the course of the Investigation the OAG reviewed extensive evidence;

        **WHEREAS** SLM Corporation (including its subsidiaries and affiliates, referred to herein as "Sallie Mae") has cooperated in the Investigation by voluntarily producing evidence and answering questions relevant to the Investigation;

        **WHEREAS**, as set forth in the findings of fact ("Findings") below, the OAG asserts that its Investigation has revealed that many institutions of higher education and lenders that provide loans to or on behalf of students of those institutions have engaged in certain acts, practices and omissions that violated Executive Law § 63(12) and General Business Law §§ 349 and 350;

        **WHEREAS**, as set forth below in section I(B), the OAG alleges that Sallie Mae has engaged in certain of the practices that violate these statutes;

**WHEREAS** Sallie Mae does not admit, and expressly denies, that its conduct constituted any violation of law;

**WHEREAS** Sallie Mae has advised the OAG of its desire to resolve the Investigation through this Assurance of Discontinuance (the "Assurance");

**WHEREAS** Sallie Mae, without admitting the OAG's Findings and assertions made below, has agreed to alter its practices with respect to education loans, to make a contribution of $2 million to the OAG's national fund for educating high school seniors and their parents about the financial aid process and to adopt a Code of Conduct for education loan practices, all as set forth specifically below;

**NOW THEREFORE**, the OAG, based upon the Investigation, makes the following Findings:

## I. FINDINGS OF THE ATTORNEY GENERAL

### A. Industry-Wide Findings

The Investigation has covered many lenders and institutions of higher education. Based on the Investigation, the OAG makes the following findings as to common practices found throughout the nation's higher education loan industry. The Attorney General does not allege that Sallie Mae has engaged in each of the industry wide practices, many of which practices do not apply to Sallie Mae.

1. Many students and their families are unable to pay all of the expenses appurtenant to higher education. In addition to grants, scholarships and work-study programs, significant numbers of students and their parents turn to loans to cover what they cannot otherwise afford to pay. Higher education loans constitute an $85 billion per year industry.

2. Higher education loans take several forms. By dollar amount, most loans are borrowed by students themselves and are federally regulated and guaranteed. The federal government has created a program for providing loans, known as "Stafford Loans," to students. The interest rate for Stafford Loans is set by the federal government. Lenders, however, have wide latitude in offering benefits to borrowers, including discounts off of that interest rate.

3. Other federal loans, known as "PLUS Loans" are offered to students' parents to cover higher education expenses incurred by their children and to graduate students. Like Stafford Loans, the federal government sets the interest rates for PLUS Loans, and lenders have wide latitude in offering borrower benefits.

4. In addition to the federal loans described above, parents or students can obtain private "alternative loans" to cover educational expenses not covered by other financial aid. The federal government does not sponsor, subsidize or guarantee alternative loans. Accordingly, the interest rate and other terms of the loans are determined by the borrower's creditworthiness and market forces.

   i. *"Preferred Lender" Lists*

5. In response to the staggering array of lenders that offer each of the various types of education loans, some institutions of higher education have created lists of recommended lenders. Institutions of higher education that use such lists – often referred to and referred to herein as "Preferred Lender Lists" – usually have separate lists for each of the several types of education loans available. In some instances, such Preferred Lender Lists contain dozens of potential lenders that meet certain minimal requirements; in other instances, the Preferred Lender Lists contain only a handful of lenders, or even a single one.

6. The lenders listed on an institution of higher education's Preferred Lender Lists typically receive in aggregate up to 90% of the loans taken out by the institution's students and their parents. Despite the significant role that these lists play in determining the lenders from which students and parents borrow, many institutions did not inform their student and parent borrowers about the process and criteria used to formulate the Preferred Lender Lists. Nor did they disclose the potential conflicts of interest on the part of their financial aid offices, which typically compile the Preferred Lender Lists. These conflicts of interest may arise from: revenue sharing between the institution and the lenders; lender-funded travel on the part of institutions' financial aid officials to attend meetings and seminars in attractive locations; the appointment of the institutions' financial aid officials to "Boards" or "Committees" sponsored by the lenders; and the lenders' provision of staff and services to the institutions; the lenders' provision of "Opportunity Loans." These practices are described below.

*ii.  Revenue Sharing*

7. In the context of the education loan business, revenue sharing refers to an arrangement whereby a lender pays an institution of higher education a percentage of the principal of each loan directed toward the lender from a borrower at the institution. Such payment is often in exchange for the institution of higher education placing the given lender on the institution of higher education's preferred lender lists. Revenue sharing is prohibited by federal regulation in the context of Stafford Loans, PLUS Loans and other federal loan programs; it occurs only in the alternative loan segment of the industry.

8. The practice of revenue sharing creates a potential conflict of interest on the part of the institutions of higher education. When and if the institutions direct students to lenders, the direction should be based solely on the best interests of the student and parents who may take out

loans from the lenders; yet, through revenue sharing arrangements, the lenders encourage the institutions to place lenders in the institution's Preferred Lender Lists because the institutions have a financial interest in the selection of the lenders by the students and parents.

    *iii.*    *Denial of Choice of Lender*

9. Borrowers have a right to select the Stafford Loan and PLUS Loan lender of their choice, irrespective of whether the lender appears on any Preferred Lender Lists. By offering consideration in exchange for exclusive or preferred lender status, lenders encourage some institutions of higher education to abrogate this right, by stating or strongly implying that borrowers were limited to the lenders on the list.

10. In some instances, a lender may contract with an institution of higher education to be the sole name on the institution's Preferred Lender List. In exchange for being the only listed preferred lender, the lender paid money to the institution.

    *iv.*    *Exclusive Consolidation Loan Marketing Agreements*

11. Former students may wish to combine their various education loans into a single package, called a "consolidation loan." Some institutions of higher education have entered into agreements with the providers of such consolidation loans pursuant to which the institution agrees to encourage its former students to consolidate the former students' loans with a particular lender and no other. In exchange, the lender pays money or gives other consideration to the institution. The lender, thus, places the institution in a conflicted position because the institution's advice and encouragement to potential borrowers may be influenced by the money paid or consideration given by the lender.

    *v.*    *Undisclosed Sales of Loans to Another Lender*

12. In many instances, institutions of higher education place several lenders on the institutions' Preferred Lender Lists, leading the potential borrower to understand that the Preferred Lender List represents a real choice of options. But, the choice is illusory when, as sometimes occurs, all or a number of the lenders on a Preferred Lender List have arranged with each other to sell all of their loans to one of the lenders.

    *vi.*    *Opportunity Loans*

13. Lenders have entered into undisclosed agreements with institutions of higher education to provide what are referred to as "Opportunity Loans." These agreements provide that the lender will make loans in the institution's discretion up to a specified aggregate amount to students with poor or no credit history, or international students, who might otherwise not be eligible for the lender's alternative loan program. In exchange for the lender's commitment to make such loans, the institution may provide concessions or promises to the lender that may prejudice other borrowers.

    *vii.*    *Call Centers*

14. Lenders have agreed with institutions of higher education to staff "call centers" that answer the institutions' students' questions regarding financial aid, loans and lenders. The call centers staffed by the lenders may create another conflict of interest: The student should receive disinterested advice and information regarding lenders, but the call center staff members have an interest in advocating on behalf of the lender that pays them.

**B.**   **Findings as to Sallie Mae**

15. SLM Corporation is a publicly-traded holding company, incorporated under the laws of the State of Delaware with its headquarters in Reston, Virginia, that operates through

various subsidiaries. Sallie Mae's primary business is to originate and hold higher education loans in the United States.

16. Sallie Mae sponsored advisory boards comprised of individuals from financial aid offices; Sallie Mae provided remuneration, including but not limited to reimbursement of travel and lodging fees, to the people who served on its advisory boards.

17. Sallie Mae provided personnel to some financial aid offices on a short-term basis at no charge during particularly busy periods. The personnel typically engaged in simple office tasks, such as envelope stuffing and copying.

18. Sallie Mae has contracts with a limited number of schools (approximately 20) pursuant to which Sallie Mae provides call-center services; under these contracts, the Sallie Mae employees staffing these call-centers answer the phone in the school's name. (The program pursuant to which these contracts were signed was called the "Campus Assist Services.").

19. Sallie Mae provided entertainment to personnel at schools with which it does loan business, including reimbursement for travel and lodging to tour Sallie Mae's servicing facilities and operational headquarters.

20. Sallie Mae is listed on the preferred lender lists of many institutions of higher learning. The OAG understands that Sallie Mae paid no referral fees to any institution of higher education.

21. Sallie Mae participates in providing opportunity loans to students at certain schools. At these schools, Sallie Mae makes private loans to credit challenged academically qualified students pursuant to these Opportunity Loan programs.

22. Sallie Mae has contracts to purchase loans from a limited number of schools (approximately 40) that act as lenders to graduate and professional students. Sallie Mae also provides loan origination servicing and loan servicing to those schools.

C. **Violations**

23. The OAG alleges that the acts, practices and omissions set forth in section I(B) on the part of Sallie Mae violated Executive Law § 63(12) and General Business Law §§ 349 and 350.

## II. AGREEMENT

**IT NOW APPEARING THAT** Sallie Mae, while it denies any violation of the laws cited in this Assurance, desires to settle and resolve the Investigation without admitting the OAG's Findings;

**AND IT FURTHER APPEARING THAT** Sallie Mae agrees to accept a Code of Conduct promulgated by the OAG for entities that provide and service education loans;

**NOW, THEREFORE,** the OAG and Sallie Mae hereby enter into the Assurance, pursuant to Executive Law § 63(15), as follows:

A. **Code of Conduct**

  i. *Prohibition of Certain Remuneration to Institutions of Higher Education*

24. Sallie Mae shall not provide, directly or indirectly, anything of value to any institution of higher education in exchange for any advantage or consideration provided to Sallie Mae related to Sallie Mae's higher education loan activity, including but not limited to placement on any institution of higher education's preferred lender list. This prohibition on providing anything of value shall also include, but not be limited to, (i) "revenue sharing" with an institution of higher education, (ii) providing an institution of higher education with any

8

computer hardware for which the institution pays below-market prices, and (iii) providing printing costs or services. Notwithstanding anything else in this paragraph, Sallie Mae may continue to participate in school lender programs that are sanctioned by federal regulations and may provide assistance to an institution of higher education as contemplated in 34 CFR 682.200(b)(definition of "Lender")(5)(i).

    *ii.    Prohibition of Certain Remuneration to Higher Education Employees*

25.    Sallie Mae shall not provide, directly or indirectly, anything of more than nominal value during any 12 month period to any officer, trustee, director, employee or agent of any institution of higher education, except that nothing in this section shall preclude an officer, trustee, director, employee or agent of any institution of higher education, or any family member thereof, from receiving a loan from Sallie Mae in the ordinary course of Sallie Mae's business. Nothing in this paragraph shall prohibit any officer, trustee, director, employee or agent of an institution of higher education, who has no involvement in either the affairs of the institution's financial aid office or in the institution's financial aid decisions, from serving on a Sallie Mae board or advisory body.

    *iii.    Limitations on Lender Advisory Boards*

26.    Sallie Mae shall not provide, directly or indirectly, any remuneration to or reimburse expenses of any officer, trustee, director, employee or agent of an institution of higher education for service on any advisory board of Sallie Mae.

    *iv.    Prohibition of Sallie Mae's Staffing of Financial Aid Offices*

27.    No employee, representative or other agent of Sallie Mae may staff an institution of higher education's financial aid offices at any time where that employee has contact with students other than general debt counseling, such as in exit interviews with students concerning

9

loan obligations they have already incurred. Sallie Mae shall take all appropriate steps necessary to ensure that none of its employees, representatives or other agents is ever identified to students or prospective students of an institution of higher education, or their parents, as an employee, representative or agent of an institution of higher education. With regard to each extant Sallie Mae Campus Assist contract, Sallie Mae may fulfill its obligations under the contract for (i) the duration of the contract or (ii) eighteen (18) months from the date of this Assurance, whichever is shorter, and shall not renew or extend any such contracts. With respect to the extant Campus Assist contracts, Sallie Mae agrees that it will train employees to identify themselves as Sallie Mae employees and not to promote the products of any particular lender, including Sallie Mae. Nothing in this paragraph prevents Sallie Mae from promoting or marketing its products or services to borrowers or potential borrowers and/or providing education and information to students on the options, obligations and issues related to financing their education provided that Sallie Mae does so in its own name.

    *v.*    *Prohibition of Opportunity Loans*

28. Sallie Mae shall not arrange with an institution of higher education to provide any Opportunity Loans as defined above in section I(A)(vi), if the provision of such Opportunity Loans are offered in return for, or in exchange for, a specified loan volume from the institution of higher education or placement on the institution's preferred lender list.

    *vi.*    *Maintenance of Repayment Benefits*

29. If Sallie Mae sells, after the date of this Agreement, any education loan that it has provided, or if Sallie Mae changes the servicer of any loan it has provided, then Sallie Mae shall take all commercially reasonable steps to ensure that all benefits originally available to a borrower (or other benefits substantially identical or better) during the repayment phase of the

loan and the possibility of such benefits, including any benefits that were available but for which the borrower had not yet qualified, will continue to inure to the benefit of the borrower to the same extent as if Sallie Mae had not sold or changed the servicer of the loan.  If Sallie Mae purchases any education loans, it will honor all benefits promised by the seller (or other benefits that are substantially identical or better) to the borrower during the repayment phase of the loan, including the possibility of such benefits.

      *vii.*    *Full Disclosure of Sales of Loans to Another Lender*

    30.    Sallie Mae shall fully and prominently disclose to potential borrowers any agreement between Sallie Mae and any unaffiliated entity to sell loans Sallie Mae may make to such potential borrowers, if such sale results in Sallie Mae no longer servicing such loan.

      *viii.*    *Disclosure at the Request of Institutions of Higher Education*

    31.    Upon the request of any institution of higher education, Sallie Mae shall disclose to the institution, in reasonable detail and form, (i) the historic default rates of borrowers from said institution, and (ii) the rates of interest charged to borrowers from the institution in the year preceding the disclosures and the number of borrowers obtaining each rate of interest.

      *ix.*    *Full Disclosure Of Non-Governmental Status*

    32.    Sallie Mae shall fully and prominently disclose to potential borrowers, by placing a notice on Sallie Mae's website (www.salliemae.com) and in its marketing brochures, that Sallie Mae is a wholly-private institution, and neither affiliated with nor part of the federal government.

**B.**    **Sallie Mae Payment**

    33.    In recognition of the Attorney General's leadership in improving the circumstances under which education financing is made available to college students and consistent with Sallie Mae's commitment to educating the public about the financial aid process,

11

Sallie Mae agrees to donate $2 million to the New York Attorney General's national fund for educating high school seniors and their parents regarding the financial aid process.

### C. Scope of the Assurance

34. Except as provided below, the Assurance concludes the investigation and precludes any action that the OAG could commence against Sallie Mae and its respective current and former officers, trustees and employees for the acts, practices, and omissions listed in section I(B) of the Assurance; provided however, that nothing contained in the Assurance shall be construed to cover claims of any type by any other state agency or any claims that may be brought by the OAG to enforce Sallie Mae's obligations arising from or relating to the provisions contained in the Assurance. The Assurance shall not prejudice, waive or affect any claims, rights or remedies of the OAG with respect to any person, other than Sallie Mae and its current and former officers, trustees and employees, all of which claims, rights, and remedies are expressly preserved, nor shall the Assurance create any rights on behalf of persons not parties to the Assurance.

### D. Cooperation

35. Sallie Mae shall cooperate fully and promptly with the OAG with regard to the Investigation and any related proceedings and actions related to higher education loans. Sallie Mae shall use its best efforts to ensure that all of its officers, directors, employees and agents also fully and promptly cooperate with the OAG in the Investigation and any related proceedings and actions, subject to their individual rights and privileges. Except where prohibited by applicable law, cooperation shall include without limitation:

    (a) Production, voluntarily and without service of subpoena, by Sallie Mae of any information and all documents or other tangible evidence related to education

loan practices reasonably requested by the OAG, and any compilations or summaries of information or data that the OAG reasonably requests be prepared, subject to recognized privileges and protections for confidential information; and

(b) Using Sallie Mae's best efforts to cause Sallie Mae's officers, directors, employees and agents to attend any proceedings related to education loan practices at which the presence of any such persons is reasonably requested by the OAG, and having such persons answer any and all inquiries that may be put by the OAG to any of them at any proceedings voluntarily, and without service of a subpoena, subject to their individual rights and privileges ("Proceedings" include but are not limited to any meetings, interviews, depositions, hearings, grand jury hearing and trial).

36. In the event any document otherwise required to be provided under the terms of the Assurance is withheld or redacted on grounds of privilege, work-product or other legal doctrine, a statement shall be submitted in writing by Sallie Mae indicating: the type of document; the date of the document; the author and recipient of the document; the general subject matter of the document; the reason for withholding the document; and the Bates number or range of the withheld document. The OAG may challenge such claim in any forum of its choice and may, without limitation, rely on all documents or communications theretofore produced or the contents of which have been described by Sallie Mae, its officers, directors, employees, or agents.

37. Sallie Mae shall not jeopardize the confidentiality of any aspect of the Investigation, including sharing or disclosing evidence, documents, or other information with

others during the course of the investigation without the consent of the OAG. Nothing herein shall prevent Sallie Mae from conferring with counsel or consultants or from providing such evidence or information to regulators or as otherwise required by law.

### E. Miscellaneous Provisions

38. The Assurance is entered into Pursuant to Executive Law § 63(15). As such, evidence of a violation of the Assurance by Sallie Mae shall constitute prima facie proof of a violation of Executive Law § 63(12) and General Business Law §§ 349 and 350 in any civil action or proceeding subsequently commenced by the OAG.

39. If Sallie Mae commits a material breach of any of the obligations described herein, the OAG may in its sole discretion terminate the Assurance upon written notice to Sallie Mae. In such event, any statute of limitations or other time-related defense applicable to the subject of the Assurance and any claims arising from or relating thereto are tolled from and after the last execution date of the Assurance and the Assurance shall in no way bar or otherwise preclude the OAG from commencing, conducting or prosecuting any investigation, action or proceeding, however denominated, related to the Investigation, against Sallie Mae or from using in any way any statements, documents or other materials produced or provided by Sallie Mae after commencement of the Investigation, including, without limitation, any statements, documents or other materials provided for purposes of settlement negotiations.

40. The Assurance and any dispute related thereto shall be governed by the laws of the State of New York without regard to any conflicts of laws principles. Sallie Mae consents to, and waives any objection to, jurisdiction and venue in New York State Supreme Court in New York County, New York.

41.  No failure or delay by the OAG in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies provided herein shall be cumulative.

42.  Sallie Mae enters into the Assurance voluntarily.

43.  The Assurance may be changed, amended or modified only by a writing signed by all parties hereto.

44.  The Assurance constitutes the entire agreement between the OAG and Sallie Mae and supersedes any prior communication, understanding or agreement, whether written or oral, concerning the subject matter of the Assurance.

45.  The Assurance shall be binding upon Sallie Mae and its successors, assigns, and/or purchasers of all or substantially all its assets, provided, however, that any successor to Sallie Mae may petition the Attorney General for relief from such undertakings.

46.  The Assurance and its provisions shall be effective and binding only when it is signed by all parties. Sallie Mae will have until August 15, 2007 to implement the provisions of this agreement. Sallie Mae may petition the Attorney General for additional time to implement provisions under this agreement. The Attorney General shall grant that relief for a reasonable time on a showing of good cause for the delay in implementation.

47. The Assurance may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one instrument.

48.  Nothing contained herein shall be construed as relieving Sallie Mae of its obligation to comply with all state and federal laws, regulations or rules, nor shall any of the provisions of the Assurance be deemed permission to engage in any act or practice prohibited by

15

such laws, regulations or rules. In the event that performance of any provision of this Assurance is rendered impossible by any New York or federal law, regulation, or binding directive, such law, regulation, or binding directive shall control. Notwithstanding anything else in this Assurance, Sallie Mae may continue to engage in conduct sanctioned by federal regulations and may provide assistance to an institution of higher education as contemplated in 34 CFR 682.200(b) (definition of "Lender")(5)(i)) and guidance from the Department of Education.

49. The acceptance of the Assurance by the OAG shall not be deemed approval by the Attorney General of any of Sallie Mae's business practices, and Sallie Mae shall make no representation to the contrary.

50. Nothing in this Assurance constitutes an admission of liability by Sallie Mae as to any issue of fact or law. Neither this Assurance no Sallie Mae's agreement to enter into this Assurance may be offered or received into evidence in any action as an admission of liability by Sallie Mae, whether arising before or after the Implementation Date.

51. Unless otherwise provided, all notices as required by the Assurance shall be provided as follows:

To the OAG:

Melvin Goldberg, Assistant Attorney General
Office of the New York State Attorney General
Bureau of Consumer Frauds & Protection
120 Broadway, 3rd Floor
New York, New York 10271
tel. (212) 416-8296
fax. (212) 416-6003

To Sallie Mae:

Robert S. Lavet
Sr. VP and General Counsel
Sallie Mae, Inc.
12061 Bluemont Way, V3410
Reston, VA 20190
703-984-5016
Fax: 703-984-6587

52. Nothing in the Assurance shall be construed to prevent any individual from pursuing any right or remedy at law which any consumer may have against Sallie Mae.

53. Sallie Mae shall submit to the Attorney General, on or before August 15, 2007, or such date after August 15, 2007 to which the parties agree, an affidavit, subscribed to by an officer of Sallie Mae authorized to bind Sallie Mae, setting forth its compliance with the provisions of the Assurance.

**WHEREFORE**, the signatures evidencing assent to this agreement have been affixed hereto on the dates set forth below.

Dated: April 11, 2007

ANDREW M. CUOMO
Attorney General of the State of New York

By: /s/ Benjamin E. Rosenberg
Benjamin E. Rosenberg
Chief Trial Counsel

17

Dated: April 11, 2007

                        **SLM CORPORATION**

                By: _/s/ Robert S. Lavet_
                      Robert S. Lavet
                      Sr. VP and General Counsel, SLM Corporation